SIGAL CHATTAH, ESQ.
Nevada Bar No.: 8264
CHATTAH LAW GROUP
5875 S. Rainbow Blvd., #203
Las Vegas, Nevada 89118
Tel: (702) 360-6200
Fax: (702) 643-6292
Chattahlaw@gmail.com

JOSEPH S. GILBERT, ESQ.
Nevada State Bar No.: 9033
JOEY GILBERT LAW
405 Marsh Avenue
Reno, Nevada 89509
Tel: (775) 284-7700
Fax: (775) 284-3809
Joey@joeygilbertlaw.com
*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| COREY GERWASKI,<br><br>        Plaintiffs,<br><br>vs.<br><br>STATE OF NEVADA ex rel. BOARD OF REGENTS OF THE NEVADA SYSTEYM OF HIGHER EDUCATION, on behalf of the UNIVERSITY OF NEVADA, LAS VEGAS; KEITH WHITFIELD, individually, AJP EDUCATIONAL FOUNDATION INC., A California Non-Profit Corporation, STUDENTS FOR JUSTICE OF PALESTINE-UNLV; NATIONAL STUDENTS FOR JUSTICE OF PALESTINE; NEVADANS FOR PALESTINIAN LIBERATION DOES I-XX and ROE entities I-XX.<br><br>        Defendants. | Case No.:<br><br><br><br><br>**COMPLAINT**<br><br>**JURY DEMAND** |

1

COMES NOW, Plaintiff, COREY GERWASKI, by and through his attorneys of record, SIGAL CHATTAH, ESQ., of CHATTAH LAW GROUP and JOSEPH S. GILBERT, ESQ., of JOEY GILBERT LAW, and hereby alleges and complain against Defendants as follows:

## JURISDICTION AND VENUE

1.       This court has Federal subject matter jurisdiction under 42 U.S.C. § 1983, 42 U.S.C. § 2000d et seq., 18 U.S.C.§ 2333(d) and 28 U.S.C § 1331, 1343.

2.       Venue is proper under 28 U.S.C. § 1391 in the District of Nevada, Clark County, because this claim arose therein.

3.       Every act and omissions alleged herein was done by Defendants and carried out under the color and pretense of state and federal laws, statutes, ordinances, regulations, or customs.

4.       This Court has supplemental jurisdiction over Plaintiff's State law claims pursuant to 28 U.S.C. § 1367(a) because they are part of the same case and controversy described by Plaintiff's Federal claims.

5.       All of the acts or failures to act herein were duly performed by and attributable to all Defendants, each acting as agent, employee, or under the direction and/or control of the others. Said acts or failures to act were within the scope of said agency and/or employment and each of the Defendants and ratified the acts and omissions by the other Defendants. Whenever and wherever reference is made in this Complaint to any acts by Defendants, such allegations and references shall also be deemed to mean the acts of each of the Defendants acting individually, jointly or severally.

/ / /

2

6.     The true names and capacities, whether individual, corporate, associate, or otherwise, of Defendants DOES I through XX, and ROE CORPORATIONS I through XX, inclusive, are unknown to Plaintiff who therefore sues said Defendants by such fictitious names. Plaintiff is informed and believes and thereon alleges that each of the Defendants designated herein as a DOE or ROE CORPORATION is responsible in some manner for the events and happenings herein referred to and damages caused proximately thereby to Plaintiff as herein alleged; that Plaintiff will ask leave of this Court to amend this Complaint to insert the true names and capacities of said Defendants DOES I through XX and/or ROE CORPORATIONS I through XX, when same have been ascertained by Plaintiff together with appropriate charging allegations, and to join such Defendants in this action.

## **PARTIES**

7.     Plaintiff COREY GERWASKI, is currently and at all times relevant herein, residents of the County of Clark, State of Nevada and a student at University Nevada, Las Vegas.

8.     Pursuant to NRS 41.031 (2), to the extent this action is determined to be governed by NRS 41.031 the UNIVERSITY OF NEVADA, LAS VEGAS, ("UNLV") and the BOARD OF REGENTS OF THE NEVADA SYSTEM OF HIGHER EDUCATION ("Board of Regents") in the name of the STATE OF NEVADA are hereby also named.

9.     UNLV is 'a public university that is a constituent of the Nevada System of Higher Education, and was created under the laws of the State of Nevada. It is located in Clark County, Nevada, at the address of 4505 S. Maryland Parkway, Las Vegas, Nevada.

10.     The Board of Regents is an entity created under the laws of the State of Nevada to serve as the governing body for the Nevada System of Higher Education. The Board of Regents

3

conducts its activities in Clark County, Nevada, from its address of 4300 S. Maryland Parkway, Las Vegas, Nevada.

11.     The Nevada System of Higher Education (NSHE) Board of Regents reserves to the President of the University the authority and responsibility for matters of student discipline. This authority is delegated by the President to the Vice President for Student Affairs or his/her designee for the processing of conduct matters, hearings and appeals.[1]

12.     Defendant KEITH WHITFIELD, during all relevant times was an employee of UNL V serving as the President of UNLV as of August 24, 2020. Based upon information and belief, he was and is, a resident of Clark County, Nevada.

13.     That collectively Defendants Whitfield and NSHE shall be named and known herein as "the UNLV Defendants."

14.     Defendant AJP Educational Foundation, Inc. a/k/a American Muslims for Palestine ("AMP") is a 501(c)(3) non-profit corporation incorporated in California with its principal place of business in Falls Church, Virginia.

15.     Defendant Students for Justice in Palestine- UNLV ("SJP-UNLV") is an unincorporated association without a formal principal place of business or publicly identified leadership structure.

16.     Defendant National Students for Justice in Palestine ("NSJP") is an unincorporated association without a formal principal place of business or publicly identified leadership structure. NSJP was founded by AMP to provide it on-campus management and control of hundreds of university chapters of Students for Justice in Palestine ("SJP"). AMP

---

[1] StudentConduct-Code3.pdf (thefire.org)

4

controls NSJP and uses it to operate a propaganda machine for Hamas and its affiliates across American college campuses.

17.     Defendant NEVADANS FOR PALESTINIAN LIBERATION a/k/a Nevadans for Palestinian Human Rights ("NPL") is a self -purported diverse group of organizations and individuals working for Palestinian human rights by organizing activities, educational events and advocacy actions that advance the cause of peace and justice. NPL is not a student organization at UNLV.

18.     This suit targets the longstanding, unchecked spread of antisemitism at the University of Nevada Las Vegas, which, following the October 7, 2023 Hamas attacks, has erupted in on-campus displays of hatred, harassment, and physical violence against Jewish students on campus, and more specifically Plaintiff herein.

19.     Upon information and belief, United States' student and non-student organizations have been infiltrated as proxies for foreign terrorist organizations to wreak havoc on U.S. college campuses and destabilize the United States' domestic tranquility.

**PRELIMINARY STATEMENT**

20.     According to their website, American Muslims for Palestine [AMP] is a grassroots organization dedicated to advancing the movement for justice in Palestine by educating the American public about Palestine and its rich cultural, historical and religious heritage and through grassroots mobilization and advocacy. AMP's fiscal sponsor is AJP Educational Foundation, a 501(c)(3) nonprofit organization.[2]

---

[2] About AMP | AMP (ampalestine.org)

21.     AMP was founded in 2006 and currently has 10 Chapters across the US and is "a leading voice in the Palestinian solidarity movement". *Id*. In August 2021, AMP officially launched an affiliated organization, Americans for Justice in Palestine Action (AJP Action) as a 501(c)(4).

22.     AMP's Chairman Dr. Hatem Bazian, is also a Co-founder of NSJP, which is the student advocacy arm of AMP. Through NSJP, AMP has an expanded platform utilizing students across the United States and social media, as seen below, to perpetuate antisemitic and anti-American propaganda by sowing chaos and destabilization of American College campuses.



23.

24.    Today, though AMP ostensibly operates as its own organization, it uses the corporate status of its fiscal sponsor, AJP Educational Foundation, Inc. ("AJP").[3]

25.    As recently as May 23, 2024, AMP continues to threat American Universities and college students as demonstrated by the following post on Twitter/X:



26.

27.    AMP founded AJP in 2008. AMP and AJP have identical leadership structures and share the same principal place of business in Falls Church, Virginia. AMP's website advertises that it is funded exclusively by domestic donations, but, upon information and belief, AMP can do so only because funds first pass through AJP, a U.S.-based non-profit.

_____

[3] In addition to obtaining revenue from AJP, AMP also received Paycheck Protection Plan loans from the United States government. See AMERICAN MUSLIMS FOR PALESTINE, 2020 ANNUAL REPORT, at 18, https://www.ampalestine.org/educate/publications/2020-annual-report.

28.     The nexus between AMP and its lobbying arm in the United States, AJP, is to wreak havoc on college campuses through the funding of student organizations, like NSJP Chapters on U.S. College campuses, as "boots on the ground" to perpetuate the narrative of foreign terrorist organizations like Hamas, Hezbollah and IRGC.

29.     This intentional destabilization on US College campuses reached a pinnacle level after October 7, 2023.

30.     NSJP was Cofounded by Bazian to provide it on-campus management and control of hundreds of university chapters of Students for Justice in Palestine, including Students for Justice of Palestine- UNLV chapter. ("SJP-UNLV").

31.     It is significant to note, that SJP-UNLV chapter's Registered Student Organization [RSO] Constitution, confirms that while it will comply with NSHE requirements, it does not; their Constitution calls for a "One State Solution", a Palestinian State, demonstrating the perpetuation of genocidal intent of the group.

32.     AMP controls NSJP and uses it to operate a propaganda machine for Hamas and its affiliates across American college campuses to influence, wreak havoc and intimidate Jewish students on university campuses across the Nation.

33.     Like many universities across the Nation, after October 7, 2023, UNLV has also allowed various student and non-student groups to hold protests on campus in complete disregard to its Jewish student population.

34.     Among those groups included are Students for Justice of Palestine, UNLV Muslim Student's Association, and UNLV's Feminist Club.

35.     UNLV has also allowed Non-Student Organizations to join protests on campus, such as Nevadans for Palestinian Liberation, Party for Socialism & Liberation, Fifth Sun Project, Red Desert Collective, Etc.

36.     In 2010, AMP sponsored the first SJP National Convention to unite the various SJP chapters. At the convention, AMP announced the creation of NSJP—AMP's new on-campus sub brand—designed to control the management, financing, and messaging of SJP chapters across the country.[4]

37.     NSJP, through its leadership and recruited grassroots supporters, has regularly (1) identified itself as a supporter of, and sometimes even part of, Hamas and its affiliates' movement; (2) disseminated instructions from Hamas and other Foreign Terrorist Organization; (3) hosted speakers that are Specially Designated Global Terrorists or affiliated with them; and (4) provided direct aid to the same.

38.     AMP's message to college campuses through NSJP is unambiguous: violent attacks are a justified response to Zionism as an idea, to Israel as an entity, and to Zionists as people.

39.     The purpose of this messaging is not only to justify the terrorism of Hamas and its affiliates in Gaza within Western academia and society at large but also to establish an environment where violence against Jews and anyone else associated with Israel could be construed as acceptable, justified, or even heroic.

---

[4] Charles Asher Small et al., Antisemitism Violent Extremism and the Threat to North American Universities: The Contextualization of the National Students for Justice in Palestine, INSTITUTE FOR THE STUDY OF GLOBAL ANTISEMITISM AND POLICY, at 12 (Oct. 2019) [henceforth, "ISGAP 2019"], https://isgap.org/wp-content/uploads/2019/10/NSJP-2019-ISGAP-Report-Long Version.pdf.

**40.**      Rhetoric against law enforcement in the United States is also part of parcel of these organizations and attacks on law enforcement is not only mimicked abroad but also seen in the United States, as confrontations with law enforcement on college campuses was rampant during late April, 2024 and first weeks of May, 2024.





5

<hr />

11

41.     It became clear after October 7, that directives uttered in the Middle East by Terrorist Organizations of Hamas, Hezbollah and IRGC[6], were being carried and organized on U.S. University campuses and University campuses around the world, through student and non-student organizations such as Defendant NSJP.



42.

_____

The U.S. Department of the Treasury claims the Corp has supported several organizations the U.S. deems to be terrorist, including Hezbollah, Hamas, Palestinian Islamic Jihad (PIJ), the Popular Front for the Liberation of Palestine – General Command (PFLP-GC), and the Taliban. *"Fact Sheet: U.S. Treasury Department Targets Iran's Support for Terrorism Treasury Announces New Sanctions Against Iran's Islamic Revolutionary Guard Corps-Qods Force Leadership"* U.S Department of Treasury, 08/03/2010.





**THE STUDENT INTIFADA IS GLOBAL!**

📍 American University in Cairo (AUC): Egyptian students have risen to make their voices clear amidst severe governmental repression. Students, faculty, alumni, and staff have been mobilizing for the past few days to amplify their demands:

1. Boycott AXA Insurance & HP Inc.
2. Full financial transparency
3. Adhere to the BDS list
4. Remove any goods supportive of Israeli apartheid.

Students have made it clear that they will not stop until demands are met! 🇵🇸🇪🇬






30 university encampments across the UK and counting!



3:01 AM · 5/19/24 From Earth · 65K Views

1.1K Reposts  77 Quotes  2.5K Likes  93 Bookmarks

← **Post**

National Students for Justi... ✓
@NationalSJP    [Follow]  ···

📍 Tokyo, Japan

Scores of students at Sophia University join the global student uprising for Gaza, pressing their school to cut ties with Tel Aviv University.



3:36 AM · 5/21/24 From Earth · 95K Views

**402** Reposts  **22** Quotes  **928** Likes  **47** Bookmarks

13

43.      In short, days of rage and directives called on by Ismail Haniyah, Khaled Mishal and Iran's Ayatollah Ali Khamenei, were now being acted out on U.S. college campuses through the leadership and organization of AMP and NSJP.

44.      America's college campuses were being run and taken over by students and non-student organizations, taking direct instructions from foreign terrorist organizations and leaders overseas, all at the costs of innocent students and faculty, who had and have no idea how these things were happening.

45.      It has become clear that foreign terrorist organizations were directly influencing American University policies through the chaotic infrastructure of dissent and upheaval created by AMP and NSJP.

46.      It further became clear that calls for "resistance" made by foreign terrorist organization, were being carried out by University Student organizations and non-student organizations at the request of Hamas, Hezbollah and IRGC leadership, fomenting chaos on campuses across the world.

47.      Every course of chaos and resistance that occurred across American Universities was reciprocally, appreciated and subject to congratulatory messages from foreign terrorist organizations, thereby perpetuating the perceived effectiveness of these student movements.

48.      Among college campuses taken over and overrun by these groups are also Nevada's campuses UNLV and University Nevada Reno.



49.

**50.** University of Nevada Las Vegas has allowed antisemitic rhetoric to run rampant on campus dating back to 2018 and has failed to protect their Jewish student population having allowed both antisemitic student and non-student organizations allowed on campus to intimidate, harass, assault their Jewish student population, without any substantive efforts to mitigate this hateful conduct, which violates UNLV's own policies against same.

**51.** Within hours of Hamas's October 7 attack, Hamas leader Ismail Haniyeh called for Hamas's "resistance abroad" to "join this battle any way they can." He also stated, "[l]et us be partners in creating this great victory, inshallah."

52.     Three days later, Mr. Mashal—the leader of Hamas's diaspora office and founder of the Islamic Association of Palestine (IAP)—called on Hamas's global supporters to be "part of this battle."[7] IAP is Hamas' public voice in the United States.

53.     Former Islamic Association of Palestine staffers and members were founding members of the Council on American-Islamic Relations (CAIR). (CAIR) is a Muslim "civil rights and advocacy group", headquartered on Capitol Hill in Washington, D.C. CAIR's stated purpose is to promote social, legal and political activism among Muslims in America.

54.     It is also clear that there is a large deeply intertwined network of pro-Hamas organizations in the United States, who have anchored themselves onto college campuses across the Nation as seen below.

55.     The mobilization of thousands of students across the United States campuses, on directive of Foreign Terrorists Organizations was not only happening in plain sight, it was happening through coordination of antisemitic and anti-American organizations existing and doing business in the United States.

56.     These Pro-Hamas organizations use buzzwords like "colonialism" "oppressors" "solidarity with…" and "liberation from" "apartheid regime" among others to describe both Israel and U.S. policies and garner support from students and universities across the Nation.

57.     The vernacular across campus protests became more pointed at the purported plight of Gazans after October 7, 2024, with student and non-student organizations organizing in

---

[7] Former Hamas Leader Khaled Mashal Calls For 'Friday of The Al-Aqsa Flood': Muslims Should Take to The Streets Worldwide, Join the Battle; The West, America, Zionists Will See Convoys of Mujahideen on Their Way to Palestine, MEMRI TV (Oct. 10, 2023), https://www.memri.org/tv/fmr-hamas-leader-calls-muslims-world-join-battle-palestine.

opposition to "Israeli- occupation of Gaza" and a movement to end the "Zionist apartheid regime" in "Palestine".

58.     Signs on and off campuses were splashed with the words "From the River to the Sea", posters of watermelons[8] were displayed, along with the Palestinian flags, and other symbolic signs.

59.     Within hours of the attack, the language of the Hamas-authored disinformation campaign appeared in NSJP propaganda across social media and on college campuses. Exactly as AMP intended, NSJP acted as Hamas' loyal foot soldiers for Hamas's propaganda battle on university campuses across the United States. The next day, NSJP released its Day of Resistance Toolkit ("NSJP Toolkit")[9] across more than 300 American college campuses and on the internet.

60.     The Toolkit, literally, was an instruction manual including the following pictures as guidelines for online media distribution whereby student organizations would simply use Canva to modify the prototype provided by NSJP, and subsequently blast it out on social media networks, such as Facebook, Instagram, Twitter, Snapchat, Tik Tok.

---

[8] The watermelon is a symbol of Palestinians' public expression of the struggle against Israeli occupation of the Palestinian territories. The colors of a watermelon capture the similar colors of green, black and red of the Pan-Arabian flag.

[9] DAY-OF-RESISTANCE-TOOLKIT.pdf (imgix.net)



**61.** The NSJP Toolkit uses the euphemism "the resistance" and similar phrases to refer Referred to as Operation Towfan Al-Aqsa (Al-Aqsa Flood).

**62.** Immediately thereafter, SJP-UNLV and NPL had coordinated their "day of rage" hosting a variety of off campus protests initially in downtown, Las Vegas in accordance with directives issued by Hamas.

**63.** Subsequently SJP-UNLV coordinated with non-student groups to facilitate antisemitic protests on UNLV's campus with other non-student organizations such as NLP, the Fifth Sun Project, and Red Desert Collective, among others, in clear advancement of carrying out NSJP's and Hamas' instructions in Las Vegas.

64.     These organizations worked in unison with SJP, taking instructions from NSJP to wreak havoc on UNLV's campus with antisemitic protests commencing on October 19, 2024 and continuing to present day.

65.     The NSJP Toolkit is a direct response to Hamas's "call for mass mobilization" issued the day prior. In it, NSJP demands its members and allies "not only support, but struggle alongside our people back home … and above all normalize and support our fearless resistance."

66.     To do so, the NSJP Toolkit puts forth a strategy to "normalize the resistance," Hamas, by arguing that Liberation is not an abstract concept. . . . [L]iberating colonized land is a real process that requires confrontation by any means necessary. In essence, decolonization is a call to action . . . It calls upon us to engage in meaningful actions that go beyond symbolism and rhetoric. Resistance comes in all forms—armed struggle, general strikes, and popular demonstrations. All of it is legitimate, and all of it is necessary. (emphases added)

67.     The NSJP Toolkit thus compels Defendants, their members, and their allies to provide "real" support to Hamas not only through their arguments and rhetoric, but also through "confrontation" that includes, among other things, "armed struggle" and violence.

68.     At UNLV, SJP-UNLV has incorporated not only NPL to join "the resistance" on UNLV's campus but also the collateral groups of Fifth Sun Project[10] and Red Desert Collective[11], to "stand in solidarity" against "Zionist colonialization".

69.     Immediately after describing the Unity Intifada, NSJP confirmed it was "PART of this movement, not in solidarity with this movement."[12] Again, only Hamas operates a "unified

---

[10] The Fifth Sun Project is a small WOC-Led Group Focused on Cultural Awareness, Indigenous Activism, Raising Funds & Support for our Community. Fifth Sun Project (uuclv.org)
[11] A working class organization based in occupied Paiute land! Red Desert Collective | Substack
[12] The Resistance News Network Telegram Chat

command" in Gaza. There is no ambiguity: Defendants identify themselves as not just aligned with Hamas's terrorist activities, but "PART of" them with a clear intent to mobilize and wreak havoc on UNLV's campus and off it in the streets of Las Vegas.

70.     The NSJP Toolkit was distributed to prepare and organize a "Day of Resistance" to support Hamas's terrorist activities. NSJP intentionally avoids acknowledging Hamas's most despicable crimes—the rape, kidnap, and the slaughter of innocent civilians—and simply declares that "[s]ettlers are not 'civilians'" and therefore can be murdered in cold blood.

71.      The NSJP Toolkit further provides graphics and advertisements for SJP Chapters and allies to use that includes images of paragliders, which references how Hamas infiltrated the Nova Festival.

72.     Neither Hamas, nor any other terrorist organization, had ever used paragliders to commit a terrorist attack until October 7—just one day before NSJP provided the graphic.

73.     The NSJP Toolkit further requests member organizations endorse the "Toofan Al Aqsa Statement"[13] The statement, analogous to the NSJP Toolkit, declares its "unwavering support of the resistance in Gaza and the broader occupied Palestinian lands" and encourages Hamas and its affiliates to continue killing and taking hostages.

74.     Many of Defendants' affiliates signed the Toofan Al-Aqsa Statement, which declares "[w]e honor Palestinians who are working on the ground on several axes of the so-called 'Gaza envelope' alongside our comrades in blood and arms, and what is coming is greater. Victory or martyrdom."

---

[13] Hamas and other Palestinian armed groups named the attacks Operation Al-Aqsa Flood (or Deluge; <u>Arabic</u>: عملية طوفان الأقصى, <u>romanized</u>: ʿamaliyyat ṭūfān al-ʾAqṣā, usually romanised as "Tufan Al-Aqsa" or "Toofan Al-Aqsa")

**75.**     Foreign terrorist organizations also pledged their support to "Toofan Al-Aqsa" issuing statements such as" that your mujahideen brothers all over the world stand with you [Hamas] in single file in the same trenches. We are with you [Hamas] and we testify to God that we will not let you down as long as our hearts are beating, until victory is achieved. Tufan Al-Aqsa will undoubtedly be the etched in the history of Islamic battles of our nation."[14]

**76.**     Al-Shabaab's statement concurred, "While your fellow mujahideen in East Africa bless the battle in the land of Palestine, we promise that we will not turn away from sacrificing in your name and cause … if there is a way to support you, we shall not delay nor hold back."

**77.**     Meanwhile in the United States, Defendants' violence and terror at UNLV is a direct instruction from overseas terror organizations codified in the NSJP Toolkit.

**78.**     The acts of these organizations working in unison, to perpetuate Hamas propaganda at UNLV against UNLV's student body was a coordinated effort as demonstrated by deliberate acts at UNLV, right after calls to action by Hamas and Iranian Revolutionary Guard Corps ("IRGC") officials.

**79.**     The NSJP Toolkit directed Defendants' members and allies "to engage in meaningful actions that go beyond symbolism and rhetoric" to include all potential forms of resistance, including "armed struggle" and violence.

**80.**     Hamas itself echoed those same calls. For example, on December 5, 2023, in an interview on Al-Aqsa TV (Hamas-Gaza), a senior Hamas official, Sami Abu Zahri, called on Hamas's allies in the United States to engage in domestic terrorism to support Hamas's terrorist activities.

---

[14] Al Qaeda Leadership

81.     Defendants' encouragement of its members, affiliates, and allies to join the "resistance"—again, a euphemism for Hamas itself—is not mere speech or advocacy. Rather, Defendants encouraged their members to exert political pressure on American institutions and politicians, in service of Hamas's goals. The chaotic images emerging from American campuses are the intended result of Defendants' endeavors.

82.     In short, Defendants act as Hamas's public relations division and recruit students as domestic foot soldiers not only to disseminate Hamas's propaganda but also to foment violence, chaos, and fear across the United States and at UNLV to intimidate students and faculty and coerce change in American policy.

83.     This is all in support Hamas's, Hezbollah and IRGC's short and long-term goals for its international terrorist activities, using and recruiting American students on American University campuses to perpetuate a terrorist agenda to sow chaos domestically in the United States.

84.     Defendants organized "Day of Resistance" riots and protests for many SJP chapters, including University of Nevada Las Vegas, to coincide with Hamas's proclaimed "Day of Rage" for its supporters in Gaza and the West Bank on October 13, 2023 (which would be late in the evening on October 12, 2023, in many parts of the United States).

85.     As demonstrated below, every call to action by Hamas, is equally mirrored and reciprocated with a call to action at UNLV, held by NSJP and SJP-UNLV along with other student and non-student organizations they collaborate with to wreak havoc on UNLV's campus.

86. Similarly, these acts of resistance at UNLV by SJP-UNLV called for days of rage often for the purpose of terrorizing Jewish Students on campus.



87. The collaboration between UNLV and SJP-UNLV to allow the SJP-UNLV to "express" their indignation under the First Amendment, at the expense of Jewish students was on unprecedented levels and never seen before by Jewish students.

88. UNLV allowed stickers and posters supporting intifada on the University campus without even bothering to remove or even attempting to remove these antisemitic messages targeting Jewish students.







**89.**

**90.**    A slingshot and messaging of David & Goliath with a Palestinian flag with

Intifada Continues displayed on garbage cans on UNLV's Campus. A sign plastered on UNLV

Student Union with a Palestinian flag.

24

**91.** Even after the days of resistance called by AMP to UNLV's SJP Chapters, the narrative continued with attacks even at Defendant Whitfield, citing "Where is your concern for Palestinians President Whitfield"



**92.**

**93.** Defendants continue to provide crucial ongoing public relations services to Hamas to generate support for its ongoing terrorism. As a sanctioned Foreign Terrorist Organization, Hamas is prohibited from hiring an American public relations firm. Defendants fill this critical gap by providing invaluable communication services that Hamas cannot receive or pay for elsewhere in the United States.

**94.** On January 21, 2024, Hamas issued a document in English, *Our Narrative— Operation Al-Aqsa Flood,* explaining how the protests and slogans of the American students in the

wake of October 7, have renewed and reinvigorated the goals of Hamas to completely destroy Israel.[15]

95.     Defendants do not just parrot Hamas's talking points. Indeed, Hamas has regularly adopted Defendants' propaganda language and framing. For example, by October 2023, Hamas's Political Bureau, in English, expressly adopted NSJP's position that not only hostage taking, but "everything we do, it is justified."

96.     Further, Defendants consistently respond to Hamas and its allies' calls for mass protests and support as seen across the Nation on U.S. college campuses.

97.     Defendants, as if on command, mimic whatever calls Hamas leadership makes, on college campuses across the Nation including UNLV. Hamas leadership has been clear to reciprocate and regale Defendants for said compliance.

98.     On March 30, 2024, Mr. Barakat gave another interview with Al-Manat TV (Hezbollah-Lebanon) in which he explained that the protesters in the West, with their chants to "Free Palestine from the River to the Sea," are providing popular, political, and media support for the armed resistance.[16]

99.     On March 30, 2024, the Iranian Revolutionary Guard called for a "an economic blockade across four continents in solidarity with Palestinians" to take place on April 15, 2024.

---

[15] Hamas Leader Abroad Khaled Mashal: 'We Reject the Two-State Solution; October 7 Proved That Liberating Palestine from The River to The Sea Is Realistic and Has Already Begun', MEMRI TV (Jan. 22, 2024), https://www.memri.org/reports/hamas-leader-abroad    khaled-mashal-we-reject-two-state-solution-october-7-proved-liberating.

[16] Canada-Based Former Senior PFLP Official Khaled Barakat on Hezbollah TV: American and Canadian Protesters Support Armed Resistance, Elimination of Israel; BDS Serves the Armed Resistance, But Cannot Substitute It, MEMRI TV (Apr. 5, 2024), https://www.memri.org/reports/canada-based-former-senior-pflp-official-khaled-barakat Hizballah-tv-American-and-Canadian.

**100.**     Local AMP and SJP chapters across the United States parroted the "Strike4Gaza" materials and made identical calls for mass disruption of American infrastructure on April 15, 2024.

**101.**     It is clear that once Foreign Terrorist Organizations including IRGC make their call to action abroad, that precise call to action is carried out in the United States, across college campuses herein, and more specifically, here at UNLV.

**102.**     On April 15, 2024, "Strike4Gaza" protests erupted across American cities and, just as the IRGC called for, created an "economic blockade" disrupting American economic and transportation centers, such as the Golden Gate Bridge, the Brooklyn Bridge, Chicago-O'Hare International Airport, and the New York Stock Exchange. Again, Defendants attacked—and recruited others to attack—American citizens, institutions, and systems to foment a culture of fear to, with the aid of the IRGC, provide material support to Hamas.

**103.**     Likewise, SJP-UNLV parroted their message and posted the following call to action for April 15, 2024 calling for an economic boycott at UNLV, specifically titled "Take Action- Strike for Gaza- Monday April 15, Tax Day-

- Take Money out of banks

- Buy Nothing

- Call in sick to work

- We're sick of genocide

- Donate to bail people out of jail; Donate to families in Gaza

- Disrupt the local economy! We call on all people of conscience in the US to close businesses call off work, walk out of school and join any local actions.



**104.** The law distinguishes between those who engage in independent advocacy and those who are providing a service to Foreign Terrorist Organization and what Defendants are doing at UNLV are carrying out the directives of Foreign Terrorists Organizations.

**105.** Defendants and UNLV have fostered an environment that does not just assist Hamas, IRGC and Hezbollah but see themselves as part of the movement Hamas controls—the same movement that terrorizes Jewish students at UNLV and continues to attack and terrorize them to this day.

**106.** Defendant have openly created a racially hostile environment where Jewish students are and were subjected to repeated racial slurs and threats and being shamed and humiliated on the basis of their race.

**107.**   Defendants have continuously fomented such a hostile environment for Jewish students such that the harassment is so severe, pervasive, and objectively offensive while UNLV maintains its deliberate indifference regarding same.

**108.**   The assistance Defendants provide to Hamas through their propaganda at UNLV is material, critical, systematic, and of significant monetary value. In fact, Defendants' substantial assistance is invaluable. Hamas is unable by law to retain public relations services in the United States, but through these continued protests of non-student organizations at the University, is the greatest free public relations campaign in the State.

**109.**   Court intervention is now needed to protect students and faculty and to end this antisemitic discrimination and harassment, which violates University policy, federal civil rights laws, and the U.S. Constitution.

**110.**   Although, several of UNLV's public Administrators have made public statements against the antisemitic behavior that has plagued the University, ultimately, they have failed to take any concrete remediation to mitigate the lack of safety Jewish students are faced with on campus.

**111.**   Instead, Defendant Whitfield continues to entertain antisemitic groups and substantiate legitimacy to their hateful behavior.

**112.**   Jewish students on campus have been forced to disavow an integral component of their Jewish identity or be denied the same rights and opportunities enjoyed by other members of the campus community.

**113.**   UNLV by and through its agents and faculty have fostered an environment where antisemitism, harassment and the demonization of Jewish students is a legitimate and acceptable

behavior on campus, whether or not perpetrated by Anti-Israel student campus organizations or other non-student organizations given a platform at UNLV.

114.     It has been UNLV's position that Anti-Zionistic rhetoric is acceptable as free speech on campus, deliberately conflating the notion that Anti-Zionism is not Antisemitism and therefore, a political policy subject to legitimate public discourse.

115.     Anti-Zionism is discrimination against those who recognize the Jews' ancestral heritage—in particular the Jews' historic connection to the land of Israel and the right of the Jewish people to self-determination in their ancestral homeland—as key components of their Jewish identity.

116.     The United States, along with at least forty-two other nations, has recognized that demonizing, delegitimizing and applying a double standard to Israel—all forms of anti-Zionism that are distinct from criticism of the State of Israel or opposition to the policies of the Israeli government—are forms of anti-Semitism.

117.     In spite of the recognition of anti-Zionism as a form of antisemitism, UNLV continues to allow students and non-student organizations on campus to verbally assault, harass, humiliate and demonize Jewish students on campus.

118.     Plaintiffs seek this Court's intervention to set things right by requiring Defendants to enforce UNLV policies in an evenhanded way, prohibit discrimination and bias as required by law, and treat Jewish students, faculty, and invited speakers in the same manner as their non-Jewish counterparts.

119.     The Fourteenth Amendment to the United States Constitution affords Plaintiff the right to equal protection under the laws.

120.    Defendants violated Plaintiff's right when they, under color of state law, carried out customs and/or policies and/or practices and usage of deliberate indifference and tolerance for discrimination, carried out on the basis of race, failed to protect Plaintiff and prohibit the discriminatory conduct.

121.    Title VI of the Civil Rights Act of 1964, as codified in 42 U.S.C. § 2000d et seq., mandates that no person shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance, and that Defendants protect Plaintiff and other similarly situated students, by prohibiting the same.

122.    Defendants were negligent and acted with deliberate indifference, when they, under color of state law, condoned, ratified, and carried out the prohibited conduct, and denied Plaintiff of his rights, benefits, and participation in their programs and activities.

123.    Defendants were negligent and acted with deliberate indifference when they, under color of state law, condoned and tolerated a hostile and offensive environment where discriminatory acts and expressions were carried out against Plaintiff, causing harm.

124.    Defendants were negligent and acted with deliberate indifference, when they, under color of state law, breached and failed in the performance of their duties.

125.    Defendants' negligent actions, and their deliberate indifference to Plaintiff, shocks the conscience and demonstrates a discriminatory and dangerous environment Plaintiff and other Jewish students found on campus at UNLV.

126.    Since at least September 2004, it has been the policy of the Office of Civil Rights ("OCR") of the U.S. Department of Education ("DOE") to investigate Title VI complaints against universities related to antisemitism. In an October 26, 2010 letter to federally funded

31

schools, OCR confirmed that such schools are "responsible for addressing harassment incidents about which [they] know[] or reasonably should have known," and must address "anti-Semitic harassment," stating that such harassment violates Title VI when it creates a "hostile environment" based on "actual or perceived shared ancestry or ethnic identity as Jews," in which "the conduct is sufficiently severe, pervasive, or persistent so as to interfere with or limit a student's ability to participate in or benefit from the services, activities, or opportunities offered by a school," or when the "harassment is encouraged, tolerated, not adequately addressed, or ignored by school employees." OCR further clarified that schools must take "immediate and appropriate action to investigate" harassment claims and "must take prompt and effective steps reasonably calculated to end the harassment, eliminate any hostile environment and its effects, and prevent the harassment from recurring."

127.    In December 2019, President Donald Trump issued Executive Order 13899 on "Combating Anti-Semitism," directing the executive branch to enforce Title VI against discrimination "rooted in anti-Semitism as vigorously as against all other forms of discrimination prohibited by Title VI," and in doing so, to consider the definition of antisemitism promulgated by the International Holocaust Remembrance Alliance ("IHRA"), an intergovernmental organization comprised of thirty-five member countries. On January 4, 2023, DOE, citing the "rise in reports of anti-Semitic incidents," released a fact sheet, "Protecting Students from Discrimination Based on Shared Ancestry or Ethnic Characteristics," which reiterates that Title VI protects "students who experience discrimination, including harassment, based on their . . . (i) shared ancestry or ethnic characteristics; or (ii) citizenship or residency in a country with a dominant religion or distinct religious identity."

128.    According to the Anti-Defamation League (ADL), "Zionism is the movement for the self-determination and statehood for the Jewish people in their ancestral homeland, the land of Israel." [17]

129.    Anti-Zionism is discriminatory and antisemitic when expressed in terms of, for example: applying double standards not applicable to other countries or peoples in assessing Israel's legitimacy and conduct; denying the Jewish people's right to self-determination or the right of the State of Israel to exist; denying that Israel has the right to self-defense against terrorism, invasion, or the murder, rape, and kidnapping of its citizens; accusing Israel of being inherently racist or comparable to the Nazis; or invoking classic antisemitic canards against Israel and its people.

130.    Zionism, which reflects the Jews' ancestral heritage and deep connection to Israel, is integral to the religious, national and/or ethnic identity of most Jews. "The vast majority of Jews around the world feel a connection or kinship with Israel, whether or not they explicitly identify as Zionists, and regardless of their opinions on the policies of the Israeli government." [18]

131.    It has become commonplace among persons seeking to disguise their anti-Semitism to use the word "Zionists" to mean Jews, while at the same time arguing (incongruously) that Zionism is merely a political viewpoint.

A.    **UNLV STUDENT CODE OF CONDUCT**

132.    UNLV's Office of Vice President of Student Affairs issued a Student Code on Conduct which specifically delineates the acceptable and unacceptable conduct by students and includes "[T]o maintain an effective campus environment, each member of the campus

---

[17] Zionism, ANTI-DEFAMATION LEAGUE, https://www.adl.org/resources/glossary term/Zionism
[18] Zionism, ANTI-DEFAMATION LEAGUE, https://www.adl.org/resources/glossary-term/zionism

community is strongly encouraged to notify appropriate officials of any violation of the Code and to assist in its enforcement. As citizens of the larger community in which the "University" is located, students/student organizations have all the responsibilities and rights that are incumbent upon any citizen. The University is concerned with what happens to students/student organizations and holds students/student organizations responsible for their own actions. Students/student organizations are subject to the University's internal disciplinary procedures, i.e., the "Code", and also, when applicable, to local, state, and federal laws.

**133.** The Code of Conduct also prohibits the following acts.

- Disrupting classroom activity, University functions, and/or the operations of the University by an action or combination of actions that unreasonably interfere with, hinder, obstruct, or prevent the right of others to freely participate in an activity, program, or service of the University. *Id.* III, K.
- Threatening, assaulting, or causing physical harm to oneself or to another. Uttering any words or performing any acts that cause physical injury, or threaten any individual, or interfere with any individual's rightful actions, including but not limited to the following:

  1. words or actions that would cause an individual to fear for his or her immediate safety.

  2. the use of physical force against an individual.

  3. repeatedly contacting another person when the contact is unwanted.

  *Id*. III,Q

- Harassment, which is any verbal, visual, electronic, or physical conduct that is sufficiently severe, and/or ongoing that it adversely affects, or has the purpose or logical consequence of interfering with any student's educational program; or creates an intimidating, hostile, or offensive environment within the University community. Harassment can include, but is not limited to, the above behaviors towards any person because of race, ethnicity, religion, gender, sexual orientation/identity, age, creed, national origin, disability, veteran status, or on any other basis.

  *Id.* III, S

**134.** UNLV's Student Code of Conduct also specifically delineates the conduct of student organizations and provides:

Any recognized student group or organization may be charged with violations of this Code. Any University-recognized student group or organization may be held accountable for the actions of any of its members if the violation of the Code is in any way related to the group or organization. Group misconduct need not be officially approved by the entire membership in order to be considered grounds for possible conduct action towards the organization.

**B.     SUPPORT FOR HAMAS AND ANTISEMITISM GROWS AT UNLV AND IS FOSTERED BY THE UNIVERSITY**

135.     In 1987, after starting the "First Intifada"—a murderous string of terrorist attacks directed at both innocent civilians and Israeli soldiers alike—the Gaza branch of the International Muslim Brotherhood splintered into a new terrorist group: Hamas.

136.     Hamas rejects Israel and the notion of secular Arab or Palestinian rule. In turn, Hamas advocates, supports, and directly engages in terrorism as part of its aim to—through "jihad"—destroy Israel and, in its place, install an Islamic state under Sharia law "from the [Jordan] River to the [Mediterranean] Sea."

137.     Hamas relies on terrorism, propaganda, and falsehoods to demonize Israel and cast itself and its members as victims of a mythical "settler-colonial" oppressor image of Israel and the Jewish people.

138.     Antisemitism is a core tenet of Harakat al-Muqawama al-Islamiya, known by its Arabic acronym, Hamas—an extreme Islamist terrorist group explicitly committed to the destruction of Israel and its Jewish inhabitants, the creation of an Islamic state in Israel's place, and the annihilation of all Jews around the world. Hamas's 1988 charter states: "The Day of Judgment will not come about until Muslims fight the Jews and kill them."

139.     In October 1997, the U.S. State Department designated Hamas, which has controlled Gaza since 2007, a Foreign Terrorist Organization.

**140.** In keeping with its charter and goals, since its inception, Hamas has carried out numerous indiscriminate terror attacks on Israeli civilians, including bombings, rocket barrages, shootings, and stabbings, including during two so-called "Intifadas" against Jews in Israel.

**141.** During the Second Intifada, from approximately September 2000 through February 2005, Hamas claimed responsibility for over fifty suicide bombings.

**142.** On October 7, 2023, Hamas launched an unprovoked surprise attack on Israel, engaging in depraved acts of murder, torture, rape, violence, and kidnapping against Israeli citizens. Thousands of armed terrorists invaded southern Israel, while others launched thousands of rockets toward Israeli civilians. Once inside Israel, the terrorists, acting as well-armed death squads, dispersed into Israeli towns shooting, raping, torturing, burning, and mutilating unarmed civilians, including infants, children, and the elderly, taking hundreds of hostages and engaging in mass murder and rape at a music festival near Gaza's border with Israel.

**143.** On October 7, 2023, Hamas had killed 1,200 people and abducted over 200 more including American citizens, still being held by Hamas as hostages.

**144.** Since then, senior Hamas officials have hailed the slaughter and vowed that October 7 was "just the first time, and there will be a second, a third, a fourth," promising another "October 7, October 10, October one-millionth" until the complete annihilation of Israel.

**145.** Shockingly, numerous students and faculty members at UNLV celebrate, justify, and excuse Hamas's mass rape, murder, and kidnapping. Many have resorted to harassment and even violence against Jewish students in support of Hamas's attack and in condemnation of Israel's defensive response. UNLV faculty members and Administration publicly support these students and oppose even the smallest measures to combat UNLV's antisemitism.

36

**146.** These faculty members and students falsely accuse the "Israeli regime" of: committing "genocide" and "ethnic cleansing" (even though the Arab population of Gaza has more than quadrupled since 1967); creating an "open-air prison" in Gaza (even though Israel completely removed itself in 2005 from Gaza, which also shares a border with Egypt); and "apartheid" (even though all citizens in Israel enjoy equal rights).

**147.** Further evidencing the antisemitic nature of their activities, these students and the faculty members who support them do not condemn or rally against such countries.

**148.** Additionally, UNLV has allowed non-student organizations like Nevadans for Palestinian Liberation, Red Desert Collective and Fifth sun Project to attend student rallies and harass UNLV's students.



**149.**

## C.   FEDERAL MANDATES, THE IHRA AND IDENTIFYING ANTISEMITISM

**150.** The International Holocaust Remembrance Alliance ("IHRA")—whose member states include the United States—recognizes that Zionism (connection to the Jewish State of Israel) cannot be separated from the identity of most Jews. On May 26, 2016, the IHRA adopted

a working definition of anti-Semitism (the Definition) that covers acts "[d]enying the Jewish people their right to self-determination, e.g., by claiming that the existence of a State of Israel is a racist endeavor." [19]

**151.** The IHRA Definition has been adopted or endorsed by 43 United Nations (UN) member states, including the United States. [20] (last visited Nov. 27, 2023).

**152.** The IHRA definition of antisemitism provides, among other things, that the following are "contemporary examples of antisemitism":

- "Calling for, aiding, or justifying the killing or harming of Jews in the name of a radical ideology or an extremist view of religion";

- "Making mendacious, dehumanizing, demonizing, or stereotypical allegations about Jews as such or the power of Jews as collective—such as, especially but not exclusively, the myth about a world Jewish conspiracy or of Jews controlling the media, economy, government, or other societal institutions";

- "Accusing Jews as a people of being responsible for real or imagined wrongdoing committed by a single Jewish person or group, or even for acts committed by non-Jews";
- "Denying the fact, scope, mechanisms (e.g. gas chambers) or intentionality of the genocide of the Jewish people at the hands of National Socialist Germany and its supporters and accomplices during World War II (the Holocaust)";

- "Accusing the Jews as a people, or Israel as a state, of inventing or exaggerating the Holocaust";

- "Accusing Jewish citizens of being more loyal to Israel, or to the alleged priorities of Jews worldwide, than to the interests of their own nations";

- "Denying the Jewish people their right to self-determination, e.g., by claiming that the existence of a State of Israel is a racist endeavor";

- "Applying double standards by requiring of [Israel] a behavior not expected or demanded of any other democratic nation";

- "Using the symbols and images associated with classic antisemitism (e.g., claims of Jews killing Jesus or blood libel) to characterize Israel or Israelis";

---

[19]   https://www.holocaustremembrance.com/resources/working-definitions-charters/working   definition-antisemitism

[20] https://www.holocaustremembrance.com/resources/working definitions-charters/working-definition-antisemitism/adoption-endorsement

- "Drawing comparisons of contemporary Israeli policy to that of the Nazis"; and
- "Holding Jews collectively responsible for actions of the state of Israel."

153.    On November 4, 2022, the U.S. Department of State (under President Biden's leadership) reaffirmed its commitment to the IHRA Definition. It explained: The United States unequivocally condemns antisemitism and views the International Holocaust Remembrance Alliance (IHRA) Working Definition of Antisemitism as integral to the fight to eliminate this scourge. It is widely accepted and used throughout the world by governments, international organizations, religious and sports entities, and other civil society organizations, which sends a powerful message of solidarity against antisemitism. Bipartisan U.S. administrations have embraced and used the IHRA Working Definition of Antisemitism, inclusive of its examples, as a policy tool.[21]

154.    In May 2023, the Biden White House issued a National Strategy to Counter Antisemitism (the "National Strategy"), particularly in the educational arena. According to the White House, the dramatic increase in the number of reported anti-Semitic incidents, many of which are occurring on campuses and in schoolyards, is simply "unacceptable."[22]

155.    The Biden administration has likewise publicly embraced the IHRA Definition in the domestic context through its repeated reliance on Executive Order 13899, which was issued by President Trump on December 16, 2019. That Executive Order directs federal agencies charged with enforcing Title VI to consider the IHRA Definition of Anti-Semitism, including the

---

[21] U.S. Dept. of State, Press Statement: The International Holocaust Remembrance Alliance Working Definition of Antisemitism (Nov. 4, 2022), https://www.state.gov/the-international holocaust-remembrance-alliance-working-definition-of-antisemitism/.

[22] The U.S. National Strategy to Counter Antisemitism 9 (May 2023), https://www.whitehouse.gov/wpcontent/uploads/2023/05/U. S. -National- Strategy-to-Counter-Anti semitism .pdf (last visited Nov. 27, 2023).

examples of anti-Semitism identified by IHRA. Exec. Order No. 13899, 84 Fed. Reg. 68799

(Dec. 11, 2019).

156.     Assistant Secretary of Education Catherine Lhamon wrote in January 2023 that

the administration "affirms OCR's [Office for Civil Rights] commitment to complying with

Executive Order 13899 on Combating Anti-Semitism," and referenced OCR guidance on the

Executive Order which remains available in OCR's online compendium of active policy

documents. U.S. Dept. of Educ., Press Release: OCR Releases New Fact Sheet on Title VI

Protection from Discrimination Based on Shared Ancestry or Ethnic Characteristics (Jan. 4,

2023), https://content.govdelivery.com/accounts/USED/bulletins/340e623. In other words, this

administration affirms the order as an active component of President Biden's civil rights policy—

and emphasizes OCR's "commitment to complying" with it. The IHRA Definition thus remains

the federal regulatory standard for evaluating whether harassing conduct is motivated by

antisemitic intent.

**D.     UNLV'S JEWISH STUDENT BODY ATTEMPTS TO MITIGATE ANTISEMITIC CONDUCT WITH DEFENDANTS**

157.     Following the chaotic acts of intimidation against Jewish Students at UNLV, after

October 7, 2023, an organizational meeting was called on November 17, 2023 with various

stake-holders of the student Jewish communities on campus with Defendant Whitfield.

158.     In attendance at said November 17, 2023, meeting with Defendants were the

following University officials:

    Keith E. Whitfield - President
    Chris Heavey - Executive Vice President and Provost
    Vince Alberta - Chief Marketing Officer, Vice President of Brand Integration
    Adam Garcia - Vice President and Director
    Jose Melendez - DIA, Executive Director of Community Partnerships, UNLV School of
    Public Health, and Chair of the Nevada Minority Health and Equity Coalition

159.    Jewish students voiced concerns at said meeting in attendance with members from the Anti-Defamation League (Las Vegas); Hillel Nevada, and other local Jewish Groups.

160.    At said meeting UNLV officials were notified of a Jewish student's vehicle being vandalized, were formally placed on notice that many of the protestors were outside groups and were not student organizations.

161.    UNLV Officials and Administrators were also notified that Jewish students were being demonized, feeling threatened, unsafe and harassed and that these protests were disrupting their ability to attend classes, moreover disrupting classes in general.

162.    Also, at said meeting students and Jewish groups were assured that efforts would be taken to mitigate their concerns, claiming that" …they can't stop the rallies but will try and minimize interruptions and hateful speech that occurs."

163.    UNLV Officials and Administrators were admonished by the students and Jewish organizations for their failure to incorporate antisemitism on their DEI platforms, and a refusal to denounce the antisemitic protests on campus by Defendant groups.

164.    UNLV Officials were advised of Jason Woodbridge (NPL Advisor and Associate Professor of Philosophy) posting antisemitic sentiments such as "From the River to the Sea" as well as posting pictures of himself at Pro-Palestine Rallies.

165.    On December 1, 2023, a Board of Regents meeting was held wherein Plaintiff testified as to the continuous antisemitism on campus, demonization of Jewish students and again requested from the Regents a call to action.

166.    On February 27, 2024, a visiting Israeli physics professor from Bar-Ilan University, Asaf Peer, was delivering an open lecture about black holes, as part of a public

physics symposium when he was interrupted by protestors voicing their views about the ongoing conflict in Gaza.

**167.** The lecture was shut down by the Anti-Israel protestors and Professor Peer was vacated.

**168.** Faculty, student, and Jewish organizations demanded Defendant Whitfield to investigate the failure of campus police to remove them from the event and whether this failure was in violation of the school's free speech policies.

**169.** Campus police responded when notified of the incident, but declined to remove the protesters, citing their First Amendment right to protest, despite the fact that UNLV's free speech policy prohibits protestors from interrupting lectures.

**170.** Such free speech policy specifies that activities must not, however, unreasonably interfere with the right of the University to conduct its affairs in an orderly manner and to maintain its property, nor may they interfere with the University's obligation to protect rights of all to teach, study, and fully exchange ideas. Physical force, the threat of force, or other coercive actions used to subject anyone to a speech of any kind is expressly forbidden."

**171.** Peer said that police initially asked whether the event was a political debate and explained it was a scientific lecture.

**172.** Instead of halting the protestors engaging in prohibited conduct against a professor, violating UNLV's student code of conduct, University Police escorted Peer off campus for "his own safety, alleging that the protestors were protected by "freedom of speech"

**173.** Instead of protecting Peer's own rights to free speech as a visiting professor teaching about black holes, and academic freedom, UNLV decided to protect the vitriolic antisemitic protestors who violated campus protocol and interrupted academic programing.

**174.** It is clear that UNLV had and has actual knowledge that racial harassment is so severe, pervasive, and objectively offensive, that they have remained so deliberately indifferent to it that it deprived and continues to deprive students of access to educational benefits or opportunities.

**175.** Not only have Defendants remained deliberately indifferent to the plight of Jewish students, even after the incident with Professor Peer, they refused to shut down the protests and in fact, UNLV lets the protests continue and Jewish students to be demonized.



**176.**

**177.**   Due to the fact that UNLV allowed to Defendants to continue to protest and wreak havoc on campus, SJP-UNLV, were emboldened to now call on and fight for the University's divestment

**178.**   In addition to the continued protests and harassment of Jewish students on campus, in May, Defendants organized protests to demand UNLV divest in any companies that deal with Israel.



**179.**

**180.**   At the "Walkout for Palestine" at UNLV protesters chanted, "From the river to the sea, Palestine will be free" and "Long live the intifada." The first is a call to wipe out Israel, which would result in the murder of millions of Jews. The second is praise for terror campaigns, including bombings, directed at Israelis.

181.     Emboldened by the Walk Out for Palestine rally and seeing that there was no negative response from UNLV, Defendants decided that they would continue to pressure the University and perpetuate more rhetoric concerning the University's divestment.



182.

183.     Ironically, faculty and Administrators did conduct a meeting with Defendant SJP and other groups, but did not do anything to admonish them regarding their antisemitic rhetoric,

45

but instead, Defendant Whitfield was more concerned about appeasing Defendants concerns as demonstrated by the Memorandum below.

184.    On May 7, 204, Defendant Whitfield held a meeting with Defendants SJP-UNLV and memorialized the meeting in a memorandum.



To:      Chancellor Patricia Charlton

From:   Keith E. Whitfield UNLV President

Re:      SJP Student Meeting (5/7/24)

Date:   May 8, 2024

I met with the UNLV registered student organization SJP (Students for the Justice of Palestine) yesterday, and their faculty adviser. I have also had like meetings with the UNLV Jewish faculty group and the Hillel student group. It is important to hear all views and perspectives on any issue. I fundamentally believe people want a chance to be heard, even if we do not always agree.

The focus of the SJP students' meeting yesterday was consistent with what the national SJP organization is saying, specifically for universities to disclose and divest of any investments with Israel. As you are aware, Brown University, the University of California, Riverside, and a handful of other higher-education institutions are considering this measure. I made no commitment to this, but I did say we would speak with the Investment Committee of the UNLV Foundation to better understand our investment strategies and asset holdings. I also emphasized that some of these holdings may be in broad portfolios of financial institutions, and it is sometimes difficult to determine what companies are included in their portfolios.

The students also expressed concern about their safety and retaliations against students involved in protests – including from elected officials whom they say stalk them and film them at their events and post on social media, or share with others. I committed that we would continue to work with their group, and all stakeholders on campus and do what we are capable of related to security or their sense of security. (I have made this same commitment to the Hillel students and Jewish faculty group.)

Finally, I also said we would consider sending a message to campus that would be inclusive of those impacted on our campus by events taking place in Gaza.


c. Elda Sidhu, UNLV General Counsel

185.

46

**186.** Amazingly, the antisemitic groups that have been wreaking havoc on Jewish students at UNLV, interrupting Israeli professors and shouting genocidal epithets at Jewish students on campus had "concerns for their safety".

**187.** Immediately after the meeting SJP-UNLV said it made "progress" in its meeting with Whitfield, after the noted memorandum only demonstrated UNLV appeared to be indulging antisemites on campus, at the cost of Jewish students; Defendants SJP-UNLV did a victory lap on social media.



**188.**     Defendant Whitfield also noted that the University would speak with the Investment Committee of the UNLV Foundation to better understand our investment strategies and asset holdings."

**189.**     While Defendant Whitfield demonstrates concern with investments in Israeli Companies, there is seemingly a failure to acknowledge that public records show that UNLV has likely engaged in "Pay for Hate" by receiving $17,857,792 from undisclosed foreign entities that support terrorism against democracies.[23]

**190.**     Since October 7, 2023, like all Jewish students on UNLV, Plaintiff has been under severe emotional strain resulting from the distress of being accosted by antisemitic protestors, who have found refuge and comfort from UNLV and its administrators, instead of being admonished for such racist behaviors and actions.

**191.**     It is clear that had these protests been targeted against any other race or class, that the University would not have allowed this to continue for almost seven months now, but the continued attacks of Jewish students at UNLV continues to be tolerated if not perpetuated by the University and its groups.

**192.**     It is also clear that the destabilization of student life at UNLV is part of a bigger agenda of utilizing student protest to influence political policies. However, these student protests are being solicited and funded by foreign terrorist organizations.

**STATEMENT OF FACTS**

**193.**     Plaintiff, Corey Gerwaksi (hereinafter "Corey"), was and at all times relevant herein a student at the University of Nevada, Las Vegas (UNLV).

---

[23] (sites.ed.gov/foreigngifts/).

48

**194.** Starting in June, 2023, Corey was being asked inappropriate questions about his Jewish heritage and sexual orientation as part of an "onboarding program" when he began working as UNLV Lied Library.

**195.** Corey is a Jewish student at UNLV and wears the Jewish skullcap, a kippah, at all times, as a devout Jew firm in his Jewish beliefs and ideology.

**196.** All the events noted herein commenced on or after August, 2023, including unjust termination, harassment, antisemitism, and retaliation, primarily involving members of the University's Administration and student government.[24]

**197.** In August 2023, Corey was unjustly terminated from his position at the UNLV library as a result of the blatant disparate treatment and antisemitism that was exhibited by supervisors.

**198.** In December 2023, Corey returned to the library for personal study, only to have the police called on him by the same individual who had fired him. This person, whose antisemitic views are well-known, claimed Corey posed a threat simply by entering the building.

**199.** This incident was both humiliating and distressing, further exacerbating the hostile environment he has been subjected to before and after October 7, 2023.

**200.** As a member of the student government (CSUN)[25] Senate, Corey faced numerous acts of discrimination and hostility, primarily from Marni Dow and other advisors.

---

[24] It is significant to note that Corey has filed an action with the EEOC, and is currently pending his right to sue status regarding same. Plaintiff will seek Amendment of this Complaint to incorporate actions under Title VII of the Civil Rights Act.

[25] The Consolidated Students of the University of Nevada, Las Vegas (CSUN) is UNLV's undergraduate student government. It is CSUN's mission to empower the voice of the undergraduate student population, provide resources to enhance the student experience, and help build community on the UNLV campus. CSUN has three branches, each with their own set of responsibilities: Executive, Legislative, and Judicial.

**201.**   Corey was elected Chair of the Scholarships and Grants Committee which is responsible for allocating $300,000.00 a year in scholarships to the undergraduate students.

**202.**   Corey faced hostility and discriminatory conduct including but not limited to the following:

- Upon announcing his campaign for student government, Marni Dow[26] became visibly upset upon learning he was a conservative candidate running; even pulled the Director of Marketing, Mia Hernandez, into her office to dissuade people from supporting him, stating that she did not want him to win.
- Corey, collaborated with a Muslim leader to draft a resolution that received support from President Whitfield. However, Marni Dow intervened and halted the Resolution's progress without valid reason.
- Marni Dow has made numerous derogatory comments about Corey's appearance, specifically stating that his being a "white male of large size" makes women feel defensive, thus justifying any negative responses toward him.
- In a meeting with Sunny Gittens[27] and Marni Dow to address his concerns, Dow flatly denied all allegations of misconduct, despite clear evidence to the contrary.
- Marni Dow and Dajhe took improperly assumed control of a meeting during public comment, claiming they were self-appointing as CSUN Attorney General and canceling the meeting, which was a violation of NOML (Nevada Open Meeting Law). The UNLV General Counsel later confirmed that they had no authority to take such actions.
- Marni Dow encouraged Makayla Franklin[28] in a public email to file impeachment charges against nine Senators, including Corey, for discussing a candidate via G Chat. This directive was issued despite advisors previously stating that they could not discuss candidates' integrity or character, effectively silencing them.
- In multiple instances, advisors, including Marni Dow, have shut down Senators' questions and discussions, dictating that they can only seek clarifications on agenda items without delving into substantive issues.
- Marni Dow disclosed Corey's private FERPA-protected credit information to a student and encouraged them to spread false accusations of racism and homophobia about him across campus. This information reached admissions and his workplace in OIT.
- There exists uncontroverted evidence that Marni Dow is actively investigating Corey and intends to do everything in her power to get him impeached.
- This campaign against him intensified following his speech at the Board of Regents meeting in November, where he advocated for Jewish safety and inclusion on campus.

**203.**   The hostility Corey has experienced is not isolated but part of a broader pattern of attacks against Jewish students based on his (and their) race and Jewish faith.

---

[26] Dow serves as Senior Associate Director, Student Government and Activities.
[27] Gittens serves as Executive Director of Student Engagement
[28] Franklin served as UNLV Student Body President.

50

204.    Multiple students have informed Corey that Marni Dow dislikes him because he is "a conservative Jew."

205.    Many members of the student government are pro-Palestine and have verbally attacked and treated him poorly due to his identity as a kippa-wearing Jew.

206.    This blatant antisemitism has created an environment where he has struggled academically, failing two classes due to the stress, and have been effectively exiled from the Senate chambers because of his Jewish identity.

207.    The situation was overtly exacerbated in November, 2023 when Corey gave a two-minute speech to the Board of Regents about antisemitism on campus and Dow was present at that meeting.

208.    Subsequently, Corey asked Dow to attend a meeting with Aramark about providing kosher foods on campus, but she rejected the meeting twice.

209.     On January 22, 2024, during Student Senate, Defendant Whitfield and UNLV's Provost came to the Senate meeting to discuss the University shooting, whereby Corey seized the opportunity and told Whitfield that students needed faculty help in fighting antisemitism and writing a resolution.

210.    Defendant Whitfield said that that was not something faculty should do to fix the tension between Jewish and Muslim students.

211.    When Corey requested that Whitfield get the two groups together to facilitate a peaceful resolution Whitfield and the Provost said that such action should come from the students and not the University.

212.    In February 2024, Corey reached out to President Keith Whitfield to explain that he felt targeted for being Jewish and to Sunny Gittens as well, but received no response or resolution.

**213.** In March 2024, Corey made formal complaints to the Board of Regents about the antisemitism he was experiencing, but never heard back from anyone regarding same.

**214.** On March 5, 2024, Corey sent an email to both Elda Sidhu and Defendant Whitfield notifying them both that he felt he was being targeted and retaliated against because of his faith, neither of them responded to his email.

**215.** Remarkably, Marni Dow has consistently opposed Corey's initiatives, dismissing every idea he presents as unfeasible.

**216.** When Corey raised concerns about proper fund appropriation and inventory management, Dow accused Corey of being inappropriate and offensive, further creating a hostile environment.

**217.** Marni Dow and Christian Abbo along with the IA committee reduced Corey's pay by 50 percent, for the remainder of the term.

**218.** The environment on campus has further exacerbated the hostility Corey faces.

**219.** UNLV has allowed the Nevada Palestine Liberation (NPL) group to march with megaphones, disrupt campus activities, and chant slogans such as "From the river to the sea."

**220.** Members of this group have personally verbally assaulted Corey because he wears a kippah.

**221.** They have told Corey to "go back to Israel" and even made abhorrent statements such as "go back to the oven, you fucking Jew."

**222.** The disparate treatment Corey faces as a man of Jewish faith on UNLV's campus is emblematic of the larger problem that Jewish students are facing at the University over the course of the past seven months, with a faculty and administration that has failed to do anything about such blatant racism against Jewish students on campus.

**223.** These incidents are clear examples of antisemitism and have contributed to an

unsafe and hostile environment on campus that Corey and other Jewish students and faculty have dealt with consistently since October 7, 2023.

**FIRST CLAIM FOR RELIEF**
**Violation of the Anti-Terrorism Act, 18 U.S.C.§ 2333(d)**
**(Against All Defendants)**

224. Plaintiffs repeat and reallege paragraphs alle preceding paragraphs and incorporate them as though fully alleged herein.

225. Under the Antiterrorism Act, "[a]ny national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees." 18 U.S.C. § 2333(a).

226. "[L]iability may be asserted as to any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism." 18 U.S.C. § 2333(d)(2).

227. A defendant may be liable under the Antiterrorism Act even without a "strict nexus" between the substantial assistance and the act of international terrorism so long as there is "a foreseeable risk" of such act. Indeed, in some cases, "defendant's role in an illicit enterprise can be so systemic that the secondary defendant is aiding and abetting every wrongful act committed by that enterprise." See *Twitter v. Taamneh*, 598 U.S. 471, 495-96 (2023).

228. Hamas is a United States designated Foreign Terrorist Organization that committed, planned, or authorized various acts of international terrorism including its (a) terrorist attack on October 7th; (b) ongoing rocket attacks against non-military, civilian targets; and (c) holding innocent civilians hostage.

53

229.    For decades, Defendants have provided substantial assistance to Hamas by acting as its propaganda wing in the United States, recruiting domestic foot soldiers for Hamas, and fomenting violence, chaos, and fear in the United States to support Hamas's short and long-term goals and international terrorist activities.

230.    Defendants intentionally instigate a mass culture of fear, threats, violence, and overt hatred to intimidate politicians and institutions for the benefit of Hamas by organizing, managing, controlling, and intentionally inciting riots and acts of domestic terrorism as part of its substantial assistance to Hamas.

231.    Indeed, Defendants themselves are successor entities to an original material support enterprise for Hamas. Defendants are operated primarily by many of those who were senior leaders in the original enterprise.

232.    It is clear that every time Defendants act in the United States, and more specifically on UNLV's campus, there is a direct nexus between the University groups and Hamas, IRGC, Hezbollah and other Foreign Terrorist Organizations.

233.    It is also clear that directives being given by Hamas, IRGC, Hezbollah and other Foreign Terrorist organizations are being acted out on U.S. college campuses through Defendants and their organizations on UNLV's campus.

234.    Defendants knowingly provide substantial assistance to Hamas through their services. Indeed, in the NSJP Toolkit, Defendants confirm not only that they are aware that their propaganda and incitement activities support Hamas but also that they perceive themselves as "PART of" Hamas's "Unity Intifada"—the terror regime that has damaged Plaintiff.

235.    Defendants knowingly provided substantial assistance to Hamas and thus aided and abetted Hamas in committing, planning, or authorizing acts of international terrorism, including the acts of international terrorism that injured Plaintiff.

236.    Not only do these acts constitute "substantial assistance" under the civil portion of the Antiterrorism Act, but they also satisfy the Antiterrorism Act's criminalization of providing "material support or resources" to a Foreign Terrorist Organization. *See* 18 U.S.C. §§ 2339A and 2339B.

237.    UNLV has also provided substantial assistance to these radical pro-terrorist organizations by allowing them to terrorize and demonize students on UNLV's campus.

238.    UNLV has also provided substantial assistance under the Antiterrorism Act by allowing them to use the student campus to distribute their literature, paraphernalia, and hosting meetings by providing substantial resources to disseminate their antisemitic and anti-American rhetoric and propaganda.

239.    UNLV has provided substantial assistance by emboldening these Defendants, by their actions and meetings with them, "legitimizing" their cause of terrorizing students on campus.

240.    Plaintiff has been injured in their persons because of Hamas's acts of international terrorism.

241.    By aiding and abetting Hamas in committing, planning, or authorizing acts of international terrorism, including the acts that caused Plaintiff to be injured in his or her person and property, Defendants are liable pursuant to 18 U.S.C. § 2333(d) for, threefold any and all,

damages that Plaintiff sustained as a result of such injuries, and the costs of this suit, including attorney's fees.

**SECOND CLAIM FOR RELIEF**
**Violation of 14TH Amendment – Equal Protection**
*(UNLV Defendants)*

**242.**   Plaintiff repeats and re-alleges all prior paragraphs of this Complaint and incorporates them by reference as though fully set forth herein,

**243.**   The Fourteenth Amendment affords Plaintiff the right to equal protection under the laws, and Defendants violated Plaintiff's right when they, under color of state law, carried out customs and/or policies and/or practices and usage of deliberate indifference and tolerance for discriminatory acts and expressions, on the basis of race and religion, failed to protect Plaintiff and prohibit the discriminatory conduct.

**244.**   At all times relevant herein, Defendants exercised substantial control over all teachers, staff, and administrators acting under color of state law and condoning, ratifying, and carrying out discriminatory acts and expressions against Plaintiff, and in failing to perform their duties.

**245.**   These acts of discrimination have been consistent and egregious peaking after October 7, 2023 and persisting presently.

**246.**   Defendants denied Plaintiff the rights afforded to him through the provision of education and services designed for Plaintiff and prepare him for a successful path in life.

**247.**   Defendants did not exercise due and reasonable care in the performance of their duties when they undermined and detracted from the educational experience of Plaintiff and created a disadvantaged academic environment.

56

248.     Defendants violated Plaintiff's constitutional right to equal protection, and the educational benefits afforded to him under the law.

249.     Defendants demonstrated their deliberate indifference to Plaintiff, and other similarly situated students, through customs and/or policies and/or practices and usage of deliberate indifference, when they tolerated discriminatory conduct, when they condoned, ratified, and carried out acts and expressions so objectionably offensive, and did create an environment where Plaintiff was in danger, and in fact was harmed, and in doing so, violated Plaintiff's right to equal protection, a violation which is actionable under 42 U.S.C. § 1983.

250.     Defendants' acts and omissions proximately and directly caused harm to Plaintiff in the violation of his constitutional, federal, and states' rights.

251.     Plaintiff is entitled to recover from Defendants for all damages directly and/or proximately resulting from the violation of his constitutional right to equal protection.

252.     Defendants' deliberate indifference to the Plaintiff and discrimination created an environment with increased danger, which was the direct and proximate cause of the violation of Plaintiff's constitutional right, and where the danger was foreseeable.

253.     Plaintiff suffered injuries in the denial of access to and enjoyment of his educational benefits, and the cumulative trauma now and into the future that will require medical and educational analyses, evaluations, and treatments, the cost of which entitles Plaintiff to special damages in an amount to be proven at time of trial.

254.     Plaintiff suffered injuries in his emotional and psychological harm, humiliation, degradation, damaged relationships, and general emotional distress, where Plaintiff claims both past and future damages, in an amount in excess of $75,000.00.

**255.** Pursuant to 42 U.S.C. § 1988, Plaintiff is entitled to recover against Defendants for all reasonable attorneys' fees expended in prosecuting this action.

### THIRD CLAIM FOR RELIEF
**Violation of Title VI of the Civil Rights Act of 1964 - 42 U.S.C. § 2000d *Et. Seq*.**
**(*Against UNLV Defendants*)**

**256.** Plaintiff repeats and re-alleges all prior paragraphs of this Complaint and incorporates them by reference as though fully set forth herein.

**257.** Whereas Title VI of the Civil Rights Act mandates that Defendants prohibit discriminatory conduct, and specifically, that no person shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

**258.** Defendants were negligent and acted with deliberate indifference when they, under color of state law, condoned, ratified, and carried out the prohibited conduct, and denied Plaintiff of his rights under Title VI of the Civil Rights Act, a violation of which is actionable under 42 U.S.C. § 2000d *Et. Seq.*

**259.** Defendants acted under color of state law when they condoned and ratified discriminatory acts and expressions, undermined and detracted from his educational and academic experience, and where Defendants created a disadvantaged and dangerous school environment, a violation of which is actionable under 42 U.S.C. § 2000d *Et. Seq.*

**260.** Defendants failed to mitigate the harm to Plaintiff and lessen the state-created danger, having actual knowledge and notice of the incidents and occurrences of discriminatory conduct, a violation which is actionable under 42 U.S.C. § 2000d *et. Seq.*

**261.** Defendants had final authority and decision-making capacity to identify, address, halt, report, and further investigate all discriminatory acts and expressions, incidents,

occurrences, and allegations, and to initiate corrective and preventative measures on behalf of Plaintiff.

262.     Defendants' negligence and deliberate indifference caused harm, and Plaintiff suffered injuries and cumulative trauma now and into the future that will require medical and educational analyses, evaluations, and treatments, the cost of which entitles Plaintiff to special damages in an amount to be proven at time of trial.

263.     Defendants' negligence and deliberate indifference caused harm, and Plaintiff suffered injuries and emotional and psychological harm, humiliation, degradation, damaged relationships, and general emotional distress, where Plaintiff claims both past and future damages, in an amount in excess of $75,000.00.

264.     Pursuant to 42 U.S.C. § 1988, Plaintiff is entitled to recover against Defendants for all reasonable attorneys' fees expended in prosecuting this action.

**FOURTH CLAIM FOR RELIEF**
**U.S.C. §1983 – Failure to Train**
(*Against UNLV Defendants*)

265.     Plaintiff repeats and realleges all prior paragraphs of this Complaint and incorporates the same by reference herein.

266.     Discrimination that violates the Equal Protection Clause of the Fourteenth Amendment committed by an institution that accepts federal funds also constitutes a violation of Title VI." *Gratz v. Bollinger*, 539 U. S. 244, 276, n. 23 (2003)

267.     Title VI prohibits intentional discrimination by a college. *Alexander v. Sandoval*, 532 U. S. 275, 280 (2001). Title VI forbids a recipient of federal funds from intentionally treating one person worse than another similarly situated person on the ground of race, color, or national origin. *Students for Fair Admissions ("SFFA") v. Presidents and Fellows of Harvard*

59

*College* and *SFFA v. University of North Carolina,* 600 U. S. ____ (2023).

268.    Defendants failed to train personal, administrators and faculty in identifying and allowing violations of Title VI discrimination against Jewish students and faculty on campus.

269.    Defendants routinely deal with free speech, lectures, and content related speech.

270.    Defendants routinely deal with racial components of academia and have a conscripted diversity equity and inclusion policy since 2020.

271.    Defendants understand the ramifications of giving preferential treatment to one racial group who discriminates against another minority.

272.    Defendants understand the ramifications of discriminating against protected minorities on the basis of their race or religion.

273.    Defendants are aware of their need to ensure that Administrators and faculty not engage in racism or make racial comments against minorities.

274.    Defendants are aware that faculty is prohibited from engaging in discrimination under Title VI.

275.    Defendants are aware that once instances of discrimination are brought to their attention, that they have an affirmative obligation to mitigate and rectify said acts, in addition to supervise, train, and discipline faculty members that violate University policies.

276.    Defendants have been placed on notice that faculty members have violated University policies and failed to discipline them or hold them accountable for their gross violations.

277.    Defendants' custom and practice of turning the other way when faculty violates individual rights, and refusal to discipline involved faculty members and/or employ additional training, ensures the likelihood of repeat situations and continuous violations of the rights of Jewish students

278.     Defendants' failure to provide proper training represents a policy for which UNLV is responsible and liable.

279.     UNLV's inadequate training demonstrates deliberate indifference on the part of the University towards Corey, and others similarly situated, with whom members of the University's faculty and administration will routinely come into contact.

280.     In the course and scope of the investigation and failure to rectify the current state on campus, Defendants either failed to follow their training or they were improperly trained in how to achieve a complete investigation and ensuring that Corey's rights as a student remain protected.

281.     Defendants' failure to train and supervise faculty and staff caused the humiliation and economic loss to Corey and was at all times the reason for Corey's humiliation and economic suffering.

282.     As a direct and proximate result of Defendant's failures, Corey suffered, severe emotional distress, mental anguish, humiliation and even economic loss as a result of his interactions with Defendants.

283.     The conduct alleged herein was done in reckless disregard of Corey's constitutionally protected rights; justifying an award of punitive damages as against the individually named Defendants.

284.     UNLV's failure to train faculty resulted in the intentional, reckless, and callous disregard for the life of and his constitutional rights.

285.     The actions of Defendants were willful, wanton, oppressive, malicious, and unconscionable to any person of normal sensibilities.

286.     Accordingly, Defendants and each of them are liable to Plaintiff for compensatory damages.

287.   Plaintiff also seeks statutory attorney fees and costs under this claim.

**FIFTH CLAIM FOR RELIEF**
**42 U.S.C. §1983 –Ratification**
(***Against UNLV Defendants***)

288.   Plaintiff repeats and realleges all prior paragraphs of this Complaint and incorporates the same by reference herein.

289.   A ratification theory may be established in two ways: 1) based on a "pattern" of ratification that constitutes a practice or custom, or (2) based on a single act by an official with policy making authority.

290.   Upon information and belief UNLV has consistently ratified all antisemitic actions of its faculty and administrators.

291.   Policymakers for UNLV, have vigorously defended the antisemitic groups on campus allowing them to torment and harass Jewish students under the guise of protected speech under the First Amendment.

292.   Upon information and belief, policy makers at UNLV have a custom and practice of failing and/or refusing to discipline faculty members, administrators and students, involved in systematically and unlawfully engaging in open antisemitism.

293.    Upon information and belief, policy makers at UNLV have a custom and practice of improperly and systematically justifying violations of university policy to allow for the perpetuation of antisemitism on campus that is in fact unjustifiable.

294.   Upon information and belief, policy makers at UNLV have failed to thoroughly investigate Jewish student complaints of antisemitism and have a custom and practice of failing to take remedial steps after such violations of university policies.

295.   Upon information and belief, UNLV has ratified, condoned, approved, and encouraged the antisemitic conduct on campus by allowing non-student groups to wreak

havoc, demonize, traumatize and harass Jewish students at UNLV.

296.     UNLV was deliberately indifferent to Corey's rights to be free from harassment, bullying, demonization and retaliation as a result of his Jewish faith. UNLV engaged in the deliberate indifference and misconduct of its employees.

297.     As a direct result of UNLV' longstanding customs and practice of deliberate indifference to Corey's constitutional rights, and rights of others so situated, it was deliberately indifferent to a substantial risk of serious harm, embarrassment and humiliation of Corey.

298.     The unlawful and illegal conduct of Defendant UNLV, its policies, procedures, customs, and practices, deprived Corey of the rights, privileges and immunities secured to him by the Constitution of the United States and federal statutory law.

299.      As a direct, proximate and foreseeable result, Plaintiff suffered damages in an amount according to proof at the time of trial.

300.     Accordingly, Defendants and each of them are liable to Plaintiff for compensatory damages, punitive damages, and attorney's fees and costs.

**SIXTH CLAIM FOR RELIEF**
**Violation of the First Amendment- Free Exercise**
(***Against UNLV Defendants***)

301.     Plaintiff repeats and re-alleges all prior paragraphs of this Complaint and incorporates them herein by reference as though fully set forth herein.

302.     Plaintiff's sincerely held religious beliefs teach that the Bible is the inspired word of God and the sole authority for faith and practice.

303.     Defendants' decision to allow the antisemitic chants and chaos on campus precluding Corey from wearing an open kippa without having to hide it under a baseball cap or other type of head covering violates his First Amendment Right to Free exercise.

**304.**     Pursuant to 42 U.S.C 1983, Plaintiff brings this claim against Defendants for acting under color of state law to deprive him of rights secure by the US Constitution.

**305.**     The First Amendment likewise guarantees Plaintiff the right to freely exercise his religion, without worrying that his religion will preclude him from attending UNLV without being harassed.

**306.**     The First Amendment guarantees that Plaintiff will not be retaliated against, due to his religious beliefs by his employer, or academic supervisors.

**307.**     Defendants' retaliation against Plaintiff because of his religious beliefs violates that First Amendment, free exercise clause because of such expression.

**308.**     Plaintiff's actions did not elicit a suspension, and as a direct and proximate result of the malicious and intentional conduct by Defendants, whose acts were directed and ratified by Defendants collectively, Plaintiff suffered damages, the exact amount which will be proven at trial.

**309.**     The intentional conduct of Defendants was so despicable, oppressive, malicious, and engaged in with such conscious disregard for Plaintiff's rights and economic benefit that punitive damages are warranted.

**310.**     That it has become necessary for Plaintiff to retain the services of legal counsel for which Plaintiffs is entitled to recover such costs and expenses from Defendants.

**SEVENTH CLAIM FOR RELIEF**
**Violation of First Amendment- Free Speech Retaliation**
(***Against UNLV Defendants***)

**311.**     Plaintiff repeats and re-alleges all prior paragraphs of this Complaint and incorporates them by reference as though fully set forth herein.

312. That it has become necessary for Plaintiff to retain the services of legal counsel for which Plaintiff is entitled to recover such costs and expenses from Defendants.

313. "[A]s a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions" for engaging in protected speech. *Hartman v. Moore, 547 U.S. 250, 256 (2006)*.

314. A First Amendment retaliation claim brought under 42 U.S.C. § 1983 requires the plaintiff to show that (1) he engaged in protected speech under *Pickering/Garcetti*, (2) the government's retaliatory conduct adversely affected that speech, and (3) the speech was at least a "substantial or motivating factor in the adverse employment action." See also *Givhan v. Western Line Consolidated School District, 439 U.S. 410 (1979)*.

315. Defendants' decision to take adverse employment action against Plaintiff because of his religious beliefs violate his First Amendment Right to Free Speech.

316. Defendants, acting under color of state law, retaliated against Corey, and violated his First Amendment rights by prosecuting an investigation against him, fabricating evidence used against him, reprimanding him and terminating him due to his protected speech regarding his faith.

317. Defendants violated Corey's First Amendment rights by undertaking actions designed to deter him from ever expressing a viewpoint different from that of Defendants, on the threat of additional investigations, proceedings, and even termination.

318. There is no state interest, compelling or otherwise, justifying Defendants' retaliatory actions against Corey.

319. Defendants, by prosecuting, punishing, and termination, have deprived and are depriving Corey of his First Amendment rights to free speech and association, as secured against

state infringement by the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

320.    Defendants were aware of and informed of Corey's constitutional rights to express opinions different from their own, and therefore were motivated by evil motive or intent, or acted with reckless or callous indifference to Corey's constitutional rights, when they violated, misrepresented, and interfered with his constitutional rights.

321.    Corey is in imminent danger of and has suffered irreparable harm, damage, and injury inherent in the violation of First and Fourteenth Amendment rights, for which there is no adequate remedy at law.

322.    If not enjoined by this Court, Defendants and/or their agents will continue to affect the aforementioned deprivations and abridgments of Plaintiff's constitutional rights, thereby causing further irreparable harm, damage, and injury for which there is no adequate remedy at law.

323.    As a direct result of Defendants' concerted actions, Corey has suffered monetary damages and other harm which he is entitled to receive at the time of trial.

324.    That it has been necessary for Plaintiff to retain the services of legal counsel for which Plaintiff is entitled to recover such costs and expenses from Defendants.

### EIGHTH CLAIM FOR RELIEF
**(Violation of First Amendment- Free Speech-Compelled Speech)**
**(*Against UNLV Defendants*)**

325.    Plaintiff repeats and re-alleges all prior paragraphs of this Complaint and incorporate them by reference as though fully set forth herein.

326.    The Supreme Court of the United States has declared, with regard to the First Amendment prohibition on compelling speech that, "[i]f there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be

orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by work or act their faith therein." *W. Va. State Bd. of Educ. v. Barnette, 319 U.S. 624, 642 (1943).*

327.     Accordingly, "when government directly regulates speech by mandating that persons explicitly agree with government policy on a particular matter, it plainly violates the First Amendment." *303 Creative LLC v. Elenis, 385 F. Supp. 3d 1147 (D. Colo. 2019), aff'd, 6 F.4th 1160 (10th Cir. 2021)*

328.     The First Amendment protects Corey from being forced to support or otherwise agree with Defendants' policies and actions as a condition of employment or academic enrollment.

329.     Defendants also sought to force Corey to voice or otherwise pledge his support, by prosecuting an investigation against him, fabricating evidence used against him, terminating him, all because he expressed an opinion and viewpoint different from Defendants' own.

330.     There is no state interest, compelling or otherwise, justifying Defendants' requirement that individuals, acquiesce to the notion that the antisemitic speech on campus is protected as free speech.

331.     Defendants, by forcing Corey to refrain from any speech that they disagree with, deprived and are depriving him of his First Amendment rights to free speech and association, as secured against state infringement by the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

332.     Defendants, by prescribing the speech and views they deem acceptable for Corey to express, upon risk of employment consequences in the future, deprived and are depriving Corey of his First Amendment rights to free speech and association, as secured against state

infringement by the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

333.    Defendants were aware of and informed of Corey's constitutional rights to express opinions different from their own, and therefore were motivated by evil motive or intent, or acted with reckless or callous indifference to Corey's constitutional rights, when they violated, misrepresented, and interfered with his constitutional rights.

334.    Corey is in imminent danger of and has suffered irreparable harm, damage, and injury inherent in the violation of First and Fourteenth Amendment rights, for which there is no adequate remedy at law.

335.    If not enjoined by this Court, Defendants and/or their agents will continue to affect the aforementioned deprivations and abridgments of Plaintiff's constitutional rights, thereby causing further irreparable harm, damage, and injury for which there is no adequate remedy at law.

336.    As a direct result of Defendants' concerted actions, Plaintiff has suffered monetary damages and other harm for which he is entitled to at the time of trial.

337.    That it has been necessary for Plaintiff to retain the services of legal counsel for which Plaintiff is entitled to recover such costs and expenses from Defendants.

**NINTH CLAIM FOR RELIEF**
**(Intentional Infliction of Emotion Distress)**
**(Against All Defendants)**

338.    Plaintiff repeats and re-alleges all prior paragraphs of this Complaint and incorporates them by reference as though fully set forth herein.

339.    Defendants' acts and omissions described herein were extreme and outrageous and intentionally conducted to cause emotional distress to Plaintiff.

68

340.     As a direct and proximate result of the malicious and intentional conduct by various Defendants, whose acts were directed and ratified by Defendants, Plaintiff suffered, and will continue to suffer, damages, including but not limited to such severe and extreme emotional distress manifested as great humiliation, embarrassment, shame, and other pain and suffering.

341.     The intentional conduct of the Defendants was so despicable, oppressive, malicious, and engaged in with such conscious disregard for Plaintiff's rights and safety that punitive damages are warranted, as is an award of attorney fees and costs of this action.

342.     As a direct result of Defendants' concerted actions, Corey has suffered monetary damages and other harm for which he is entitled to receive at the time of trial.

343.     That it has been necessary for Plaintiff to retain the services of legal counsel for which Plaintiff is entitled to recover such costs and expenses from Defendants.

**TENTH CLAIM FOR RELIEF**
**Negligent Hiring**
(***Against UNLV Defendants***)

344.     Plaintiff repeats and re-alleges all prior paragraphs of this Complaint and incorporates them by reference as though fully set forth herein.

345.     Defendants owed several duties to Plaintiff including, but not limited to, the following:

A.     The duty to keep Plaintiff safe from the negligent and/or criminal acts of its employees or third parties.

B.     The duty to provide responsible teachers and faculty.

C.     The duty to act reasonably under the circumstances.

D.     The duty to take action to control the wrongful acts of its employees and associates when it had reason to anticipate such acts.

346.     Defendants breached these duties of care owed to Plaintiff.

347.     Defendants knew that Jewish students were being harassed and demonized on campus and that even members of UNLV's faculty were participating in ethe demonization and antisemitic rhetoric.

348.     Defendants failed to conduct any mitigation efforts over the course of the past seven months to correct any of these acts and engaged in such failures with a complete disregard for student safety or rights.

349.     As a direct and proximate result of these breaches, Plaintiff has suffered damages in an exact amount to be proven at trial.

350.     The failures of Defendants to hire a proper teaching staff was intentional and so despicable, oppressive, malicious, and engaged in with such conscious disregard for Plaintiff's rights and safety that punitive damages are warranted.

351.     That it has been necessary for Plaintiff to retain the services of legal counsel for which Plaintiff is entitled to recover such costs and expenses from Defendants.

**ELEVENTH CLAIM FOR RELIEF**
**Negligent Retention and Supervision**
**(*Against UNLV Defendants*)**

352.     Plaintiff repeats and re-alleges all prior paragraphs of this Complaint and incorporates them by reference as though fully set forth herein.

353.     UNLV Defendants had a duty to use reasonable care in the training, supervision, and retention of University faculty to make sure they are fit for their positions.

**354.** UNLV Defendants were placed on notice that their faculty and administrators were not doing anything to mitigate the antisemitism that was ongoing on UNLV's campus.

**355.** Corey and multiple students repeatedly and consistently notified the University of the administrator and faculty members who minimized the plight of Jewish students on campus and Defendants breached their duties owed to Plaintiff.

**356.** As a direct and proximate result of these breaches, Plaintiff has suffered damages in an exact amount to be proven at trial.

**Wherefore, Plaintiff prays for judgement against Defendants as follows:**

**1.** Plaintiff seeks a Declaration from the Court that Defendants have violated Plaintiff's constitutional right to equal protection.

**2.** Plaintiff seeks an immediate hearing on Plaintiff's Motion for Temporary Restraining Order, and, upon hearing, enter an Order restraining Defendants from allowing non-student groups interfere and continue to torment Jewish students on campus by engaging in unprotected speech.

**3.** Permanently enjoin Defendants SJP-UNLV and NSJP from engaging in any campus activities, banning them from UNLV's campus.

**4.** Permanent enjoin all non-student organizations that violate NSHE student conduct and policies from engaging in any campus activities, banning them from UNLV's campus.

**5.** For damages against Defendants under 18 U.S.C. § 2333(d).

**6.** For damages against Defendants for violation of Title VI of the Civil Rights Act of 1964 – 42 U.S.C. § 2000d *Et Seq.*

71

**7.** For special damages, both past and future, in an amount in excess of $75,000.00 against the Defendant.

**8.** For general damages, both past and future, in an amount in excess of $75,000.00 against the Defendant.

**9.** For compensatory damages directly and proximately caused by the acts/omissions of Defendants.

**10.** For punitive damages in the amount to be requested at trial.

**11.** For reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

**12.** For such other and further relief as this court deems proper.

## <u>AFFIRMATION - PURSUANT TO NRS 239B.030</u>

The undersigned hereby affirm the preceding document does not contain the social security number of any person.

**DATED** this 26th day of May, 2024.

**CHATTAH LAW GROUP**

_____*/s/ Sigal Chattah*_____
SIGAL CHATTAH, ESQ.
Nevada Bar No.: 8264
5875 S. Rainbow Blvd., #205
Las Vegas, Nevada 89118

**JOEY GILBERT LAW**

_____*/s/ Joseph S. Gilbert*_____
JOSEPH S. GILBERT, ESQ.
Nevada State Bar No.: 9033
405 Marsh Avenue
Reno, Nevada 89509
*Attorneys for Plaintiffs*