SIGAL CHATTAH, ESQ.
Nevada Bar No.: 8264
CHATTAH LAW GROUP
5875 S. Rainbow Blvd., #204
Las Vegas, Nevada 89118
Tel: (702) 360-6200
Fax: (702) 643-6292
Chattahlaw@gmail.com

JOSEPH S. GILBERT, ESQ.
Nevada State Bar No.: 9033
JOEY GILBERT LAW
405 Marsh Avenue
Reno, Nevada 89509
Tel: (775) 284-7700
Fax: (775) 284-3809
Joey@joeygilbertlaw.com
*Co-Counsel for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| COREY GERWASKI, | |
| Plaintiffs, | Case No.: 2:24-cv-00985 |
| vs. | |
| STATE OF NEVADA ex rel. BOARD OF REGENTS OF THE NEVADA SYSTEYM OF HIGHER EDUCATION, on behalf of the UNIVERSITY OF NEVADA, LAS VEGAS; KEITH WHITFIELD, individually, AJP EDUCATIONAL FOUNDATION INC., A California Non-Profit Corporation, STUDENTS FOR JUSTICE OF PALESTINE-UNLV; NATIONAL STUDENTS FOR JUSTICE OF PALESTINE; NEVADANS FOR PALESTINIAN LIBERATION DOES I-XX and ROE entities I-XX. | **OPPOSITION TO MOTION TO DISMISS**<br><br>**[ORAL ARGUMENT REQUESTED]** |
| Defendants. | |

1

1

## TABLE OF AUTHORITIES

2

**CASES**

3

*ACLU v. Mote*, 423 F.3d 438 (4th Cir. 2005).

4

*Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed.2d 868 (2009)

5

*Ashcroft v. Am. Civil Liberties Union* , 535 U.S. 573, 122 S.Ct. 1700 (2002)

6

*Bell Atl. Corp. v. Twombly,* 550 U.S. 54, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)

7

*Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685 (7th Cir. 2008)

8

*Boncasa v. Standard Chartered PLC*, 2023 WL 7110774,
at *2–*3 (S.D.N.Y. Oct. 27, 2023)

9

10

*Brandenburg v. Ohio*, 395 U.S. 444 (1969)

11

*Cardigan Mountain Sch. V. New Hampshire Ins. Co.,* 787 F.3d 82 (1st Cir. 2015)

12

*Christian Legal Soc. Chapter of the Univ. of Cal., Hastings Coll. of the L. v. Martinez*,
561 U.S. 661 (2010)

13

*Elonis v. United States*, 575 U. S. 723 (2015)

14

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*,
82 F.4th 664, 1(9th Cir. 2023)

15

16

*Gerlich v. Leath*, 861 F.3d 697, 705 (8th Cir. 2017)

17

*Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983)

18

*Holder v. Humanitarian Law Project*, 549 F.3d 685 (7th Cir. 2008)

19

*Hotel Emps. & Rest. Emps. Union, Loc. 100 of New York, N.Y. & Vicinity, AFL CIO v.
City of New York Dep't of Parks & Recreation*, 311 F.3d 534 2 (2d Cir. 2002)

20

21

*Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842 (2d Cir. 2021)

22

*McDonough v. Anoka County*, 799 F.3d 931 (8th Cir. 2015)

23

*National Association for the Advancement of Colored People v. Claiborne Hardware Co.*,
458 U.S. 886 (1982)

24

25

*Rosenberger v. Rector & Visitors of the Univ. of Virginia*, 515 U.S. 819 1 (1995)

26

*Rothstein v. UBS AG* , 708 F.3d 82 1 (2d Cir. 2013)

27

*Snyder v. Phelps*, 562 U.S. 443 (2011)

28

*Somers v. Apple, Inc.*, 729 F.3d 953 (9th Cir. 2013)

*Tinker v. Des Moines Indep. Sch. Dist*., 393 U.S. 503 (1969)

*Tyler v. City of Kingston*, 74 F.4th 57 3 (2d Cir. 2023)

*United States. v. Osadzinski,* 97 F.4th 484 (7th Cir. 2024)

*United States v. Stevens* , 559 U.S. 468, 130 S.Ct. 1577, 176 L.Ed.2d 435 (2010)

*Virginia v. Black*, 538 U. S. 343 (2003)

*Whittney v. Guys, Inc.*, 700 F.3d 1118 (8th Cir. 2012)

*Widmar v. Vincent*, 454 U.S. 263 (1981)

*Zobay v Mtn Grp*., 695 F. Supp. 3d 301 (E.D.N.Y. 2023)

**MISC.**

Blinder, Alan (2023-11-17). *"Inside the Pro-Palestinian Group Protesting Across College Campuses". The New York Times. ISSN 0362-4331. Retrieved 2025-03-17*

Brown University suspends Students for Justice in Palestine pending investigation - The Brown Daily Herald

*"Jewish Leftists Disrupt Kadima MK Speech at U.S. University". Haaretz.*

*Judgment of the Nuremberg International Military Tribunal 1946* (1947) 41 AJIL 172.

https://www.jewishexponent.com/swarthmore-israel-protests-result-in-suspension-of-students-for-palestine-group-2/

Pro-Palestine activists call for mass 'takeover' of US campuses - The Jerusalem Post (jpost.com)

Pro-Palestinian group storms Jewish professor's UNLV lecture, forcing it to cancel (8newsnow.com)

*Rosenfeld, Arno (2023-12-20). "The secret history and uncertain future of Students for Justice in Palestine". The Forward. Retrieved 2025-03-17*

## MEMORANDUM OF POINTS AND AUTHORITIES

COMES NOW, Plaintiff, COREY GERWASKI, by and through his attorneys of record, SIGAL CHATTAH, ESQ., of CHATTAH LAW GROUP and JOSEPH S. GILBERT, ESQ., of JOEY GILBERT LAW, and file the foregoing Response to Motion to Dismiss Complaint [ECF 51] filed by Defendant Students for Justice of Palestine in the above-entitled action.

## INTRODUCTION

The following action against Defendants Students for Justice in Palestine-UNLV (SJP-UNLV), AJP Educational Foundation, Inc. a/k/a American Muslims for Palestine ("AMP"), and National Students for Justice of Palestine (NSJP), stem from the same nucleus of operative facts, to wit, these organizations wreaked havoc on UNLV's campus, giving rise to claims against the three defendants by Corey Gerwaski, a student at UNLV.

Mr. Gerwaski filed his First Amended Complaint on August 9, 2024 [ECF NO. 6], herein after "FAC". Service on Students of Justice of Palestine-UNLV was timely.

Plaintiff's claims against SJP-UNLV include the following claims for relief:

1. First Claim for Relief: Violation of the Anti-Terrorism Act, 18 U.S.C.§ 2333(d)

2. Ninth Claim for Relief: Intentional Infliction of Emotion Distress

Notably, since the protests and occupations began on Oct. 8, 2023, just hours after the Hamas raid began and a week before Israel fired so much as a single retaliatory bullet, there was the clear implication that SJP (and SJP-UNLV) knew about the raid in advance and had prepped its adherents to move instantly.[1] NSJP and SJP-UNLV's readiness and lightning response strongly imply foreknowledge. Their knowledge is further shown by the striking pattern of post-attack coordination, conducted on social media, between Hamas, AMP, SJP-UNLV and NSJP to foment disruption on and off campus.

Defendant SJP-UNLV seeks dismissal of this action against them raising essentially the same arguments as its parental organization, AMP. Plaintiff requests this Court deny Defendant SJP-UNLV's Motion and continue this matter's adjudication on the merits in ordinary course.

---

[1] College anti-semitism bans don't go far enough | Opinion | avpress.com

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## STUDENTS FOR JUSTICE IN PALESTINE

For at least the last five years, Students for Justice in Palestine has been active at the University of Nevada Las Vegas as a Chapter of NSJP. National Students for Justice in Palestine (NSJP) was founded at the University of California, Berkeley in 1993.[23] It was cofounded by Hatem Bazian, now the chairman of American Muslims for Palestine (AMP).[4] National Students for Justice in Palestine boasts 300 chapters nationwide.

Immediately, following the October 7, 2023 Hamas attacks, chapters of Students for Justice of Palestine on campuses across the country have mobilized, harassed, and incited violence against Jewish students at campuses nationwide, leading to expulsion, suspension, and sanction of various SJP Chapters. UNLV has not suspended its Chapter, despite the unrest it created for Plaintiff and other Jewish students and the violation of university policies therein.

In late 2023, SJP chapters were banned or suspended at Brandeis University, Columbia University, Rutgers University and George Washington University for violating university policies, with Columbia's suspension lasting through the fall semester and GWU's for three months. In February 2024, SJP Chapters were banned from University of California campuses for violating University policies.

At Fordham University, administrators barred students from starting an SJP chapter, believing it would create "polarization" on campus and "run contrary to the mission and values" of the school.

Both the undergraduate SJP group and an SJP chapter made up of graduate students were

---

[2] *Rosenfeld, Arno (2023-12-20). "The secret history and uncertain future of Students for Justice in Palestine". The Forward. Retrieved 2024-02-16.*
*"Jewish Leftists Disrupt Kadima MK Speech at U.S. University". Haaretz.*

[4] *Blinder, Alan (2023-11-17). "Inside the Pro-Palestinian Group Protesting Across College Campuses". The New York Times. ISSN 0362-4331. Retrieved 2024-02-20.*

banned from UCLA indefinitely. They cannot use school facilities or get student government funds as most clubs do. Similar bans hit the group's chapters at UC campuses in Irvine, San Diego, and Santa Cruz.

The Swarthmore College chapter of Students for Justice in Palestine, in Swarthmore, Pennsylvania, as well as outside protesters, staged a sit-in on campus that violated university policy which resulted suspension of Swarthmore SJP[5]

In October, 2024, Brown University suspended their chapter of SJP "Given the severity of alleged threatening, intimidating and harassing actions during an event on campus, Brown University has initiated a review of the event and required the Brown chapter of Students for Justice in Palestine to cease all organization activities pending full review of the matter," University Spokesperson Brian Clark told The Herald.[6]

Most recently, on March 10, 2025, National Students for Justice in Palestine (NSJP) issued a directive, "We call on the widest swath of organizations, formations, and individuals to walk out of class, take over central spaces on campus, and assert our mass power," the NSJP said on social media. "In the face of the state's existential attacks on the student movement and popular education, we declare that we, the united students, faculty, staff, and workers, are the university."[7]

Published across social media platforms and endorsed by eight activist groups, including the Palestinian Youth Movement, City University of New York for Palestine, and the US Campaign for Palestinian Rights Action, the call to action came in response to a crackdown on campus protests by the US government.

Whether it is NSJP, SJP-UNLV and/or its parent AMP systematically violating UNLV's University policies, their goal is clear as day; to subvert university authority, create chaos, harass, and wreak havoc on Jewish students, and attempt to hide behind First Amendment protections. Universities are currently paying a steep price because of their failures to protect

---

[5]    https://www.jewishexponent.com/swarthmore-israel-protests-result-in-suspension-of-students-for-palestine-group-2/
[6] Brown University suspends Students for Justice in Palestine pending investigation - The Brown Daily Herald
[7] Pro-Palestine activists call for mass 'takeover' of US campuses - The Jerusalem Post (jpost.com)

Jewish students in the same manner that UNLV failed Corey and others, while other Universities learned quickly and swiftly banned SJP chapters from their campuses.

## STATEMENT OF FACTS

Immediately, after October 7, 2023, students at UNLV and faculty rallied to support Hamas, whose terrorists had invaded Israel to murder, torture, and rape 1,200 people and abduct hundreds of others. As Plaintiff alleges, and has been demonstrated by recent events concluding that SJP engages in conduct that violates student's rights and specifically at UNLV violating Plaintiff's rights, SJP-UNLV's sole activities were to agitate, harass and create chaos on campus for Jewish students in violation of UNLV policies.

Cases such as the matter *sub judice* have been filed across the Nation following similar activities on other campuses and have all found a favorable result in favor of Plaintiffs following the egregious nature of what Jewish students across the Country experienced. SJP-UNLV brings the foregoing Motion to Dismiss making the same failed assertions as have been made by other SJP chapters nationwide, that their actions fall under the First Amendment protections.

Like Defendant AMP, SJP-UNLV and NSJP's rolls and acts in this case are particularly egregious because their roll was two-fold. First, on-campus acting to harass and sow chaos at the University, inciting, encouraging, and soliciting harassment of Jewish students and delegitimizing their presence on campus, encouraging students and faculty to follow their lead. Off campus, because of the coordinated activities that AMP, SJP-UNLV and NSJP engaged in on university campuses facilitated support to FTOs as recognized by Hamas itself.

As Hamas terrorists targeted Israel, SJP-UNLV and NSJP declared it is "PART of" Hamas and under its "unified command" and began pumping a pro-Hamas narrative and propaganda around America and specifically at UNLV.

NSJP and particularly SJP-UNLV is Hamas' propaganda arm at UNLV and in the United States creating a platform of pro-terrorist activities. SJP-UNLV continuously supplied Hamas with invaluable support through recruitment, fundraising, human mobilization, and volunteers to further their terrorist agenda.

On university campuses world-wide, NSJP and locally, SJP-UNLV, declared that it is "PART of" Hamas and operating under its "unified command," and it unleashed a concerted propaganda and disruption campaign on America's University campuses. Plaintiff seeks to hold SJP-UNLV, NSJP and AMP liable for its role in furthering the chaos and mayhem caused on UNLV's campus against Gerwaski: supplying pro-Hamas propaganda services—before, during, and after October 7—to maximize Hamas' terrorist activities, and radicalize and legitimize support for Hamas' terrorist activities.

A simple example of this is the following post on SJP-UNLV's post of their statement following their violation of UNLV policy and disrupting Professor Assaf Peer's lecture.[8]



See FAC ¶177-185.

---

[8] Pro-Palestinian group storms Jewish professor's UNLV lecture, forcing it to cancel (8newsnow.com)

8

The fact that SJP-UNLV uses the same failed arguments in this action, as they have in every University that has thrown them off campus, attempting to hide behind the same failed First Amendment arguments, simply demonstrates that they either fail to recognize that sowing chaos, harassment Jewish students and providing material assistance to FTO's on UNLV's campus is illegal or they recognize it and simply do not care.

### LEGAL ARGUMENT

**A.    PLAINTIFF'S ALLEGATIONS ARE SUFFICIENTLY PLED UNDER *TWOMBLY* TO PRECLUDE DEFENDANT FROM PREVAILING ON ITS MOTION TO DISMISS.**

To survive a motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). Although a complaint need not contain "detailed factual allegations," it must contain facts with enough specificity "to raise a right to relief above the speculative level." *Id.* at 555. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," will not pass muster. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed.2d 868 (2009) *(citing Twombly, 550 U.S. at 555).* In sum, this standard "calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the claim]." *Twombly*, *550 U.S. at 556*. However, at the pleading stage, the plausibility requirements of *Iqbal* and *Twombly* do not require "some general and formal level of evidentiary proof." *Whittney v. Guys, Inc.*, 700 F.3d 1118, 1128 (8th Cir. 2012).

"Asking for plausible grounds does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of" the claimed violations. *Twombly*, 550 U.S. at 556. "There is no requirement for direct evidence; the factual allegations may be circumstantial and 'need only be enough to nudge the claim 'across the line from conceivable to plausible.'" *McDonough v. Anoka County, 799* F.3d

931, 945 (8th Cir. 2015) (quoting *Cardigan Mountain Sch. V. New Hampshire Ins. Co.*, 787 F.3d 82, 88 (1st Cir. 2015) *(quoting Twombly, 550 U.S. at 556)).*

Where a court grants a motion to dismiss under Rule 12(b)(6) or a motion for judgment on the pleadings under Rule 12(c), leave to amend should be freely given if it is possible that further factual allegations will cure any defect. *See Somers v. Apple, Inc.*, *729 F.3d 953, 960 (9th Cir. 2013)* ("[A] district court should grant the plaintiff leave to amend if the complaint can possibly be cured by additional factional allegations….").

Contrary to Defendant's claim that Plaintiff fails to allege sufficient facts to sustain a finding to satisfy notice pleading under Fed. R.Civ. Pro 8 in a 77-page Complaint with facts, photos and examples of their outrageous conduct is absurd. Should this Court find that Plaintiff has insufficiently pleaded facts to sustain a finding in his favor, Plaintiff hereby requests leave to amend the foregoing FAC.

**B.    DEFENDANTS' ACTIONS AS ALLEGED, WERE NOT AND ARE NOT PROTECTED BY THE FIRST AMENDMENT**

Defendants SJP-UNLV reiterate essentially the same arguments made by their co-defendants in this action, AMP. However, throughout the FAC, SJP-UNLV's actions are much more culpable than AMP and are not protected by the First Amendment as delineated *infra*.

The First Amendment provides "Congress shall make no law ... abridging the freedom of speech." U.S. CONST. amend. I. "[A]s a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *United States v. Stevens*, 559 U.S. 460, 468, 130 S.Ct. 1577, 176 L.Ed.2d 435 (2010) (quoting *Ashcroft v. Am. Civil Liberties Union*, 535 U.S. 564, 573, 122 S.Ct. 1700, 152 L.Ed.2d 771, (2002) ). However, there are some "well-defined and narrowly limited classes of speech" that have been recognized as falling outside the protection of the First Amendment. *Stevens*, 559 U.S. at 468–72, 130 S.Ct. 1577. These include child pornography,

obscenity, defamation, fighting words, incitement, true threats of violence, fraud, and speech integral to criminal conduct. *See id.*

True threats are "serious expression[s]" conveying that a speaker means to "commit an act of unlawful violence." *Virginia v. Black*, 538 U. S. 343, 359 (2003). The existence of a threat depends not on "the mental state of the author," but on "what the statement conveys" to the person on the receiving end. *Elonis v. United States*, 575 U. S. 723, 733 (2015).[9] Calls for the extermination of Jews resulting in adverse actions against Jewish students, such as Gerwaski are not protected by the First Amendment.

Like, AMP, SJP-UNLV's citation to *Snyder v Phelps* in support of their claim that the First Amendment bars Plaintiff's claims in this matter is fatally flawed. *Snyder v. Phelps*, 562 U.S. 443 (2011), was a landmark decision by the Supreme Court of the United States in which the Court held that speech made in a public place on a matter of public concern cannot be the basis of liability for a tort of emotional distress, even if the speech is viewed as offensive or outrageous. This case is not about speech, it is about providing material assistance to Foreign Terrorist Organizations and perpetuating months of harassment and chaos on UNLV's campus.

Likewise, their reliance on *NAACP v Claiborne Hardware Co.* fails for the same reasons. *National Association for the Advancement of Colored People v. Claiborne Hardware Co.*, 458 U.S. 886 (1982), was also a landmark decision of the United States Supreme Court that held that although states have broad power to regulate economic activities, they cannot prohibit peaceful advocacy of a politically motivated boycott. AMP's activities were not peaceful advocacy of a politically motivated boycott. SJP's activities had nothing to do with politically motivated boycott, they were the public relations arm and foot soldiers of FTO, soliciting support for

---

[9] Assuming this Court is persuaded that they are entitled to a First Amendment analysis, this Court should apply a recklessness standard—i.e., a showing that a person "consciously disregard[ed] a substantial [and unjustifiable] risk that [his] conduct will cause harm to another," *Voisine v. United States*, 579 U. S. 686 (2016).

continued terrorism and destabilization domestically against Jewish students at UNLV, harming Plaintiff.

At the outset, this is not a First Amendment case. This is not a case where free speech is challenged in a context that is even remotely allowable. The Constitution does not protect knowingly giving cash or material support to terrorists. *See, e.g., Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 700 (7th Cir. 2008) ("If the financier knew that the organization to which it was giving money engaged in terrorism, penalizing him would not violate the First Amendment."). Regardless of whether the Constitution protects wholly independent speech in favor of the most vitriolic statements, it does not protect providing terrorists with propaganda and recruiting services.

In *Holder v. Humanitarian Law Project*, the Supreme Court considered a challenge to a statute barring people from providing "material support" in the form of "training," "expert advice or assistance," "service," and "personnel" to terrorist groups. 561 U.S. 1, 14 (2010) (citing 18 U.S.C. § 2339B).[10]  In *Holder*, The Humanitarian Law Project sought to help Turkey's Kurdistan Workers Party (PKK) and Sri Lanka's Liberation Tigers of Tamil Eelam (LTTE) with peaceful conflict resolution. The Supreme Court upheld a federal law banning "material support" to "foreign terrorist organizations" and refused to apply the strict scrutiny standard required in content-based regulations. Petitioners claimed it would violate the First Amendment to apply the statute to speech that would "advance only the legitimate activities of the designated terrorist organizations, not the terrorism." *Id*. at 29.  The Supreme Court rejected the argument, as any

---

[10] Section 2339A(b)(1) defines the term "material support or resources" as any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, ***personnel*** (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials [*Emphasis added*]. Se *United States v Carpenter*; 3:21-CR-38-KAC-DCP (E.D. Tenn. Dec. 6, 2022).

support to a terrorist organization can advance terrorism by "free[ing] up other resources within the organization that may be put to violent ends." *Id.* at 30; see *id.* at 32 n.6 (explaining that speech-related services "facilitate[] the group's ability to attract 'funds,' 'financing,' and 'goods' that will further its terrorist acts").

Under *Holder*, the First Amendment does not protect "expressive activity that amounts to the provision of material support to a foreign terrorist organization where the support is either addressed to, directed by, or coordinated with that organization." *See also United States. v. Osadzinski,* 97 F.4th 484, 492 (7th Cir. 2024). In *Osadzinski,* the Seventh Circuit rejected a First Amendment challenge to a conviction for sharing a propaganda-duplicating computer program because the defendant believed he was giving it to ISIS affiliates. See *id.* at 486, 492.

### 1.    Defendants' Actions are also Limited in the Context of *Brandenburg*

In the landmark case *Brandenburg v. Ohio*, 395 U.S. 444 (1969) the Supreme Court established the "imminent lawless action" test, limiting government's ability to restrict speech that advocates violence or illegal action, unless it is both directed at inciting such action and likely to produce it. The Supreme Court held that: "[T]he constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action."

The Court established a two-pronged test, now known as the *Brandenburg* test, to determine when speech advocating violence can be restricted:

The speech must be "directed to inciting or producing imminent lawless action".

The speech must be "likely to incite or produce such action".

In First Amendment cases, there are three types of forums: traditional public forums, non-public forums, and limited public forums. *ACLU v. Mote*, 423 F.3d 438, 443 (4th Cir. 2005).

13

A limited public forum "is one that is not traditionally public, but the government has purposefully opened to the public, or some segment of the public, for expressive activity." *Id.* at 443. The University's campus is a limited public forum. *Id.* at 444.

Accordingly, because SJP is "within the class to which [the University campus] is made generally available," restrictions on SJP's speech are subject to strict scrutiny. *Id.* Consideration of SJP's right to free expression is "shaped by the educational context in which it arises," *Christian Legal Soc. Chapter of the Univ. of Cal., Hastings Coll. of the L. v. Martinez*, 561 U.S. 661, 685 (2010).

Thus, the Court must be mindful of the compelling interests that are applicable to this context. First Amendment claims must "be analyzed in light of the special characteristics of the school environment." *Id.* at 686-87. First and foremost, "[a] university's mission is education. *Widmar v. Vincent*, 454 U.S. 263, 268 n.5 (1981).

The Supreme Court has "recognized that First Amendment rights must be analyzed in 'light of the special characteristics of the school environment.'" *Widmar v. Vincent*, 454 U.S. 263, 268 n.5 (1981) (quoting *Tinker v. Des Moines Indep. Sch. Dist.*, 393 U.S. 503, 506 (1969)). "A university differs in significant respects from public forums such as streets or parks or even municipal theaters. A university's mission is education, and decisions of this Court have never denied a university's authority to impose reasonable regulations compatible with that mission upon the use of its campus and facilities." *Id.*

[A] limited public forum is created when the government opens a non-public forum for public expression, but limits expressive activity to certain kinds of speakers or the discussion of subjects." *Hotel Emps. & Rest. Emps. Union, Loc. 100 of New York, N.Y. & Vicinity, AFL CIO v. City of New York Dep't of Parks & Recreation*, 311 F.3d 534, 552 (2d Cir. 2002).

14

The "reasonable, viewpoint neutral" standard applies to First Amendment questions arising in a limited public forum. *See Tyler v. City of Kingston*, 74 F.4th 57, 63 (2d Cir. 2023).

Here, there are two possible forums. The first is the forum comprised of student groups. Granting Registered Student Organization status is naturally limited to students registered at the University. Such status allows groups to access nonpublic resources, including free use of the University's buildings and grounds.

*Martinez* determined that a public educational institution considering a group's Registered Student Organization status fit "comfortably within the limited-public-forum category." 561 U.S. at 682. Indeed, courts generally consider a university facility or resource to be a limited public forum. *See, e.g., Hotel Emps. & Rest. Emps. Union, Loc. 100 of New York, N.Y. & Vicinity, AFL CIO*, 311 F.3d at 545 ("Examples of limited public fora include state university meeting facilities opened for student groups ...."); *Gerlich v. Leath*, 861 F.3d 697, 705 (8th Cir. 2017) (concluding that university "created a limited public forum when it made its trademarks available for student organizations to use if they abided by certain conditions").

Correspondingly, "First Amendment free-speech and freedom-of-expressive-association challenges related to regulation of student-run clubs . . . [are reviewed] under the Supreme Court's limited-public-forum doctrine." *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 711 (9th Cir. 2023)  (Forrest, J., concurring) (citing *Martinez*, 561 U.S. at 679-80); *see also Rosenberger v. Rector & Visitors of the Univ. of Virginia*, 515 U.S. 819, 829-31 (1995) (applying limited public forum standard to restrictions on student activity fund available to student groups that complied with certain procedural requirements).

**2.  SJP-UNLV Violated the Code of Conduct at UNLV, as Alleged in the Plaintiff's Complaint.**

15

As noted in Plaintiff's FAC, ⁋ 143-145, UNLV's Office of Vice President of Student Affairs issued a Student Code on Conduct which specifically delineates the acceptable and unacceptable conduct by students and Student Organizations.

Students/student organizations are subject to the University's internal disciplinary procedures, i.e., the "Code," and, when applicable, to local, state, and federal laws. The Code of Conduct also prohibits the following acts.

- Disrupting classroom activity, University functions, and/or the operations of the University by an action or combination of actions that unreasonably interfere with, hinder, obstruct, or prevent the right of others to freely participate in an activity, program, or service of the University. *Id.* III, K.

- Threatening, assaulting, or causing physical harm to oneself or to another. Uttering any words or performing any acts that cause physical injury, or threaten any individual, or interfere with any individual's rightful actions, including but not limited to the following:

    1. words or actions that would cause an individual to fear for his or her immediate safety.

    2. the use of physical force against an individual.

    3. repeatedly contacting another person when the contact is unwanted.

    *Id*. III, Q

- ***Harassment, which is any verbal, visual***, electronic, or physical conduct that is ***sufficiently severe, and/or ongoing that it adversely affects, or has the purpose or logical consequence of interfering with any student's educational program***; ***or creates an intimidating, hostile, or offensive environment within the University community.*** Harassment can include, but is not limited to, the above behaviors towards any person because of ***race, ethnicity, religion***, gender, sexual orientation/identity, age, creed, ***national origin,*** disability, veteran status, or on any other basis. [*Emphasis added*]

    *Id.* III, S

UNLV's Student Code of Conduct also specifically delineates the conduct of student organizations and provides:

Any recognized student group or organization may be charged with violations of this Code. Any University-recognized student group or organization may be held accountable for the actions of any of its members if the violation of the Code is in any way related to

16

the group or organization. Group misconduct need not be officially approved by the entire membership to be considered grounds for possible conduct action towards the organization.

Here, as demonstrated and alleged not only in Plaintiff's FAC, but by the actions of universities all over the Country, expelling SJP chapters from university campuses nationwide, SJP has simply engaged in conduct that exceeds the protections of the First Amendment. As alleged in Plaintiff's FAC, SJP has engaged in verbal and visual harassment, which has adversely affected and interfered with Gerwaski's educational program at UNLV.

**B.    PLAINTIFF HAS ALLEGED SUFFICIENT FACTS TO SUSTAIN HIS NINTH CLAIM FOR RELIEF OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

Here, SJP's conduct was extreme and outrageous as an organization that solicits and encourages antisemitic vitriol and incites violence against Jewish students at UNLV by "globalizing the intifada."

Social media posts that say "Zionist presence on our campus can't go unchecked" [See ECF 6, 24; 3-12] with encouraging and inciting harassment and abuse of Jewish students is intolerable in a civilized community. To SJP-UNLV, "checking" the Zionist presence includes harassing students such as Plaintiff, interrupting Israeli faculty members, and soliciting and encouraging antisemitism by UNLV faculty in violation of Title VI and VII.

Encouraging and facilitating the harm of Jewish students and "Zionist presence" at UNLV goes outside all possible bounds of decency.

Plaintiff sufficiently plead all the damages that resulted from Defendant's acts in his FAC. Plaintiff sufficiently plead and demonstrates that Defendants acts are both the actual and proximate cause of Mr. Gerwaski's distress.

Furthermore, Gerwaski specifically delineates that he not only suffered emotional distress but also that he had suffered great humiliation, embarrassment, shame, and other pain and

suffering.

Plaintiff alleged sufficient facts to satisfy the requirements under Fed. R. Civ. Pro. 8. Assuming *arguendo*, this Court finds that there are insufficient facts alleged to comply with Rule 8 requirements, Plaintiff seeks leave to incorporate additional facts regarding same. Accordingly, Mr. Gerwaski meets the threshold to sustain a finding of a claim for relief under Fed. R. Civ. Pro Rule 8 for his Ninth Claim for Relief

## C.    PLAINTIFF SUFFICIENTLY PLEAD HIS CLAIM UNDER JASTA

SJP echoes AMP's flawed argument that their propaganda services for terror groups— dismissed by SJP as "mere advocacy"—are excluded from JASTA.  At the outset, JASTA extends to all forms of "substantial assistance," 18 U.S.C. § 2333(d)(2), without restricting liability to certain kinds of support or offering safe harbors for propaganda similar conduct.

By JASTA's plain terms, if the support is "substantial," the form of that support is irrelevant. Caselaw further confirms that assistance under JASTA need not be tangible; services like banking, project financing, and logistical support have all been recognized as "substantial." *See, e.g., Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 849–50, 865–66 (2d Cir. 2021) (banking services); *Boncasa v. Standard Chartered PLC*, 2023 WL 7110774, at *2–*3, *11 (S.D.N.Y. Oct. 27, 2023) (project financing services); *Zobay v Mtn Grp*., 695 F. Supp. 3d 301, 314,349-350 (E.D.N.Y. 2023) (logistical support).

As *Twitte*r also demonstrates, speech alone can aid and abet a terrorist attack. Simply "giving verbal encouragement"—as by "yelling 'Kill him!'"—supports liability. *Twitter*, 598 U.S. at 492; see also id. at 490 (noting aiding and abetting "come[s] in many forms, including inducing, encouraging, soliciting, or advising the commission of the offense, such as through words of encouragement or driving the getaway car"). Although *Twitter* did not result in liability due in large part to the platform's "arm's length, passive, and largely indifferent" relationship to

the terrorists and the attack at issue, the Court noted that deliberate promotion of a terrorist group's content could indeed incur liability. *Id.* at 500 (stating that liability might well lie if the platform had "consciously and selectively chose to promote content provided by a particular terrorist group") *Id.* (emphasis added).

Plaintiff asserts his claim under the Justice Against Sponsors of Terrorism Act ("JASTA"), 18 U.S.C. § 2333(d), which extends liability under the Antiterrorism Act to aiders and abettors. Congress intended JASTA to "provide civil litigants with the broadest possible basis . . . to seek relief against persons, entities, and foreign countries, . . . that have provided material support, directly or indirectly," to terrorist organization that have attacked the United States or its citizens. JASTA, Pub. L. No. 114-222, 130 Stat. 852, § 2(b) (2016).

A claim under 18 U.S.C.§ 2333(d) has three elements: (i) the plaintiff suffers an "injury arising from an act of international terrorism"; (ii) the attack is "committed, planned, or authorized" by an organization designated as a foreign terrorist organization at the time of the attack; and (iii) the defendant "aids and abets, by knowingly providing substantial assistance." 18 U.S.C. § 2333(d)(1); *Twitter v. Taamneh*, 598 U.S. 471, 483-484 (2023).

18 U.S.C.§ 2333(d) provides that "[L]iability may be asserted as to any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism." Here, Defendant conflates that the congressional intent of the statute somehow precludes SJP from being found liable for their participation in acts that perpetuated terrorist acts both foreign and domestically.

The third JASTA element (aiding and abetting) has three components of its own: (i) the primary actor, *i.e.,* a foreign terrorist organization like Hamas, must commit a primary violation; (ii) "the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance;" and (iii) "the defendant must knowingly and

19

1
2
3

substantially assist the principal violation." *Twitter,* 598 U.S. at 486 (quoting *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983)); see also 130 Stat. 852, § 2(a)(5) (stating that *Halberstam* "provides the proper legal framework" for analyzing JASTA claims).

4
5
6
7
8
9
10
11
12
13

Defendant's focus on only October 7, 2023, as the only date that Gerwaski must suffer damages from; *ergo*, since Gerwaski was not personally affected by October 7, he is precluded from asserting claims against SJP under JASTA. In fact, SJP's actions for which they are liable for only occurred after October 7, 2023. SJP's actions peaked across the US and overseas after October 7, 2024, with the continuous assistance they provided to Hamas and IRGC after October 7, 2023. SJP has done everything in its powers on and off college campuses and UNLV for over six months to enflame and encourage and provide substantial assistance to FTOs through their activities continuing far after October 7, 2023 stoking and inflaming antisemitism.

14
15
16
17
18
19

Plaintiff specifically delineates in his FAC, FTOs acts months after October 7, 2023, that are supported by Defendants here on UNLV's campus. Specifically, on December 5, 2023, in an interview on Al-Aqsa TV (Hamas-Gaza), a senior Hamas official, Sami Abu Zahri, called on Hamas's allies in the United States to engage in domestic terrorism to support Hamas's terrorist activities. Defendants' encouragement of its members, affiliates, and allies to join the "resistance"—again, a euphemism for Hamas itself—is not mere speech or advocacy.

20
21
22
23
24
25

Rather, Defendants encouraged their members to exert political pressure on American institutions and politicians, in service of Hamas's goals. Furthermore, SJP-UNLV boasted about it as delineated in Plaintiff's FAC, [ECF 6 ⁋ 198]. Their goal was to have UNLV capitulate to Hamas and other FTO's through their advocacy for said FTOs, while hiding behind alleged First Amendment protections.

26
27
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15



16    The chaotic images emerging from American campuses are the intended result of SJP's

17 endeavors.  SJP acts as Hamas' public relations division and recruited students as domestic foot

18 soldiers not only to disseminate Hamas's propaganda but also to foment violence, chaos, and fear

19 across the United States and at UNLV to intimidate students and faculty and coerce change in

20 American policy.

21    This is all in support Hamas's, Hezbollah and IRGC's short and long-term goals for its

22

23 international terrorist activities, using and recruiting American students on American University

24 campuses to perpetuate a terrorist agenda to sow chaos domestically in the United States.

25    SJP organized a "Day of Resistance" riots and protests at UNLV, to coincide with

26

27 Hamas's proclaimed "Day of Rage" for its supporters in Gaza and the West Bank on October 13,

28

2023 (which would be late in the evening on October 12, 2023, in many parts of the United States).

As demonstrated in social media posts in the FAC, every call to action by Hamas, is equally mirrored and reciprocated with a call to action at UNLV, held by NSJP, and SJP-UNLV along with other student and non-student organizations they collaborate with to wreak havoc on UNLV's campus.

Accordingly, it is indisputable that that secondary liability is appropriate where SJP "consciously and culpably 'participate[d]' in wrongful acts in the United States to help make the continued Hamas and IRGC terrorism successful in the Middle East. Without the constant perpetuation of SJP's actions at UNLV legitimizing the acts of Hamas in Israel and against the hostages, Gerwaski and other Jewish students would have never been subjected to the abuse and harassment they had been to.

### *(a) Plaintiff Sufficiently Alleges a Personal Harm by Acts of International Terrorism*

Seemingly, Defendants claim that Plaintiff failed to allege proximate causation. JASTA does not require proximate causation. As Plaintiff has explained, a JASTA claim involves several elements, components, and factors, designed to identify "conscious, voluntary, and culpable participation in another's wrongdoing." *Twitter*, 598 U.S. at 493. Traditional proximate cause figures nowhere in the analysis. Instead, the defendant's connection to the misconduct is principally addressed through the requirement that the defendant must provide knowing and substantial assistance. As shown above, that requirement is satisfied here.

Mr. Gerwaski does not need to allege in the Complaint the he is an American National.[11] Furthermore, Plaintiff's Amended Complaint specifically delineates acts that SJP have engaged

---

[11] Mr. Gerwaski is an American National, and assuming arguendo that this Court requires Mr. Gerwaski allege with specificity that he has standing to bring this action under 2333(a), Plaintiff seeks leave to amend same and assert said allegations therein.

in since 2010 at UNLV, long before the October 7, 2023 attack ever occurred. [*See* ECF 6, 9; 5-23.] The only three requirements Mr. Gerwaski, needs to meet to prevail under the ATA are that he suffered an act that arose from international terrorism. SJP's involvement in assisting FTO's is adequately alleged in the FAC.  As alleged in Plaintiffs' Complaint UNLV and Defendants SJP collectively and collaterally engaged in actions in violation of JASTA [See ECF-6; 57-58].

Plaintiffs FAC specifically alleges that "[O]n January 21, 2024, Hamas issued a document in English, *Our Narrative—Operation Al-Aqsa Flood,* explaining how the protests and slogans of the American students in the wake of October 7, have renewed and reinvigorated the goals of Hamas to completely destroy Israel.[12] [See ECF-6; 26-27]. There could not be a clearer, bolder demonstration of substantial assistance of SJP to Hamas. The link of SJP to the Hamas leader Khaled Mashal could not be made any clearer, then Mashal's own words, claiming SJP's actions have "renewed and reinvigorated the goals of Hamas to completely destroy Israel."

By providing substantial (material) assistance[13] to SJP, and their affiliates to continue terrorizing Jewish students on campus. The mutual reliance and relationship that exists between Hamas and SJP-UNLV have resulted in injuries to Mr. Gerwaski, insofar as the acts of terrorism against Jews in Israel, refusing to release hostages and collectively and collaterally justifying these acts as resistance to harm students at UNLV and specifically Gerwaski.

Further, Plaintiff's FAC provides 27 pages of extensive facts creating a direct nexus between Hamas, Defendant SJP, and UNLV's substantially assisting and complicitly allowing SJP-UNLV to engage in these egregious acts which directly caused damages to Mr. Gerwaski.

---

[12] Hamas Leader Abroad Khaled Mashal: 'We Reject the Two-State Solution; October 7 Proved That Liberating Palestine from The River to The Sea Is Realistic and Has Already Begun', MEMRI TV (Jan. 22, 2024), https://www.memri.org/reports/hamas-leader-abroad khaled-mashal-we-reject-two-state-solution-october-7-proved-liberating.
[13] See ECF 6, 54-55.

1

2
          *(b) Plaintiff Sufficiently Alleges Proximate Causation to Satisfy the ATA's Requirement.*

3
To satisfy the ATA's "by reason of" requirement, a plaintiff must show at least some

4
direct relationship between the injuries that he or she suffered and the defendant's acts. Plaintiff's

5
FAC delineates over 27 pages of allegations regarding SJP's acts in collaboration with the

6
University Defendants and NSJP. It is indisputable that the rhetoric that, UNLV, NSJP and SJP-

7
UNLV coordinated, validated the University's legitimization and normalization of Jewish

8
student harassment that Mr. Gerwaski experienced. The blatant violation of the University's

9
campus student code of conduct to capitulate to SJP-UNLV, NSJP actions proximately caused

10
damages to Gerwaski.

11

12
Importantly, whether faculty and student body felt their actions against Gerwaski were

13
valid, because the University allowed them, are issues of fact to be determined by the jury at

14
trial. *See Judgment of the Nuremberg International Military Tribunal 1946* (1947) 41 AJIL 172.

15
Part of the proximate cause requirement under the JASTA is whether Gerwaksi's damages

16
against the University, organizations were foreseeable consequences of the actions of the

17
activities of UNLV, NSJP and SHP-UNLV, acting in collaboration to intimidate and harass

18
Jewish students, specifically Gerwaski, on UNLV's campus.

19

20
It is hard to dispute that a hostile environment would not exist at UNLV, or be reasonably

21
foreseeable or anticipated as a natural consequence, by allowing NSJP and SJP-UNLV, to

22
continuously harass and abuse Gerwaski and other Jewish students " *See Rothstein v. UBS*

23
*AG* , 708 F.3d 82, 91 (2d Cir. 2013). Spewing antisemitic hate on UNLV's campus for months

24
against Jewish students legitimized every action taken against Gerwaski, whether in the

25
employment context or in the student body. If SJP's virulent antisemitism is normalized on

26
campus, but also legitimized in the name of "resistance," then of course, a reasonably anticipated

27
consequence of that would be that Jewish students would be abused and harassed.

28

## CONCLUSION

A careful review of Plaintiff's FAC will demonstrate that in the course of the 77-page Complaint, SJP-UNLV's complicity in the events that are the subject of this suit are irrefutable at this juncture under a standard for stating a claim for which relief should be granted. For the reasons discussed herein-above, Plaintiff respectfully request that this Court deny the Defendants' Motion to Dismiss in its entirety.

**DATED** this 19th day of March, 2025.

CHATTAH LAW GROUP

_/s/ Sigal Chattah_
SIGAL CHATTAH, ESQ.
Nevada Bar No.: 8264
5875 S. Rainbow Blvd., #203
Las Vegas, Nevada 89118

JOEY GILBERT LAW

_/s/ Joseph S. Gilbert_
JOSEPH S. GILBERT, ESQ.
Nevada State Bar No.: 9033
405 Marsh Avenue
Reno, Nevada 89509
_Attorneys for Plaintiffs_

## CERTIFICATE OF SERVICE

I hereby certify that on the 19th day of March, 2025, I personally served a true copy of the foregoing Plaintiffs' RESPONSE TO DEFENDANTS' MOTION TO DISMISS by the Court's electronic service system to all registered parties:

_/s/ Sigal Chattah_
_____

An Agent of Chattah Law Group