DAVID Z. CHESNOFF, ESQ.
*Nevada Bar No. 2292*
RICHARD A. SCHONFELD, ESQ.
Nevada Bar No. 6815
ROBERT Z. DEMARCO
*Nevada Bar No. 12359*
CHESNOFF & SCHONFELD
520 South Fourth Street
Las Vegas, Nevada 89101
Telephone: (702) 384-5563
dzchesnoff@cslawoffice.net
rschonfeld@cslawoffice.net
rdemarco@sclawoffice.net
Attorneys for Plaintiff, *COREY GERWASKI*

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

| | |
|---|---|
| COREY GERWASKI, | ) |
| | ) |
| Plaintiff, | ) CASE NO. 2:24-cv-00985 |
| | ) |
| vs. | ) |
| | ) |
| STATE OF NEVADA, ex rel. BOARD | ) |
| OF REGENTS of the NEVADA SYSTEM | ) |
| OF HIGHER EDUCATION, on behalf | ) **OPPOSITION TO AJP EDUCATIONAL** |
| of the UNIVERSITY OF NEVADA | ) **FOUNDATION INC.'S MOTION FOR** |
| LAS VEGAS; KEITH WHITFIELD | ) **SANCTIONS (ECF 93) AND** |
| individually; AJP EDUCATIONAL | ) **COUNTERMOTION FOR SANCTIONS** |
| FOUNDATION INC., a California | ) |
| Non-Profit Corporation; STUDENTS FOR | ) |
| JUSTICE IN PALESTINE-UNLV; | ) |
| NATIONAL STUDENTS FOR JUSTICE | ) **[ORAL ARGUMENT REQUESTED]** |
| OF PALESTINE; NEVADANS FOR | ) |
| PALESTINIAN LIBERATION; | ) |
| DOES I-XX and ROE entities I-XX, | ) |
| DEFENDANT(S), an Individual/LLC/Corp; | ) |
| DOE Nevada corporation; DOE Individuals | ) |
| I–XX; ROE Entities, I–XX, | ) |
| | ) |
| Defendants. | ) |
| | ) |

COMES NOW, Plaintiff, COREY GERWASKI ("Mr. Gerwaski" or "Plaintiff"), by and through his attorneys of record, DAVID Z. CHESNOFF, ESQ., RICHARD. A. SCHONFELD, ESQ., and ROBERT Z. DEMARCO, ESQ., of CHENSOFF & SCHONFELD, and files this Opposition to AJP Educational Foundation, Inc.'s Motion for Sanctions (ECF 93) and Countermotion for Sanctions.

This Opposition and Countermotion is made and based upon the papers and pleadings on file herein, the attached Memorandum of Points and Authorities, and any oral argument that may be heard.  This Opposition and Countermotion also incorporates by reference as though fully set forth herein Plaintiff's Second Amended Complaint and Plaintiff's Oppositions to Defendants' Motions to Dismiss.

DATED this 15th day of August 2025.

                                        Respectfully Submitted:

                                        CHESNOFF & SCHONFELD

                                        By: Robert Z. DeMarco
                                            DAVID Z. CHESNOFF, ESQ.
                                            Nevada Bar No. 2292
                                            RICHARD A. SCHONFELD, ESQ.
                                            Nevada Bar No. 6815
                                            ROBERT Z. DEMARCO, ESQ.
                                            Nevada Bar No. 12359
                                            520 South Fourth Street
                                            Las Vegas, Nevada 89101
                                            Phone: (702) 384-5563
                                            Fax: (702) 598-1425
                                            Attorneys for Plaintiff

## MEMORANDUM OF POINTS AND AUTHORITIES

**I.  DEFENDANT AJP EDUCATIONAL FOUNDATION INC.'S MOTION FOR SANCTIONS SHOULD BE DENIED.  PLAINTIFF'S COUNTERMOTION FOR SANCTIONS SHOLD BE GRANTED.**

### A.  INTRODUCTION

Defendant AJP Educational Foundation, Inc. d/b/a American Muslims for Palestine ("AMP") has filed what can only be described as an abusive, retaliatory, and legally hollow motion for sanctions. AMP attempts to use Rule 11 to intimidate Plaintiff into abandoning legitimate claims and the filing is not a legitimate invocation of Rule 11.  Rather, it is a weaponized intimidation tactic, designed to chill Plaintiff's statutory rights under the Anti-Terrorism Act ("ATA") and punish him for naming AMP as a defendant.  Simply stated, AMP's motion is a misuse of the judicial process. The motion simply rehashes arguments already made in their motion to dismiss, relies on mischaracterizations of the pleadings, and attempts to secure punitive relief before discovery has even begun.

Rule 11 is not a bludgeon to punish opposing parties for daring to bring claims, nor is it a substitute for summary judgment. Yet, AMP's motion is precisely that; a desperate attempt to halt Plaintiff's pursuit of relief in a matter involving substantial public importance and alleged violations of the ATA. It is respectfully submitted that this misuse of sanctions is itself sanctionable under Rule 11 and 28 U.S.C. § 1927.

**II.  FEDERAL RULE OF CIVIL PROCEDURE 11**

Federal Rule of Civil Procedure 11 states:

(a) Signature. Every pleading, written motion, and other paper must be signed by at least one attorney of record in the attorney's name--or by a party personally if the party is unrepresented. The paper must state the signer's address, e-mail address, and telephone number. Unless a rule or statute specifically states otherwise, a pleading need not be verified or accompanied by an affidavit. The court must strike an unsigned paper unless the omission is promptly corrected after being called to the attorney's or party's attention.
(b) Representations to the Court. By presenting to the court a pleading, written motion, or other paper--whether by signing, filing, submitting, or later advocating it--an attorney or unrepresented party certifies that to the best of the

person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:

(1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;

(2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;

(3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and

(4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

(c) Sanctions.

(1) In General. If, after notice and a reasonable opportunity to respond, the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation. Absent exceptional circumstances, a law firm must be held jointly responsible for a violation committed by its partner, associate, or employee.

(2) Motion for Sanctions. A motion for sanctions must be made separately from any other motion and must describe the specific conduct that allegedly violates Rule 11(b). The motion must be served under Rule 5, but it must not be filed or be presented to the court if the challenged paper, claim, defense, contention, or denial is withdrawn or appropriately corrected within 21 days after service or within another time the court sets. If warranted, the court may award to the prevailing party the reasonable expenses, including attorney's fees, incurred for the motion.

(3) On the Court's Initiative. On its own, the court may order an attorney, law firm, or party to show cause why conduct specifically described in the order has not violated Rule 11(b).

(4) Nature of a Sanction. A sanction imposed under this rule must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated. The sanction may include nonmonetary directives; an order to pay a penalty into court; or, if imposed on motion and warranted for effective deterrence, an order directing payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from the violation.

(5) Limitations on Monetary Sanctions. The court must not impose a monetary sanction:

(A) against a represented party for violating Rule 11(b)(2); or

(B) on its own, unless it issued the show-cause order under Rule 11(c)(3) before voluntary dismissal or settlement of the claims made by or against the party that is, or whose attorneys are, to be sanctioned.

(6) Requirements for an Order. An order imposing a sanction must describe the sanctioned conduct and explain the basis for the sanction.

(d) Inapplicability to Discovery. This rule does not apply to disclosures and discovery requests, responses, objections, and motions under Rules 26 through 37.

## III.    STANDARD FOR RULE 11 SANCTIONS

Sanctions under Rule 11 are an "***extraordinary remedy, one to be exercised with extreme caution***." *Operating Eng'rs Pension Tr. v. A-C Co.*, 859 F.2d 1336, 1345 (9th Cir. 1988) (emphasis added). The Ninth Circuit requires a two-part inquiry: (1) Whether the paper is legally or factually baseless from an objective perspective; and (2) Whether the attorney or party conducted a reasonable inquiry before filing. *Christian v. Mattel, Inc.*, 286 F.3d 1118, 1127 (9th Cir. 2002).

Crucially, "Rule 11 motions...***should not be employed...to test the sufficiency or efficacy of allegations in the pleadings***; other motions are available for those purposes." Fed. R. Civ. P. 11 advisory committee's note (1993 Amendments) (emphasis added).

Rule 11 is intended to deter baseless filings in district court and imposes a duty of "reasonable inquiry" so that anything filed with the court is "well grounded in fact, legally tenable, and 'not interposed for any improper purpose.'" *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990) (internal quotation marks omitted).

"A district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Id.* at 405.   As stated in *Donaldson v. Clark*, 819 F.2d 1551, 1561 (11th Cir. 1987):

> Rule 11 does not change the liberal notice pleading regime of the federal courts or the requirement of Fed.R.Civ.P. 8, which demands only a "short and plain statement of the claim." The rule does not require that pleadings allege all material facts or the exact articulation of the legal theories upon which the case will be based. The reasonable inquiry standard of Rule 11 does not preclude plaintiffs from establishing the merits of claims through discovery. Nor is Rule 11 intended to chill innovative theories and vigorous advocacy that bring about vital and positive changes in the law. The rule should not be used to deter potentially controversial or unpopular suits. It does not mean the end of doctrinal development, novel legal arguments, or cases of first impression. The Advisory Committee Note specifies that the rule "is not intended to chill an attorney's enthusiasm or creativity in pursuing factual or legal theories."

*Id.* Courts ordinarily defer Rule 11 determinations until the end of the litigation. *See, e.g.*, *Mann v. G & G Mfg., Inc.* (6th Cir.) 900 F.2d 953, 960, *cert. denied sub nom. Sloan v. G & G Mfg., Inc.* (1990) 498 U.S. 959, 111 S.Ct. 387, 112 L.Ed.2d 398. ("[A] Rule 11 motion is generally determined at the end of the proceedings."); see *also Archie Comic Publications, Inc. v. Decarlo*

(S.D.N.Y. Nov. 21, 2000) No. 00 Civ. 5686 (LAK), 2000 WL 1731341, at *1 (internal citation omitted) ("'[T]he time when sanctions are to be imposed rests in the discretion of the trial judge.'" Indeed,...this "'normally will be determined at the end of the litigation' in the case of pleadings...."); *Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.* (S.D.N.Y. May 2, 2000) No. 00 Civ. 1115 (LAK), 2000 WL 528633, at *1 ("The Advisory Committee Note to the 1983 amendment to Rule 11 makes clear that '[t]he time when sanctions are to be imposed rests in the discretion of the trial judge...[I]t is anticipated that, in the case of pleadings the sanctions issue under Rule 11 normally will be determined at the end of the litigation....'"); *Wallace v. Life Ins. of North America* (S.D.N.Y. Feb. 22, 1996) No. 93 Civ. 6056(CSH), 1996 WL 79329, at *1 ("[I]t is the Court's practice to defer resolution of Rule 11 issues until the end of the litigation.").

## IV.    FACTUAL BACKGROUND

On May 26, 2024, Plaintiff filed this lawsuit and filed an Amended Complaint on August 9, 2024. ECF Nos. 1, 6. On October 8, 2024, Defendant AMP moved to dismiss in full, followed by a special motion to dismiss, on November 18, 2024. ECF Nos. 24, 37. This Court granted dismissal of the claims against AMP, but granted Plaintiff leave to amend. ECF No. 71.

On June 6, 2025, Plaintiff filed a Second Amended Complaint ("SAC"). (ECF No. 79).  On July 2, 2025, AMP's counsel notified Plaintiff's counsel of their intention to seek Rule 11 sanction demanding correction, retraction, or withdrawal of the SAC. On August 1, 2025 AMP filed their Rule 11 motion (ECF No. 93.)   Also on August 1, 2025, AMP filed a Motion to Dismiss the Second Amended Complaint. (ECF No. 95.).

Plaintiff was at all times relevant a student at the University of Nevada, Las Vegas (UNLV). Plaintiff's SAC sets forth allegations related to his employment at the UNLV Lied Library and his position as Chair of the Scholarships and Grants Committee.  *See* SAC at para. 17-42.  Plaintiff's SAC also sets forth that the environment on campus has further exacerbated the hostility Plaintiff faced.  Specifically, UNLV has allowed groups to march with megaphones, disrupt campus

activities, and chant slogans such as "From the river to the sea."  This is clearly an antisemitic chant which calls for the destruction of the sovereign state of Israel and the death of its Jewish inhabitants.

As stated in the Antisemitism and Anti-Israeli Bias at UCLA Report dated October 16, 2024, it should be noted that:

> Hamas uses the phrase "from the river to the sea..." in its 2017 Charter (Section 20) and declares its intention to hunt down Jews everywhere in the world in its 1988 charter, a sentiment which has not been superseded. The phrase has also been used in speeches by Osama bin Laden, Hezbollah's leadership, and Iran's leadership.  For many, "from the river to the sea," calls for elimination of the State of Israel, and for the land of Israel to be placed entirely under Arab rule. Given the record of many Arab regimes in the region, there is a high probability of the forced displacement of Israeli Jews in these hypothetical circumstances.[1]

Furthermore, Plaintiff has been verbally assaulted on the campus of UNLV because he wears a kippah. *See* SAC at para. 43-45.

The SAC also states in part under the ATA cause of action:

- Hamas is a United States designated Foreign Terrorist Organization that committed, planned, or authorized various acts of international terrorism including its (a) terrorist attack on October 7th; (b) ongoing rocket attacks against non-military, civilian targets; and (c) holding innocent civilians hostage.

- For decades, Defendants have provided substantial assistance to Hamas by acting as its propaganda wing in the United States, recruiting domestic foot soldiers for Hamas, and fomenting violence, chaos, and fear in the United States to support Hamas's short and long-term goals and international terrorist activities.

- Defendants intentionally instigate a mass culture of fear, threats, violence, and overt hatred to intimidate politicians and institutions for the benefit of Hamas by organizing, managing, controlling, and intentionally inciting riots and acts of domestic terrorism as part of its substantial assistance to Hamas.

- Indeed, Defendants themselves are successor entities to an original material support enterprise for Hamas. Defendants are operated primarily by many of those who were senior leaders in the original enterprise.

SAC at para. 241-244.

---

[1] Antisemitism and Anti-Israeli Bias at UCLA, October 16, 2024, at p. 47, available at https://antisemitismreport.org/ (internal footnotes omitted).

The SAC added the following language in part under the ATA cause of action:

- Defendants AMP, SJP-UNLV, NSJP continue to provide substantial assistance to the Hamas organization and promote Hamas, including at the UNLV campus, and there is an ongoing risk of violence injurious conduct, and terrorist actions at UNLV.  The threats posed by Hamas and Defendants AMP, SJP-UNLV, NSJP, including antisemitic conduct, are an immediate threat to the safety of citizens and students at UNLV, including Plaintiff.  Unless enjoined, citizens and students at UNLV face an ongoing risk of violence injurious conduct, and terrorist actions at UNLV.  For example, an individual was recently charged with two counts of first-degree murder after a shooting outside a Jewish museum in Washington, DC on May 21, 2025.   The suspect in that incident allegedly shouted "free, free Palestine" following the shooting.  *Id.*

- In addition to the discrimination and harassment at UNLV, as a direct and proximate result of Defendants AMP, SJP-UNLV, NSJP conduct at UNLV, and their aiding and abetting Hamas, Plaintiff is in a state of fear and anxiety in light of the ever-present and real threats posed by said Defendants which have been unrestrained at the UNLV campus since October 7, 2023, including that on May 31st, 2024, Plaintiff collapsed in his calculus class. Plaintiff was taken to the UNLV Health and Wellness Center, where his face became paralyzed on-site. He was rushed to Sunrise Hospital and diagnosed with extreme stress disorder, which had triggered Bell's Palsy. After ruling out all viral and bacterial infections, it was concluded that the facial paralysis was stress-induced. Plaintiff's cranial nerve had been severely impacted by the overwhelming levels of stress he has endured. Plaintiff lost the ability to blink, drink water properly, and see out of one eye. A majority of Plaintiff's face was paralyzed and completely unmovable.  Plaintiff was discharged with a high-dose steroid treatment, and the paralysis persisted until the end of August 2024. Plaintiff began to slowly regain movement at that time. As a direct and proximate result Plaintiff was forced to withdraw from two additional classes over the summer.

SAC at para. 245-246.  Accordingly, Plaintiff has alleged what injuries he sustained and how those injuries arose from the Defendants' conduct.  *Compare* Court's Order, ECF 71, at pp. 10-11.

It should be noted that the SAC also states in part under the ATA cause of action:

- It is clear that every time Defendants act in the United States, and more specifically on UNLV's campus, there is a direct nexus between the University groups and Hamas, IRGC, Hezbollah and other Foreign Terrorist Organizations.

- It is also clear that directives being given by Hamas, IRGC, Hezbollah and other Foreign Terrorist organizations are being acted out on U.S. college campuses through Defendants and their organizations on UNLV's campus.

- Defendants knowingly provide substantial assistance to Hamas through their services. Indeed, in the NSJP Toolkit, Defendants confirm not only that they are

aware that their propaganda and incitement activities support Hamas but also that they perceive themselves as "PART of" Hamas's "Unity Intifada"—the terror regime that has damaged Plaintiff.

- Defendants knowingly provided substantial assistance to Hamas and thus aided and abetted Hamas in committing, planning, or authorizing acts of international terrorism, including the acts of international terrorism that injured Plaintiff.

- Not only do these acts constitute "substantial assistance" under the civil portion of the Antiterrorism Act, but they also satisfy the Antiterrorism Act's criminalization of providing "material support or resources" to a Foreign Terrorist Organization. See 18 U.S.C. §§ 2339A and 2339B.

- UNLV has also provided substantial assistance to these radical pro-terrorist organizations by allowing them to terrorize and demonize students on UNLV's campus, including Defendants' decision to allow the antisemitic chants and chaos on campus precluding Plaintiff from wearing an open kippa without having to hide it under a baseball cap or other type of head covering.

- UNLV has also provided substantial assistance under the Antiterrorism Act by allowing them to use the student campus to distribute their literature, paraphernalia, and hosting meetings by providing substantial resources to disseminate their antisemitic and anti-American rhetoric and propaganda.

- UNLV has provided substantial assistance by emboldening these Defendants, by their actions and meetings with them, "legitimizing" their cause of terrorizing students on campus.

- Plaintiff has been injured in his person because of Hamas's acts of international terrorism.

- By aiding and abetting Hamas in committing, planning, or authorizing acts of international terrorism, including the acts that caused Plaintiff to be injured in his or her person and property, Defendants are liable pursuant to 18 U.S.C. § 2333(d) for, threefold any and all, damages that Plaintiff sustained as a result of such injuries, and the costs of this suit, including attorney's fees.

*See* SAC 247-256.  The SAC also added:

- Plaintiff is entitled to permanent relief preventing and enjoining AMP, SJP-UNLV, NSJP and its agents, from aiding and abetting Hamas in committing, planning, or authorizing acts of international terrorism at the UNLV campus.

- Plaintiff is entitled to an order enjoining AMP, SJP-UNLV, NSJP and its agents from establishing, implementing, instituting, maintaining, or executing policies, practices, procedures, or protocols that: (i) penalize or discriminate against Jewish and/or pro-Israel students, including Plaintiff; (ii) fund student organizations that exclude or penalize Jewish and/or Pro-Israel students; and (iii) officially

recognize student organizations that exclude, discriminate against, or harass Jewish and/or pro-Israel students.

*See* SAC 257-258.

## III.    ARGUMENT

Here, AMP's Motion fails for three fundamental reasons: 1) AMP conflates factual disputes with sanctionable conduct; 2) AMP misstates the Rule 11 standard, ignoring the presumption in favor of allowing claims to be tested on their merits; 3) AMP attempts to reargue matters that are already contained in their motion to dismiss.

## A.    AMP's Motion is Procedurally and Substantively Defective

AMP's motion is a veiled attempt to further argue the motion to dismiss under the guise of seeking sanctions. AMP simply challenges factual allegations regarding its coordination with NSJP and its role in post-October 7 conduct. Whether Plaintiff's allegations will be proven is a question for discovery and trial, not sanctions. The Complaint details in part that under the Antiterrorism Act, "[a]ny national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees." 18 U.S.C. § 2333(a).

"[L]iability may be asserted as to any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism." 18 U.S.C. § 2333(d)(2).  Moreover, a defendant may be liable under the Antiterrorism Act even without a "strict nexus" between the substantial assistance and the act of international terrorism so long as there is "a foreseeable risk" of such act. Indeed, in some cases, "defendant's role in an illicit enterprise can be so systemic that the secondary defendant is aiding and abetting every wrongful act committed by that enterprise." *See Twitter v. Taamneh*, 598 U.S. 471, 495-96 (2023).  It should be noted that *Twitter v. Taamneh* involved an internet platform, whereas here, the Defendants AMP, NSJP and SJP-UNLV are organizations.

Enacted in 2016 over President Obama's veto, the Justice Against Sponsors of Terrorism Act (JASTA), Pub. L. No. 114-222, § 4(a), 130 Stat. 852, 854 (2016) (codified at 18 U.S.C. § 2333(d)) garnered headlines primarily for its amendments to the Foreign Sovereign Immunities Act (FSIA). However, JASTA also amended the ATA to clarify the rules governing suits against non-governmental defendants. As Congress explained in the text of the statute, "[i]t is necessary to recognize the substantive causes of action for aiding and abetting and conspiracy liability under [the ATA]." JASTA § 2(a)(4), 130 Stat. at 852 (codified at 18 U.S.C. § 2333 note). Thus, JASTA sought to make explicit that the ATA provides a civil damages remedy against "persons or entities" "that knowingly or recklessly contribute material support or resources, directly or indirectly, to persons or organizations that pose a significant risk of committing acts of terrorism that threaten the security of nationals of the United States or the national security, foreign policy, or economy of the United States." *Id.* § 2(a)(6) (emphasis added). Indeed, Congress could hardly have been clearer in JASTA's text as to its purpose:

> The purpose of this Act is to provide civil litigants with the broadest possible basis, consistent with the Constitution of the United States, to seek relief against persons, entities, and foreign countries, wherever acting and wherever they may be found, that have provided material support, *directly or indirectly*, to foreign organizations or persons that engage in terrorist activities against the United States.

*Id.* § 2(b), 130 Stat. at 853 (emphases added).

To that end, JASTA created 18 U.S.C. § 2333(d)(2):

> In an action under [§ 2333(a)] for an injury arising from an act of international terrorism committed, planned, or authorized by an organization that had been designated as a foreign terrorist organization [(FTO)] as of the date on which such act of international terrorism was committed, planned, or authorized, liability may be asserted as to any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism.

*Id.* § 4(a), 130 Stat. at 854 (emphases added).

Congress also recognized that, to provide both a meaningful remedy and a meaningful deterrent, civil liability had to extend beyond terror operatives to all who helped to facilitate their unlawful activities, even donors: "By its provisions for compensatory damages, tremble [sic] damages, and the imposition of liability *at any point along the causal chain of terrorism*, [the ATA] would interrupt, or at least imperil, the flow of money." S. REP. No. 102-342, at 22 (1992). (emphasis added).

As stated above, Plaintiff has specifically alleged that Defendant AMP and Defendants SJP-UNLV, NSJP continue to provide substantial assistance to the Hamas organization and promote Hamas, including at the UNLV campus, and there is an ongoing risk of violence injurious conduct, and terrorist actions at UNLV.  As alleged, the threats posed by Hamas and Defendants AMP, SJP-UNLV, NSJP, including antisemitic conduct at UNLV, are an immediate threat to the safety of citizens and students at UNLV, including Plaintiff.

The SAC sets forth that unless enjoined, citizens and students at UNLV face an ongoing risk of violence injurious conduct, and terrorist actions at UNLV.  In addition to the discrimination and harassment at UNLV, as a direct and proximate result of Defendants AMP, SJP-UNLV, NSJP conduct at UNLV, and their aiding and abetting Hamas, Plaintiff is in a state of fear and anxiety in light of the ever-present and real threats posed by said Defendants which have been unrestrained at the UNLV campus since October 7, 2023, including injuries suffered on May 31st, 2024.

It is respectfully submitted that the Court's prior findings that "Gerwaski does not allege any actions by the defendants that substantially assisted the October 7, 2023 act of international terrorism. All of the defendants' conduct alleged in the FAC took place after this event" is misplaced.  The instant SAC addresses that the Defendants' conduct after the October 7, 2023 has substantially assisted Hamas (including directly after the October 7, 2023 attacks) in terrorizing Jewish students, specifically, Plaintiff at UNLV.  Those allegations must be accepted as true at this stage.  Plaintiff seeks to pursue discovery, including deposing members of the Defendants, deposing

staff and witnesses at UNLV, and propounding discovery requests which is believed to support the allegations.

James Comer, Chairman of the Committee on Oversight and Accountability in a letter dated May 29, 2024 to National Students for Justice in Palestine c/o Dr. Osama Abuirshaid, Executive Director of the American Muslims for Palestine (AMP) wrote in part:

> Since the October 7, 2023, terror attack on Israel by Hamas, antisemitic incidences have skyrocketed in the United States. At illegal encampments on college campuses, many individuals have championed antisemitic rhetoric calling for the elimination of Jewish people from Israel, employing "From the river to the sea, Palestine will be free" and "Death to Israel" as rallying cries. The Committee is particularly concerned that organizations promulgating pro-Hamas propaganda and engaging in illegal activities at institutions of higher education might be receiving funding or other support from foreign or domestic sources which support the aims of Hamas or other foreign terrorist organizations. We therefore seek documents and information from your organization to facilitate oversight into how pro-Hamas propaganda and illegal encampments are being funded.

> National Students for Justice in Palestine (National SJP), which is founded and controlled by American Muslims for Palestine (AMP), is one group claiming to "support[] over two hundred Palestine solidarity organizations on college campuses across occupied Turtle Island (U.S. and Canada)." It has recently released statements, some purportedly signed by various campus chapter organizations, expressing support for the "Popular University for Gaza, a coordinated pressure campaign against university administrations and trustees to immediately divest from the [I]sraeli state" and pledging, "[a]s we across Turtle Island (the so-called [U]nited [S]tates and [C]anada) and around the world establish encampments and popular, liberated spaces on our campuses…" to "completely divest our tuition dollars from—and to cut all institutional ties to—the zionist entity as well as all companies complicit in the colonization of Palestine." Individuals previously affiliated with Hamas-backed charities are providing the trainings, materials, and financial support to college campus protests. National SJP's new publication, "The Written Resistance", curiously began in September 2023, mere days before the October 7th terrorist attacks. This publication hosts various authors, including editorials from the "Editorial Board" of National SJP. One such editorial from April 2024 positively cites quotes from Mao Tse Tung—an individual directly responsible for the repression and deaths of tens of millions of people—in its efforts to promote the "struggle for liberation against Zionism and US imperialism..."

> National SJP founder Dr. Hatem Bazian serves as the Chairman of the National Board of AMP, further solidifying the current relationship between National SJP and AMP. AMP has substantial ties to Hamas via its financial sponsor, Americans for Justice in Palestine Educational Foundation, Inc. (AJP), a 501(c)(3) non-profit organization. AJP is currently under investigation by the Virginia Attorney General for violating state charitable solicitation laws and "benefitting or providing support to terrorist organizations." Reportedly, current AMP board members have been involved in fundraising for Hamas charities.

According to the Anti-Defamation League, AMP is the alter ego of the Islamic Association of Palestine (IAP), once the main propaganda arm for Hamas in the U.S., which was dissolved in 2004 after being implicated in terror finance. Several of IAP's employees and officers went on to found AMP as the rebranded material support arm for Hamas. 18 AMP is also linked to the Holy Land Foundation (HLF), which sent approximately $12.4 million outside the U.S. to support Hamas. Like IAP, HLF was founded by members of Hamas senior leadership20 and was shut down due to five of its officers being convicted for terror financing. Four former employees of HLF now work for AMP, which frequently sponsors events featuring past leaders of HLF and their families.[2]

This case is not about free speech. It is not legal for organizations to support and substantially assist Hamas whereby there is a threat to the safety of citizens and students at UNLV.

Accordingly, Defendant's Motion for Sanctions and Motion to Dismiss should be denied.[3]

**B.      There is personal jurisdiction over AMP in this Court.**

In its Motion for Sanctions, AMP argues in part:

"Plaintiff alleges no new facts to support any general jurisdiction over AMP. Id. at 8. Plaintiff further fails to sufficiently allege any facts that establish contact with Nevada sufficient to support specific jurisdiction. Id. While Plaintiff inserts the conclusory sentence recited above that AMP somehow "controls" NSJP and NSJP vaguely "communicates" with SJP-UNLV, that alone cannot suffice. ECF No. 79 at ¶ 98; ECF No. 71 at 8 ("distributing a message through social media, absent specific targeting of the forum, is insufficient to establish specific jurisdiction").

AMP ignores the amendments to Complaint.  In its prior order finding lack of jurisdiction, the Court stated in part: "Although Gerwaski alleges that NSJP sent its toolkit out to "more than 300 American college campuses and on the internet," he does not allege that UNLV was one of those campuses or even that SJP-UNLV utilized the toolkit in its activities."  ECF 71, at p. 8, lines 6-9.  Here, the SAC now specifically alleges that "UNLV was one of those campuses that SJP-UNLV utilized the NSJP Toolkit in its activities." SAC at para. 98.

---

[2] https://oversight.house.gov/wp-content/uploads/2024/05/Letter-to-National-SJP-5.29.24.pdf (internal footnotes omitted).

[3] It should be noted that Defendant's citation to *Jan v. People Media Project*, No. 3:24-CV-05553-TMC, 2025 WL 359009 (W.D. Wash. Jan. 31, 2025) is misplaced and distinguishable.  That case involved the Alien Tort Statute and the court granted leave to amend.  In its subsequent Order, the court denied the Defendants' Motion to Dismiss. 2025 WL 1311970.

AMP's argument for sanctions ignores this point, and the motion should be denied on this basis alone. Moreover, Defendant's argument is purely a legal disagreement as to whether personal jurisdiction exists. AMP does not deny that the "Toolkit" was used at the UNLV campus. "In fact, the SJP Toolkit, released after October 7, 2023, SJP openly declared themselves to be part of the "movement" (which refers to Hamas' October 7 attacks), and not just supporters."[4] In this regard, the SAC also alleges that AMP controls NSJP and NSJP communicates with its local chapters including SJP-UNLV. *See id.*; *see also supra*. As also set forth in Plaintiff's Opposition to AMP's Motion to Dismiss, it is respectfully submitted that by making this Honorable Court expend its precious resources, and by attacking the merits of the claims via anti-SLAPP motions and a Rule 11 Motion for Sanctions, AMP have waived their ability to contest personal jurisdiction.

In light of the foregoing, the Court has personal jurisdiction over the claims against AMP. Should this Honorable Court feel that it needs additional information, Plaintiff requests discovery on the issue of personal jurisdiction, as well as an evidentiary hearing. *California Offset Printers, Inc. v. Hampton Intern. Communications, Inc.* 945 F.2d 408 (9th Cir. 1991) ("When personal jurisdiction is contested, the district court may hold a preliminary evidentiary hearing to resolve disputed questions of fact" and "[t]he trial court should allow discovery when material facts bearing on jurisdiction are disputed and it proposes to resolve that dispute"); *Data Disc, Inc. v. Systems Technology Associates, Inc.*, 557 F.2d 1280, 1285 (9th Cir. 1977); *Trump v. Eighth Judicial Dist. Court of State of Nev. In and For County of Clark*, 109 Nev. 687, 857 P.2d 740 (Nev. 1993).

As such, sanctions against Plaintiff and his counsel should be denied.

---

[4] https://isgap.org/wp-content/uploads/2024/05/Student_Justice_Palestine_Report.pdf

**C.     Plaintiff's Claims are Objectively Warranted by Existing Law**

    **1.     The ATA Claim is properly pled and is factually supported**

The ATA, 18 U.S.C. § 2333, permits civil actions against those who aid and abet international terrorism. Courts recognize that providing operational, propaganda, or recruitment support may constitute substantial assistance. *Boim v. Holy Land Found.*, 549 F.3d 685, 690–91 (7th Cir. 2008) (en banc).

As stated above, and in the SAC, Plaintiff's allegations regarding AMP's use of NSJP's Hamas-aligned toolkit and coordinated campus actions meet the threshold for plausibility.

Plaintiff alleges AMP exercises control over NSJP, which directly interacts with Nevada-based chapters. These contacts, taken as true, support a colorable claim of purposeful direction toward Nevada.

Notably, AMP does not contest its involvement with NSJP, rather, AMP declares that it is protected by the First Amendment. However, this case does not involve mere "demonstrations, protest marches, and picketing."  These are not mere independent advocates; they are recruiters and propagandists. Knowingly providing such services, especially in such an ongoing, systematic fashion, violates the Antiterrorism Act.

Unfortunately, antisemitic conduct has occurred on university campuses across the United States, post-October 7, 2023.  Such conduct has resulted in assorted litigation, including certain matters which have arisen in conjunction with reports documenting antisemitism violations.  For example, universities' respective task forces (UCLA and Harvard) which found that the universities had fostered an antisemitic environment.

Specifically, in *Frankel et al v. Regents of the University of Southern California et al.*, 2:24-CV-4702, the plaintiffs, three Jewish students and a Jewish professor brought the case in June of 2024, in the wake of UCLA's facilitation of encampments that were run as exclusionary zones that blocked Jews from attending classes, using the library and accessing other essential areas of campus. UCLA's misconduct was documented in a report filed by UCLA's own Task Force to Combat Antisemitism and Anti-Israeli Bias, which found that the university had fostered an

1    antisemitic environment. *See supra.* The court granted a preliminary injunction banning the

2    exclusion zones.[5] The case recently resulted in a $6 million settlement.[6]

3         In that case, the agitators on the campus refused to let students through unless they disavowed

4    Israel's right to exist. For a full week, UCLA's administration failed to clear the Jew Exclusion

5    Zone and instead ordered campus police to stand down and allow the illegal encampment to stay.

6    The administration even stationed security staff around the encampment to keep students

7    unapproved by the protesters out of the area. Even after the first encampment was cleared, activists

8    have continued to stage encampments and occupations of public spaces at UCLA. Even after

9    UCLA's belated decision to disband the initial encampment, agitators continued to erect

10   encampments replete with anti-Semitic imagery and, in one case, an attack on a campus rabbi.

11        As stated in the Antisemitism and Anti-Israeli Bias at UCLA Report dated October 16,

12   2024, there are direct citations to Hamas at campus activities:

> "***The encampment was weird because it was at once claiming to be peaceful and anti-war, but also had a critical mass of people who were in support of Hamas, and who would refuse to disassociate with them***. Also, they completely ignored the hostages and the horrific attacks of October 7th. Things intensified after the pro-Israel rally, and after the screen with videos from October 7th was put up directly across the encampment. For so much of the war being on people's private screens, streamed through goPro cameras, through social media, it was jarring to have that screen brought into a public space. It's a lot harder to look away from the atrocities when it is glaring in your face. But, I am not sure how impactful it was for people in the encampment and for passersby. They may have just seen it as Israeli propaganda. I have friends who thought the encampment was "beautiful" and "peaceful." But, that all felt like a facade. And there was a lot of antisemitic and Anti-Israeli imagery and messaging everywhere."
>
> …
>
> Walking by campus and having routes blocked while seeing signs emblazoned with "Israelis are native to hell"33 and swastikas was a sight I will never forget. It was extremely hard to focus and go on as usual, and I have heard of experiences of those being physically blocked or slapped because they showed signs of Jewish identity or were known to not agree with the encampment's values. My roommate was walking home when someone from the encampment screamed "We are terrorism" at her. ***While I am extremely dedicated to free speech, there is no***

---

[5] https://becketnewsite.s3.amazonaws.com/20240813183534/injunction.pdf

[6] UCLA reaches $6 million settlement with Jewish students over campus protests : NPR

***context in which swastikas are ok, Hamas headbands are on***. or this level of disrupment is accepted.

…

"***I was approached and told by a protestor that she belongs to Hamas***. A friend of mine was pepper sprayed by a protestor for her Jewish identity. I put up posters of kidnapped Israelis on the Jewish Law Students Association, as I was authorized to do, only for them to be repeatedly ripped down.43 I had to walk past chants calling for the extermination of my people and chants supporting genocidal terrorist organizations on a regular basis."

"I was assaulted, threatened, and harassed during the encampment. I had an Israeli flag and a man ran towards me in order to push me. I was blocked for being Jewish. They were calling for an intifada collectively which is to kill the Jews. They had a star of david on the floor with the writing "step here" next to it.44 ***Some of the people there were praising Hamas who's main goal (also stated in their charter) is to kill Jews. I was told to kill myself from people***. It also prevented me from getting to class on time and utilizing campus resources. The people at the protest were told not to talk to me because I'm from Israel. I also think that it's a shame that UCLA let the protestors stay in the quad (which they did illegally) but they wouldn't let me and my friends who weren't doing anything violent or illegal go past the fence (on the Israeli side) with the press to talk on TV."

*See id.* UCLA Report at pp. 27, 35 (emphasis added).

Accordingly, the involvement of the Defendants at UNLV, specifically AMP and Defendants SJP-UNLV, NSJP, including their assistance of (and association with) Hamas is a genuine material factual issue that precludes sanctions or dismissal.

Furthermore, at Harvard, several matters have recently arisen as a result of antisemitic conduct on the campus.

- There is a pending matter involving the school and the government, but there has not yet been a settlement.  This arose after the Trump administration's termination of more than $2.6 billion in funding over its handling of antisemitism. Harvard sued the government and defended its right to control academic and campus policies.  There were also detailed reports

by the school finding antisemitic conduct,[7] including a violation of Title VI found by the U.S. Department of Health and Human Services Office for Civil Rights, with incidents involving direct student-on-student harassment and targeted harassment by *student groups*, including Harvard student groups and faculty groups posted to Instagram an antisemitic cartoon that included the Star of David, dollar signs, and nooses.[8]

- Harvard University has settled three lawsuits related to antisemitism on campus, one with Students Against Antisemitism and another with the Brandeis Center for Human Rights Under Law and Jewish Americans for Fairness in Education. These largely related to general claims outlined in the task force reports. A separate settlement was reached with former Harvard Divinity School student Alexander Shabbos Kestenbaum, who also sued the university over antisemitism.

- The settlements involve Harvard agreeing to strengthen its policies against antisemitism and adopt the International Holocaust Remembrance Alliance (IHRA) definition of antisemitism. The specific terms including any financial compensation are not public. Again, the case involving Alexander Kestenbaum was settled but the terms are not public. In that case, he encountered various antisemitic incidents, including roving mobs and other documented incidents of antisemitism.

- Barnard College, StandWithUs Center for Legal Justice, Students Against Antisemitism, Inc. and the Barnard student plaintiffs in the federal court action *Students Against Antisemitism, Inc. et al v. The Trustees of Columbia University in the City of New York et al (S.D.N.Y. 1:24-cv-01306-VSB-SN)* recently announced an agreement to resolve claims against Barnard College. As part of the settlement, Barnard has committed to implement

---

[7] Presidential Task Force on Combating Antisemitism and Anti-Israeli Bias, April 29, 2025 https://www.harvard.edu/wp-content/uploads/2025/04/FINAL-Harvard-ASAIB-Report-4.29.25.pdf; see also Presidential Task Force on Combating Anti-Muslim, Anti-Arab, and Anti-Palestinian Bias, April 29, 2025 https://www.harvard.edu/wp-content/uploads/2025/04/FINAL-Harvard-AMAAAPB-Report-4.29.25.pdf

[8] https://www.hhs.gov/sites/default/files/harvard-title-vi-notice-violation.pdf

1    important measures to address antisemitism on its campus and to ensure access and

2    inclusion of all students to the College's educational mission and environment.[9]

3    • AMP and NSJP, among other Defendants, have also been sued in the Eastern District of

4      Virginia Case styled *Parizer et al v. AJP Educational Foundation, Inc. et al*, 1:24-cv-00724-

5      RDA-IDD.  That case specifically involves allegations regarding the use of the "Toolkit."[10]

6      The Complaint in that case specifically states in part "When someone tells you they are

7      aiding and abetting terrorists—***believe them***."  *Id.* (emphasis in original).

8    Likewise, here, Mr. Gerwaski, like other students at UNLV, has been victimized by the

9    antisemitic and tortious conduct on the UNLV campus, post-October 7, 2023.  He has properly

10   asserted his claims against the Defendants and the Motion for Sanctions and the related Motions to

11   Dismiss should be denied.

12       **2.    The Conspiracy Claim is properly pled and is factually supported**

13   Lastly, Defendant argues that the civil conspiracy claim should be dismissed because

14   Plaintiff has not "alleged any agreement between AMP and the other defendants, much less with the

15   particularity required by FRCP 9(b)."  This argument, again, is incorrect and is a factual dispute.

16   Moreover, Plaintiff's allegations of coordinated action with NSJP, SJP-UNLV, and other groups to

17   advance Hamas's objectives survive at the pleading stage.  The conspiracy is also specifically

18   alleged in the SAC.  For example, the launch of the on-campus activities, including the launch of

19   the "Toolkit" were directly after the October 7, 2023 attacks:

20   • Within hours of the attack, the language of the Hamas-authored disinformation campaign
     appeared in NSJP propaganda across social media and on college campuses. Exactly as
21   AMP intended, NSJP acted as Hamas' loyal foot soldiers for Hamas's propaganda battle on
     university campuses across the United States. The next day, NSJP released its Day of
22   Resistance Toolkit ("NSJP Toolkit")[11] across more than 300 American college campuses
     and on the internet.
23

24

25

---

26   [9] https://www.kasowitz.com/media/client-news/kasowitz-and-barnard-announce-settlement-of-lawsuit/

27   [10]

28   https://ia804601.us.archive.org/14/items/gov.uscourts.ilnd.464113/gov.uscourts.ilnd.464113.1.2.pdf

[11] DAY-OF-RESISTANCE-TOOLKIT.pdf (imgix.net)

- The Toolkit, literally, was an instruction manual including the following pictures as guidelines for online media distribution whereby student organizations would simply use Canva to modify the prototype provided by NSJP, and subsequently blast it out on social media networks, such as Facebook, Instagram, Twitter, Snapchat, Tik Tok.

- Immediately thereafter, SJP-UNLV and NPL had coordinated their "day of rage" hosting a variety of off campus protests initially in downtown, Las Vegas in accordance with directives issued by Hamas.

- Subsequently SJP-UNLV coordinated with non-student groups to facilitate antisemitic protests on UNLV's campus with other non-student organizations such as NLP, the Fifth Sun Project, and Red Desert Collective, among others, in clear advancement of carrying out NSJP's and Hamas' instructions in Las Vegas.

- These organizations worked in unison with SJP, taking instructions from NSJP to wreak havoc on UNLV's campus with antisemitic protests commencing on October 19, 2024 and continuing to present day.

- The NSJP Toolkit is a direct response to Hamas' "call for mass mobilization" issued the day prior. In it, NSJP demands its members and allies "not only support, but struggle alongside our people back home … and above all normalize and support our fearless resistance."

- To do so, the NSJP Toolkit puts forth a strategy to "normalize the resistance," Hamas, by arguing that Liberation is not an abstract concept… [L]iberating colonized land is a real process that requires confrontation by any means necessary. In essence, decolonization is a call to action . . . It calls upon us to engage in meaningful actions that go beyond symbolism and rhetoric. Resistance comes in all forms—armed struggle, general strikes, and popular demonstrations. All of it is legitimate, and all of it is necessary. (emphases added).

- AMP controls NSJP and NSJP communicates with its local chapters including SJP-UNLV. UNLV was one of those campuses that SJP-UNLV utilized the NSJP Toolkit in its activities.

SAC 90-98.  Plaintiff's SAC contains specific allegations to support how the Defendant groups

worked together to engage in the conduct at UNLV.

**D.    AMP's Motion is Itself Sanctionable**

Here, by filing a sanctions motion for the improper purpose of harassment or intimidation,

AMP has violated Rule 11(b)(1).  AMP's request that Plaintiff and his counsel be sanctioned is

regrettable and should be denied.  Counsel for Plaintiff have never received Rule 11 sanctions, and

as this Honorable Court is well aware, undersigned counsel has the utmost respect for the Court and

the judicial process.  Counsel understands its obligations and complied with Rule 11 in submitting

the Second Amended Complaint.  As this Honorable Court is aware, undersigned counsel

substituted in as counsel for Plaintiff when Ms. Chattah, Plaintiff's former counsel, became the

acting U.S. Attorney for this District.  In submitting the SAC, counsel, on behalf of Plaintiff, has

reasserted what they believe are meritorious claims, and Plaintiff should be permitted to proceed

with his SAC.

As such, AMP has unreasonably multiplied proceedings, warranting sanctions under 28

U.S.C. § 1927.

28 U.S. Code § 1927 states in part:

> Any attorney or other person admitted to conduct cases in any court of the United
> States or any Territory thereof who so multiplies the proceedings in any case
> unreasonably and vexatiously may be required by the court to satisfy personally
> the excess costs, expenses, and attorneys' fees reasonably incurred because of
> such conduct.

Accordingly, Plaintiff should be awarded reasonable attorney's fees and costs incurred in

responding to AMP's improper motion.  In addition, this Honorable Court should impose a

monetary sanction sufficient to deter AMP and its counsel from further misuse of Rule 11.

## V.    CONCLUSION

AMP's Motion for Sanctions is legally baseless.  The Court should deny AMP's motion in

its entirety; and grant Plaintiff's countermotion for sanctions against AMP and its counsel.  At a

minimum, discovery should proceed, and AMP's Motion should be deferred to the conclusion of

the litigation.

DATED this 15th day of August 2025.

Respectfully Submitted:

CHESNOFF & SCHONFELD

By: <u>Robert Z. DeMarco</u>
    DAVID Z. CHESNOFF, ESQ.
    Nevada Bar No. 2292
    RICHARD A. SCHONFELD, ESQ.
    Nevada Bar No. 6815
    ROBERT Z. DEMARCO, ESQ.
    Nevada Bar No. 12359
    Counsel for Plaintiff, *COREY GERWASKI*

## CERTIFICATE OF SERVICE

Pursuant to Fed. R. Civ. P. 5(b), I hereby certify that a copy of the foregoing document was electronically filed with the Clerk of the Court to be served by the Court's electronic filing system on all counsel of record.

**DATED** this 15th day of August 2025.

/s/ Robert Z. DeMarco
Employee of Chesnoff & Schonfeld