DAVID Z. CHESNOFF, ESQ.
*Nevada Bar No. 2292*
RICHARD A. SCHONFELD, ESQ.
Nevada Bar No. 6815
ROBERT Z. DEMARCO
*Nevada Bar No. 12359*
CHESNOFF & SCHONFELD
520 South Fourth Street
Las Vegas, Nevada 89101
Telephone: (702) 384-5563
dzchesnoff@cslawoffice.net
rschonfeld@cslawoffice.net
rdemarco@sclawoffice.net
Attorneys for Plaintiff, *COREY GERWASKI*

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

| | |
|---|---|
| COREY GERWASKI, | ) |
| | ) |
| Plaintiff, | ) CASE NO. 2:24-cv-00985 |
| | ) |
| vs. | ) |
| | ) |
| STATE OF NEVADA, ex rel. BOARD | ) |
| OF REGENTS of the NEVADA SYSTEM | ) |
| OF HIGHER EDUCATION, on behalf | ) **OPPOSITION TO AJP EDUCATIONAL, INC.'S** |
| of the UNIVERSITY OF NEVADA | ) **MOTION TO DISMISS SECOND** |
| LAS VEGAS; KEITH WHITFIELD | ) **AMENDED COMPLAINT** |
| individually; AJP EDUCATIONAL | ) **(ECF 95); COUNTERMOTION FOR LIMITED** |
| FOUNDATION INC., a California | ) **JURISDICTIONAL DISCOVERY** |
| Non-Profit Corporation; STUDENTS FOR | ) |
| JUSTICE IN PALESTINE-UNLV; | ) |
| NATIONAL STUDENTS FOR JUSTICE | ) **[ORAL ARGUMENT REQUESTED]** |
| OF PALESTINE; NEVADANS FOR | ) |
| PALESTINIAN LIBERATION; | ) |
| DOES I-XX and ROE entities I-XX, | ) |
| DEFENDANT(S), an Individual/LLC/Corp; | ) |
| DOE Nevada corporation; DOE Individuals | ) |
| I–XX; ROE Entities, I–XX, | ) |
| | ) |
| Defendants. | ) |
| | ) |

COMES NOW, Plaintiff, COREY GERWASKI ("Mr. Gerwaski"), by and through his attorneys of record, DAVID Z. CHESNOFF, ESQ., RICHARD. A. SCHONFELD, ESQ., and ROBERT Z. DEMARCO, ESQ., of CHENSNOFF & SCHONFELD, and files this Opposition to AJP Education Foundation Inc.'s Motion to Dismiss Second Amended Complaint (ECF 95); and Countermotion for Limited Jurisdictional Discovery.

This Opposition and Countermotion is made and based upon the papers and pleadings on file herein, the attached Memorandum of Points and Authorities, and any oral argument that may be heard.

DATED this 15th day of August 2025.

Respectfully Submitted:

CHESNOFF & SCHONFELD

By: Robert Z. DeMarco
 DAVID Z. CHESNOFF, ESQ.
 Nevada Bar No. 2292
 RICHARD A. SCHONFELD, ESQ.
 Nevada Bar No. 6815
 ROBERT Z. DEMARCO, ESQ.
 Nevada Bar No. 12359
 520 South Fourth Street
 Las Vegas, Nevada 89101
 Phone: (702) 384-5563
 Fax: (702) 598-1425
 Attorneys for Plaintiff

## MEMORANDUM OF POINTS AND AUTHORITIES

**A.    DEFENDANT AJP EDUCATIONAL, INC.'S MOTION TO DISMISS SHOULD BE DENIED.**

**I.    INTRODUCTION**

Defendant AJP Educational Foundation, Inc. ("AMP") seeks dismissal of Plaintiff's Second Amended Complaint ("SAC") under Rules 12(b)(2), 12(b)(5), and 12(b)(6), portraying itself as an entirely domestic, uninvolved educational nonprofit. In doing so, AMP ignores well-pleaded factual allegations, improperly invites the Court to weigh disputed facts at the pleading stage, and misstates the scope of the Court's jurisdictional authority. The SAC alleges a sustained campaign of conduct by AMP, in coordination with related organizations including NSJP and SJP-UNLV and actors, that have targeted Nevada, UNLV, and Plaintiff specifically, creating foreseeable harm in this District. Where AMP attempts to recast targeted and coordinated actions into "mere political speech," it ignores that the SAC alleges purposeful conduct directed into Nevada, foreseeably causing physical, emotional, and educational harm to Plaintiff.

Dismissal is entirely premature. Plaintiff has pled sufficient jurisdictional facts to satisfy a prima facie showing under *Int'l Shoe* and its progeny, has alleged concrete injuries proximately caused by AMP's conduct in violation of the Anti-Terrorism Act ("ATA") and state law conspiracy.

At a minimum, Plaintiff is entitled to limited jurisdictional discovery to uncover AMP's communications, funding streams, and coordination with Nevada actors, facts uniquely in AMP's possession and concealed in its briefing.

When the well-pleaded factual allegations are taken as true and construed in Plaintiff's favor, as Rule 12(b)(6) requires, the SAC plausibly states claims under the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333, and Nevada common-law civil conspiracy.  Defendants' attempt to ask this Honorable Court to essentially grant summary judgment before discovery has even commenced should be rejected.

## II.    LEGAL STANDARD

A motion under Fed. R. Civ. P. 12(b)(6) tests only the sufficiency of the complaint, not the merits. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court must accept all well-pleaded factual allegations as true and draw all reasonable inferences in the plaintiff's favor. Dismissal is proper only if the complaint fails to state a claim that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). At this stage, the Court does not weigh evidence or resolve factual disputes.

## III.    FACTUAL BACKGROUND

On May 26, 2024, Plaintiff filed this lawsuit and filed an Amended Complaint on August 9, 2024. ECF Nos. 1, 6. On October 8, 2024, Defendant AMP moved to dismiss in full, followed by a special motion to dismiss, on November 18, 2024. ECF Nos. 24, 37. This Court granted dismissal of the claims against AMP, but granted Plaintiff leave to amend. ECF No. 71.

On June 6, 2025, Plaintiff filed a Second Amended Complaint ("SAC"). (ECF No. 79).  On August 1, 2025, AMP filed a Motion to Dismiss the Second Amended Complaint. (ECF No. 95).

Plaintiff was at all times relevant a student at the University of Nevada, Las Vegas (UNLV). Plaintiff's SAC sets forth allegations related to his employment at the UNLV Lied Library and his position as Chair of the Scholarships and Grants Committee.  *See* SAC at para. 17-42.  Plaintiff's SAC also sets forth that the environment on campus has further exacerbated the hostility Plaintiff faced.  Specifically, UNLV has allowed groups to march with megaphones, disrupt campus activities, and chant slogans such as "From the river to the sea."  This is clearly an antisemitic chant which calls for the destruction of the sovereign state of Israel and the death of its Jewish inhabitants.

As stated in the Antisemitism and Anti-Israeli Bias at UCLA Report dated October 16, 2024, it should be noted that:

 Hamas uses the phrase "from the river to the sea..." in its 2017 Charter (Section 20) and declares its intention to hunt down Jews everywhere in the world in its 1988 charter, a sentiment which has not been superseded. The phrase has also been used in speeches by Osama bin Laden, Hezbollah's leadership, and Iran's leadership.  For many, "from the river to the sea," calls for elimination of the

State of Israel, and for the land of Israel to be placed entirely under Arab rule. Given the record of many Arab regimes in the region, there is a high probability of the forced displacement of Israeli Jews in these hypothetical circumstances.[1]

Furthermore, Plaintiff has been verbally assaulted on the campus of UNLV because he wears a kippah. *See* SAC at para. 43-45.

The SAC also states in part under the ATA cause of action:

- Hamas is a United States designated Foreign Terrorist Organization that committed, planned, or authorized various acts of international terrorism including its (a) terrorist attack on October 7th; (b) ongoing rocket attacks against non-military, civilian targets; and (c) holding innocent civilians hostage.

- For decades, Defendants have provided substantial assistance to Hamas by acting as its propaganda wing in the United States, recruiting domestic foot soldiers for Hamas, and fomenting violence, chaos, and fear in the United States to support Hamas's short and long-term goals and international terrorist activities.

- Defendants intentionally instigate a mass culture of fear, threats, violence, and overt hatred to intimidate politicians and institutions for the benefit of Hamas by organizing, managing, controlling, and intentionally inciting riots and acts of domestic terrorism as part of its substantial assistance to Hamas.

- Indeed, Defendants themselves are successor entities to an original material support enterprise for Hamas. Defendants are operated primarily by many of those who were senior leaders in the original enterprise.

SAC at para. 241-244.

The SAC added the following language in part under the ATA cause of action:

- Defendants AMP, SJP-UNLV, NSJP continue to provide substantial assistance to the Hamas organization and promote Hamas, including at the UNLV campus, and there is an ongoing risk of violence injurious conduct, and terrorist actions at UNLV. The threats posed by Hamas and Defendants AMP, SJP-UNLV, NSJP, including antisemitic conduct, are an immediate threat to the safety of citizens and students at UNLV, including Plaintiff. Unless enjoined, citizens and students at UNLV face an ongoing risk of violence injurious conduct, and terrorist actions at UNLV. For example, an individual was recently charged with two counts of first-degree murder after a shooting outside a Jewish museum in Washington, DC on May 21, 2025. The suspect in that incident allegedly shouted "free, free Palestine" following the shooting. *Id.*

---

[1] Antisemitism and Anti-Israeli Bias at UCLA, October 16, 2024, at p. 47, available at https://antisemitismreport.org/ (internal footnotes omitted).

- In addition to the discrimination and harassment at UNLV, as a direct and proximate result of Defendants AMP, SJP-UNLV, NSJP conduct at UNLV, and their aiding and abetting Hamas, Plaintiff is in a state of fear and anxiety in light of the ever-present and real threats posed by said Defendants which have been unrestrained at the UNLV campus since October 7, 2023, including that on May 31st, 2024, Plaintiff collapsed in his calculus class. Plaintiff was taken to the UNLV Health and Wellness Center, where his face became paralyzed on-site. He was rushed to Sunrise Hospital and diagnosed with extreme stress disorder, which had triggered Bell's Palsy. After ruling out all viral and bacterial infections, it was concluded that the facial paralysis was stress-induced. Plaintiff's cranial nerve had been severely impacted by the overwhelming levels of stress he has endured. Plaintiff lost the ability to blink, drink water properly, and see out of one eye. A majority of Plaintiff's face was paralyzed and completely unmovable. Plaintiff was discharged with a high-dose steroid treatment, and the paralysis persisted until the end of August 2024. Plaintiff began to slowly regain movement at that time. As a direct and proximate result Plaintiff was forced to withdraw from two additional classes over the summer.

SAC at para. 245-246. Accordingly, Plaintiff has alleged what injuries he sustained and how those injuries arose from the Defendants' conduct. *Compare* Court's Order, ECF 71, at pp. 10-11.

It should be noted that the SAC also states in part under the ATA cause of action:

- It is clear that every time Defendants act in the United States, and more specifically on UNLV's campus, there is a direct nexus between the University groups and Hamas, IRGC, Hezbollah and other Foreign Terrorist Organizations.

- It is also clear that directives being given by Hamas, IRGC, Hezbollah and other Foreign Terrorist organizations are being acted out on U.S. college campuses through Defendants and their organizations on UNLV's campus.

- Defendants knowingly provide substantial assistance to Hamas through their services. Indeed, in the NSJP Toolkit, Defendants confirm not only that they are aware that their propaganda and incitement activities support Hamas but also that they perceive themselves as "PART of" Hamas's "Unity Intifada"—the terror regime that has damaged Plaintiff.

- Defendants knowingly provided substantial assistance to Hamas and thus aided and abetted Hamas in committing, planning, or authorizing acts of international terrorism, including the acts of international terrorism that injured Plaintiff.

- Not only do these acts constitute "substantial assistance" under the civil portion of the Antiterrorism Act, but they also satisfy the Antiterrorism Act's criminalization of providing "material support or resources" to a Foreign Terrorist Organization. See 18 U.S.C. §§ 2339A and 2339B.

- UNLV has also provided substantial assistance to these radical pro-terrorist organizations by allowing them to terrorize and demonize students on UNLV's campus, including Defendants' decision to allow the antisemitic chants and chaos on campus precluding Plaintiff from wearing an open kippa without having to hide it under a baseball cap or other type of head covering.

- UNLV has also provided substantial assistance under the Antiterrorism Act by allowing them to use the student campus to distribute their literature, paraphernalia, and hosting meetings by providing substantial resources to disseminate their antisemitic and anti-American rhetoric and propaganda.

- UNLV has provided substantial assistance by emboldening these Defendants, by their actions and meetings with them, "legitimizing" their cause of terrorizing students on campus.

- Plaintiff has been injured in his person because of Hamas's acts of international terrorism.

- By aiding and abetting Hamas in committing, planning, or authorizing acts of international terrorism, including the acts that caused Plaintiff to be injured in his or her person and property, Defendants are liable pursuant to 18 U.S.C. § 2333(d) for, threefold any and all, damages that Plaintiff sustained as a result of such injuries, and the costs of this suit, including attorney's fees.

*See* SAC 247-256.  The SAC also added:

- Plaintiff is entitled to permanent relief preventing and enjoining AMP, SJP-UNLV, NSJP and its agents, from aiding and abetting Hamas in committing, planning, or authorizing acts of international terrorism at the UNLV campus.

- Plaintiff is entitled to an order enjoining AMP, SJP-UNLV, NSJP and its agents from establishing, implementing, instituting, maintaining, or executing policies, practices, procedures, or protocols that: (i) penalize or discriminate against Jewish and/or pro-Israel students, including Plaintiff; (ii) fund student organizations that exclude or penalize Jewish and/or Pro-Israel students; and (iii) officially recognize student organizations that exclude, discriminate against, or harass Jewish and/or pro-Israel students.

*See* SAC 257-258.

IV.    **ARGUMENT**

A.    **There is personal jurisdiction over AMP in this Court.  Moreover, AMP waived any personal jurisdiction defense.**

Contrary to AMP's contention that it has no forum contacts, the SAC alleges that:

- AMP directs and coordinates the activities of National Students for Justice in Palestine ("NSJP") and its local chapter SJP-UNLV. (SAC at para. 65, 98–99).

- AMP caused, encouraged, and organized "days of resistance" and similar campaigns expressly targeting UNLV's campus and students, including Plaintiff. (SAC at para. 74, 123).

- These activities, carried out under AMP's leadership, foreseeably resulted in hostile campus conditions, direct harassment of Plaintiff, and a severe stress-induced medical crisis. (SAC at para. 136–146, 245–246).

These allegations are not abstract political speech; they describe intentional conduct directed into Nevada with the foreseeable effect of harming a Nevada resident.  Moreover, AMP's claim that it has "no contact" with Nevada overlooks its alleged purposeful direction of activities toward this forum, satisfying the Ninth Circuit's *Schwarzenegger* test, including:

- AMP had purposeful direction, including coordinating with NSJP and SJP-UNLV to organize and promote disruptive and threatening events at UNLV. This constitutes intentional acts expressly aimed at Nevada.

- Plaintiff's injuries including medical trauma, hostile environment, and interference with education, directly arose from these Nevada-focused acts.

- Given the deliberate targeting of Nevada's university and student population, AMP should have reasonably anticipated being haled into court here.

Furthermore, in its Motion AMP downplays the amendments to Complaint.  In its prior order finding lack of jurisdiction, the Court stated in part: "Although Gerwaski alleges that NSJP sent its toolkit out to "more than 300 American college campuses and on the internet," he does not allege that UNLV was one of those campuses or even that SJP-UNLV utilized the toolkit in its activities."

ECF 71, at p. 8, lines 6-9.  Here, the SAC now specifically alleges that "UNLV was one of those campuses that SJP-UNLV utilized the NSJP Toolkit in its activities." SAC at para. 98.

AMP's argument ignores this point, and the motion should be denied on this basis alone. AMP does not deny that the "Toolkit" was used at the UNLV campus.

"In fact, the SJP Toolkit, released after October 7, 2023, SJP openly declared themselves to be part of the "movement" (which refers to Hamas' October 7 attacks), and not just supporters."[2] In this regard, the SAC also alleges that AMP controls NSJP and NSJP communicates with its local chapters including SJP-UNLV.  *See id.*; *see also supra*.  The assertion that Plaintiff did not allege that "AMP knew about the Toolkit, contributed to its contents, or circulated it in any way" is misplaced and is clearly a factual dispute.

While specific personal jurisdiction clearly exists, it also respectfully submitted that AMP waived any personal jurisdiction defense, including, by challenging the merits of the underlying case by filing, not one, but now two anti-SLAPP motions.

Personal jurisdiction flowing from the Due Process Clause may be waived either explicitly or implicitly. *See Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982); *Days Inns Worldwide, Inc. v. Patel*, 445 F.3d 899, 904 (6th Cir. 2006); *Albino v. Baca*, 747 F.3d 1162, 1170 (9th Cir. 2014).  In deciding whether a defendant waived the personal jurisdiction defense, the court must determine whether any of the defendant's appearances and filings in the district court constitute "legal submission to the jurisdiction of the court."  *Gerber v. Riordan*, 649 F.3d 514, 519 (6th Cir. 2011) (internal quotation and citation omitted).  Submissions, appearances, and filings that give a plaintiff reasonable expectation that a defendant will defend the suit on the merits or that cause the court to go to some effort that would be wasted if personal jurisdiction is later found lacking, result in waiver of a personal jurisdiction defense. *Id.*

---

[2] https://isgap.org/wp-content/uploads/2024/05/Student_Justice_Palestine_Report.pdf

The actions of the defendant may amount to a legal submission to the jurisdiction of the court, whether voluntary or not. *Id.* The voluntary use of certain district court procedures may serve as constructive consent to the personal jurisdiction of the district court. *Id.* Indeed, "[a] party need not actually file an answer or motion before waiver is found." *Trustees of Central Laborers' Welfare Fund v. Lowery,* 924 F.2d 731, 732 (7th Cir. 1991); *O'Brien v. Sage Group, Inc.,* 141 F.R.D. 81, 83 (N.D.Ill. 1992), *judgment aff'd,* 998 F.2d 1394 (1993). While the defendants may literally comply with Rule 12(h), they still may "not comply with the spirit of the rule, which is 'to expedite and simplify proceedings in the Federal Courts.'" *Yeldell,* 913 F.2d 533, 539 (8th Cir. 1990) (quoting C. Wright & A. Miller, 5A *Federal Practice and Procedure* § 1342, at 162 (2d ed.1990)).

In the case at bar, AMP's anti-SLAPP filings and Motion for Rule 11 sanctions have given Plaintiff a reasonable expectation that AMP has defended the suit on the merits. More importantly, the Defendants have also already caused the court to expend significant resources as well. *See also, e.g.*, *Massachusetts Mut. Life Ins. Co. v. Woodall*, 304 F.Supp.2d 1364 (S.D.Ga. 2003) ("MMLIC persuasively argues that Woodall has waived his personal jurisdiction and venue defenses by litigating non-jurisdictional matters (*e.g.,* his prior motion to strike, discovery conduct, merits-based stipulation and status report co-generation")). Accordingly, the procedural history and various non-jurisdictional filings by AMP make clear that they have implicitly waived their ability to contest personal jurisdiction. Again, by making this Honorable Court expend its precious resources, and by attacking the merits of the claims via anti-SLAPP motions and a Rule 11 Motion for Sanctions, AMP have waived their ability to contest personal jurisdiction.

In light of the foregoing, the Court has personal jurisdiction over the claims against AMP. Should this Honorable Court feel that it needs additional information, Plaintiff requests discovery on the issue of personal jurisdiction, as well as an evidentiary hearing. *California Offset Printers, Inc. v. Hampton Intern. Communications, Inc.* 945 F.2d 408 (9th Cir. 1991) ("When personal

jurisdiction is contested, the district court may hold a preliminary evidentiary hearing to resolve disputed questions of fact" and "[t]he trial court should allow discovery when material facts bearing on jurisdiction are disputed and it proposes to resolve that dispute"); *Data Disc, Inc. v. Systems Technology Associates, Inc.*, 557 F.2d 1280, 1285 (9th Cir. 1977); *Trump v. Eighth Judicial Dist. Court of State of Nev. In and For County of Clark*, 109 Nev. 687, 857 P.2d 740 (Nev. 1993). Accordingly, if the Court finds Plaintiff's prima facie showing insufficient, limited jurisdictional discovery should be granted to obtain information such as:

- Communications between AMP and NSJP and SJP-UNLV;

- Funding or material support AMP provided to Nevada-based actors;

- AMP's internal documents referencing UNLV or Nevada activities;

- Interrogatories on AMP's communications with Nevada actors;

- Requests for production of documents referencing Nevada, UNLV, or Plaintiff;

- Depositions of AMP's officers on jurisdictional topics.

**B.    Plaintiff has properly alleged an ATA claim**

AMP simply challenges factual allegations regarding its coordination with NSJP and SJP-UNLV and its role in post-October 7 conduct. Whether Plaintiff's allegations will be proven is a question for discovery and trial. The Complaint details in part that under the Antiterrorism Act, "[a]ny national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees." 18 U.S.C. § 2333(a).

"[L]iability may be asserted as to any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism." 18 U.S.C. § 2333(d)(2). Moreover, a defendant may be liable under the Antiterrorism Act even without a "strict nexus" between the substantial assistance and the act of international

terrorism so long as there is "a foreseeable risk" of such act. Indeed, in some cases, "defendant's role in an illicit enterprise can be so systemic that the secondary defendant is aiding and abetting every wrongful act committed by that enterprise." *See Twitter v. Taamneh*, 598 U.S. 471, 495-96 (2023).  It should be noted that *Twitter v. Taamneh* involved an internet platform, whereas here, the Defendants AMP, NSJP and SJP-UNLV are organizations.

Enacted in 2016 over President Obama's veto, the Justice Against Sponsors of Terrorism Act (JASTA), Pub. L. No. 114-222, § 4(a), 130 Stat. 852, 854 (2016) (codified at 18 U.S.C. § 2333(d)) garnered headlines primarily for its amendments to the Foreign Sovereign Immunities Act (FSIA). However, JASTA also amended the ATA to clarify the rules governing suits against non-governmental defendants. As Congress explained in the text of the statute, "[i]t is necessary to recognize the substantive causes of action for aiding and abetting and conspiracy liability under [the ATA]." JASTA § 2(a)(4), 130 Stat. at 852 (codified at 18 U.S.C. § 2333 note). Thus, JASTA sought to make explicit that the ATA provides a civil damages remedy against "persons or entities" "that knowingly or recklessly contribute material support or resources, directly or indirectly, to persons or organizations that pose a significant risk of committing acts of terrorism that threaten the security of nationals of the United States or the national security, foreign policy, or economy of the United States." *Id.* § 2(a)(6) (emphasis added). Indeed, Congress could hardly have been clearer in JASTA's text as to its purpose:

> *The purpose of this Act is to provide civil litigants with the broadest possible basis*, consistent with the Constitution of the United States, to seek relief against persons, entities, and foreign countries, wherever acting and wherever they may be found, that have provided material support, *directly or indirectly*, to foreign organizations or persons that engage in terrorist activities against the United States.

*Id.* § 2(b), 130 Stat. at 853 (emphases added).

To that end, JASTA created 18 U.S.C. § 2333(d)(2):

> In an action under [§ 2333(a)] for an injury arising from an act of international terrorism committed, planned, or authorized by an organization that had been

designated as a foreign terrorist organization [(FTO)] as of the date on which such act of international terrorism was committed, planned, or authorized, liability may be asserted as to any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism.

*Id.* § 4(a), 130 Stat. at 854 (emphases added).

Congress also recognized that, to provide both a meaningful remedy and a meaningful deterrent, civil liability had to extend beyond terror operatives to all who helped to facilitate their unlawful activities, even donors: "By its provisions for compensatory damages, tremble [sic] damages, and the imposition of liability *at any point along the causal chain of terrorism*, [the ATA] would interrupt, or at least imperil, the flow of money." S. REP. No. 102-342, at 22 (1992). (emphasis added).

As stated above, Plaintiff has specifically alleged that Defendant AMP and Defendants SJP-UNLV, NSJP continue to provide substantial assistance to the Hamas organization and promote Hamas, including at the UNLV campus, and there is an ongoing risk of violence injurious conduct, and terrorist actions at UNLV.  As alleged, the threats posed by Hamas and Defendants AMP, SJP-UNLV, NSJP, including antisemitic conduct at UNLV, are an immediate threat to the safety of citizens and students at UNLV, including Plaintiff.

The SAC sets forth that unless enjoined, citizens and students at UNLV face an ongoing risk of violence injurious conduct, and terrorist actions at UNLV.  In addition to the discrimination and harassment at UNLV, as a direct and proximate result of Defendants AMP, SJP-UNLV, NSJP conduct at UNLV, and their aiding and abetting Hamas, Plaintiff is in a state of fear and anxiety in light of the ever-present and real threats posed by said Defendants which have been unrestrained at the UNLV campus since October 7, 2023, including injuries suffered on May 31st, 2024.

It is respectfully submitted that the Court's prior findings that "Gerwaski does not allege any actions by the defendants that substantially assisted the October 7, 2023 act of international terrorism. All of the defendants' conduct alleged in the FAC took place after this event" is

misplaced.  The instant SAC addresses that the Defendants' conduct after the October 7, 2023 has substantially assisted Hamas (including directly after the October 7, 2023 attacks) in terrorizing Jewish students, specifically, Plaintiff at UNLV.  Those allegations must be accepted as true at this stage.  Plaintiff seeks to pursue discovery, including deposing members of the Defendants, deposing staff and witnesses at UNLV, and propounding discovery requests which is believed to support the allegations.

James Comer, Chairman of the Committee on Oversight and Accountability wrot in a letter dated May 29, 2024 to National Students for Justice in Palestine c/o Dr. Osama Abuirshaid, Executive Director of the American Muslims for Palestine (AMP) wrote in part:

> Since the October 7, 2023, terror attack on Israel by Hamas, antisemitic incidences have skyrocketed in the United States. At illegal encampments on college campuses, many individuals have championed antisemitic rhetoric calling for the elimination of Jewish people from Israel, employing "From the river to the sea, Palestine will be free" and "Death to Israel" as rallying cries. The Committee is particularly concerned that organizations promulgating pro-Hamas propaganda and engaging in illegal activities at institutions of higher education might be receiving funding or other support from foreign or domestic sources which support the aims of Hamas4 or other foreign terrorist organizations. We therefore seek documents and information from your organization to facilitate oversight into how pro-Hamas propaganda and illegal encampments are being funded.

> National Students for Justice in Palestine (National SJP), which is founded and controlled by American Muslims for Palestine (AMP), is one group claiming to "support[] over two hundred Palestine solidarity organizations on college campuses across occupied Turtle Island (U.S. and Canada)." It has recently released statements, some purportedly signed by various campus chapter organizations, expressing support for the "Popular University for Gaza, a coordinated pressure campaign against university administrations and trustees to immediately divest from the [I]sraeli state" and pledging, "[a]s we across Turtle Island (the so-called [U]nited [S]tates and [C]anada) and around the world establish encampments and popular, liberated spaces on our campuses…" to "completely divest our tuition dollars from—and to cut all institutional ties to—the zionist entity as well as all companies complicit in the colonization of Palestine." Individuals previously affiliated with Hamas-backed charities are providing the trainings, materials, and financial support to college campus protests. National SJP's new publication, "The Written Resistance", curiously began in September 2023, mere days before the October 7th terrorist attacks. This publication hosts various authors, including editorials from the "Editorial Board" of National SJP. One such editorial from April 2024 positively cites quotes from Mao Tse Tung—an individual directly responsible for the repression and deaths of tens of millions of people—in its efforts to promote the "struggle for liberation against Zionism and US imperialism..."

National SJP founder Dr. Hatem Bazian serves as the Chairman of the National Board of AMP, further solidifying the current relationship between National SJP and AMP. AMP has substantial ties to Hamas via its financial sponsor, Americans for Justice in Palestine Educational Foundation, Inc. (AJP), a 501(c)(3) non-profit organization.14 AJP is currently under investigation by the Virginia Attorney General for violating state charitable solicitation laws and "benefitting or providing support to terrorist organizations." Reportedly, current AMP board members have been involved in fundraising for Hamas charities.

According to the Anti-Defamation League, AMP is the alter ego of the Islamic Association of Palestine (IAP), once the main propaganda arm for Hamas in the U.S., which was dissolved in 2004 after being implicated in terror finance. Several of IAP's employees and officers went on to found AMP as the rebranded material support arm for Hamas.  AMP is also linked to the Holy Land Foundation (HLF), which sent approximately $12.4 million outside the U.S. to support Hamas. Like IAP, HLF was founded by members of Hamas senior leadership20 and was shut down due to five of its officers being convicted for terror financing. Four former employees of HLF now work for AMP, which frequently sponsors events featuring past leaders of HLF and their families.[3]

This case is not about free speech. It is not legal for organizations to support and substantially assist Hamas whereby there is a threat to the safety of citizens and students at UNLV.[4]

Here, Plaintiff has alleged a cognizable injury. The SAC alleges Plaintiff suffered severe medical harm (Bell's Palsy), emotional damages, and educational deprivation as a direct and proximate result of AMP's conduct aiding and abetting Hamas's campaign of intimidation. (SAC at para. 245–246). Unlike in *Fields v. Twitter*, these injuries are not attenuated but are the foreseeable product of coordinated acts on a U.S. campus in response to directives from a designated Foreign Terrorist Organization. Moreover, the SAC details how AMP:

- Exercises control over NSJP and its chapters;

- Disseminates and implements Hamas-aligned messaging and tactics through those chapters;

- Encourages actions that create a hostile environment for Jewish students and directly impair Plaintiff's rights and safety.

---

[3] https://oversight.house.gov/wp-content/uploads/2024/05/Letter-to-National-SJP-5.29.24.pdf (internal footnotes omitted)
[4] It should be noted that Defendant's citation to *Jan v. People Media Project*, No. 3:24-CV-05553-TMC, 2025 WL 359009 (W.D. Wash. Jan. 31, 2025) is misplaced and distinguishable.  That case involved the Alien Tort Statute and the court granted leave to amend.  In its subsequent Order, the court denied the Defendants' Motion to Dismiss. 2025 WL 1311970.

- AMP's public alignment with Hamas's "Unity Intifada" and continued coordination of Hamas-endorsed messaging shows awareness of its role in the broader campaign (SAC at para. 101, 249).

- AMP controlled NSJP, provided infrastructure and support, and enabled on-campus execution of Hamas-aligned tactics, foreseeably advancing the intimidation of Jewish students

These allegations meet the *Twitter v. Taamneh* "knowing and substantial assistance" standard at the pleading stage, where inferences must be drawn in Plaintiff's favor.

The "propaganda" at issue is not mere advocacy; it was part of a coordinated operational plan with foreseeable harmful consequences, which is actionable.

As stated above, and in the SAC, Plaintiff's allegations regarding AMP's use of NSJP's Hamas-aligned toolkit and coordinated campus actions easily meet the threshold for plausibility.

Plaintiff alleges AMP exercises control over NSJP, which directly interacts with Nevada-based chapters. These contacts, taken as true, support a colorable claim of purposeful direction toward Nevada. Notably, AMP does not contest its involvement with NSJP, rather, AMP declares that it is protected by the First Amendment. However, this case does not involve mere "demonstrations, protest marches, and picketing." These are not mere independent advocates; they are recruiters and propagandists for international terrorist organizations and nation-state proxies operating in plain sight throughout the United States. Knowingly providing such services, especially in such an ongoing, systematic fashion, violates the Antiterrorism Act.

Unfortunately, antisemitic conduct has occurred on university campuses across the United States, post-October 7, 2023. Such conduct has resulted in assorted litigation, including certain matters which have arisen in conjunction with reports documenting antisemitism violations. For example, universities' respective task forces (UCLA and Harvard) which found that the universities had fostered an antisemitic environment.

Specifically, in *Frankel et al v. Regents of the University of Southern California et al.*, 2:24-CV-4702, the plaintiffs, three Jewish students and a Jewish professor brought the case in June of 2024, in the wake of UCLA's facilitation of encampments that were run as exclusionary zones that blocked Jews from attending classes, using the library and accessing other essential areas of campus. UCLA's misconduct was documented in a report filed by UCLA's own Task Force to Combat Antisemitism and Anti-Israeli Bias, which found that the university had fostered an antisemitic environment.  *See supra.*  The court granted a preliminary injunction banning the exclusion zones.[5]  The case recently resulted in a $6 million settlement.[6]

In that case, the agitators on the campus refused to let students through unless they disavowed Israel's right to exist.  For a full week, UCLA's administration failed to clear the Jew Exclusion Zone and instead ordered campus police to stand down and allow the illegal encampment to stay. The administration even stationed security staff around the encampment to keep students unapproved by the protesters out of the area. Even after the first encampment was cleared, activists have continued to stage encampments and occupations of public spaces at UCLA.  Even after UCLA's belated decision to disband the initial encampment, agitators continued to erect encampments replete with anti-Semitic imagery and, in one case, an attack on a campus rabbi.

As stated in the Antisemitism and Anti-Israeli Bias at UCLA Report dated October 16, 2024, there are direct citations to Hamas at campus activities:

> "***The encampment was weird because it was at once claiming to be peaceful and anti-war, but also had a critical mass of people who were in support of Hamas, and who would refuse to disassociate with them***. Also, they completely ignored the hostages and the horrific attacks of October 7th. Things intensified after the pro-Israel rally, and after the screen with videos from October 7th was put up directly across the encampment. For so much of the war being on people's private screens, streamed through goPro cameras, through social media, it was jarring to have that screen brought into a public space. It's a lot harder to look away from

---

[5] https://becketnewsite.s3.amazonaws.com/20240813183534/injunction.pdf

[6] UCLA reaches $6 million settlement with Jewish students over campus protests : NPR

the atrocities when it is glaring in your face. But, I am not sure how impactful it was for people in the encampment and for passersby. They may have just seen it as Israeli propaganda. I have friends who thought the encampment was "beautiful" and "peaceful." But, that all felt like a facade. And there was a lot of antisemitic and Anti-Israeli imagery and messaging everywhere."

…

Walking by campus and having routes blocked while seeing signs emblazoned with "Israelis are native to hell"33 and swastikas was a sight I will never forget. It was extremely hard to focus and go on as usual, and I have heard of experiences of those being physically blocked or slapped because they showed signs of Jewish identity or were known to not agree with the encampment's values. My roommate was walking home when someone from the encampment screamed "We are terrorism" at her. **While I am extremely dedicated to free speech, there is no context in which swastikas are ok, Hamas headbands are on**. or this level of disrupment is accepted.

…

"**I was approached and told by a protestor that she belongs to Hamas**. A friend of mine was pepper sprayed by a protestor for her Jewish identity. I put up posters of kidnapped Israelis on the Jewish Law Students Association, as I was authorized to do, only for them to be repeatedly ripped down.43 I had to walk past chants calling for the extermination of my people and chants supporting genocidal terrorist organizations on a regular basis."

"I was assaulted, threatened, and harassed during the encampment. I had an Israeli flag and a man ran towards me in order to push me. I was blocked for being Jewish. They were calling for an intifada collectively which is to kill the Jews. They had a star of david on the floor with the writing "step here" next to it.44 **Some of the people there were praising Hamas who's main goal (also stated in their charter) is to kill Jews. I was told to kill myself from people**. It also prevented me from getting to class on time and utilizing campus resources. The people at the protest were told not to talk to me because I'm from Israel. I also think that it's a shame that UCLA let the protestors stay in the quad (which they did illegally) but they wouldn't let me and my friends who weren't doing anything violent or illegal go past the fence (on the Israeli side) with the press to talk on TV."

*See id.* UCLA Report at pp. 27, 35 (emphasis added).

Accordingly, the involvement of the Defendants at UNLV, specifically AMP and Defendants SJP-UNLV, NSJP, including their assistance of (and association with) Hamas is a genuine material factual issue that precludes dismissal.

Furthermore, at Harvard, several matters have recently arisen as a result of antisemitic conduct on the campus.

- There is a pending matter involving the school and the government, but there has not yet been a settlement.  This arose after the Trump administration's termination of more than $2.6 billion in funding over its handling of antisemitism. Harvard sued the government and defended its right to control academic and campus policies.  There were also detailed reports by the school finding antisemitic conduct,[7] including a violation of Title VI found by the U.S. Department of Health and Human Services Office for Civil Rights, with incidents involving direct student-on-student harassment and targeted harassment by *student groups*, including Harvard student groups and faculty groups posted to Instagram an antisemitic cartoon that included the Star of David, dollar signs, and nooses.[8]

- Harvard University has settled three lawsuits related to antisemitism on campus, one with Students Against Antisemitism and another with the Brandeis Center for Human Rights Under Law and Jewish Americans for Fairness in Education. These largely related to general claims outlined in the task force reports. A separate settlement was reached with former Harvard Divinity School student Alexander Shabbos Kestenbaum, who also sued the university over antisemitism.

- The settlements involve Harvard agreeing to strengthen its policies against antisemitism and adopt the International Holocaust Remembrance Alliance (IHRA) definition of antisemitism. The specific terms including any financial compensation are not public. Again, the case involving Alexander Kestenbaum was settled but the terms are not public.

---

[7] Presidential Task Force on Combating Antisemitism and Anti-Israeli Bias, April 29, 2025 https://www.harvard.edu/wp-content/uploads/2025/04/FINAL-Harvard-ASAIB-Report-4.29.25.pdf; see also Presidential Task Force on Combating Anti-Muslim, Anti-Arab, and Anti-Palestinian Bias, April 29, 2025 https://www.harvard.edu/wp-content/uploads/2025/04/FINAL-Harvard-AMAAAPB-Report-4.29.25.pdf

[8] https://www.hhs.gov/sites/default/files/harvard-title-vi-notice-violation.pdf

In that case, he encountered various antisemitic incidents, including roving mobs and other documented incidents of antisemitism.

- Barnard College, StandWithUs Center for Legal Justice, Students Against Antisemitism, Inc. and the Barnard student plaintiffs in the federal court action *Students Against Antisemitism, Inc. et al v. The Trustees of Columbia University in the City of New York et al (S.D.N.Y. 1:24-cv-01306-VSB-SN)* announced an agreement to resolve claims against Barnard College.  As part of the settlement, Barnard has committed to implement important measures to address antisemitism on its campus and to ensure access and inclusion of all students to the College's educational mission and environment.[9]

- AMP and NSJP, among other Defendants, have also been sued in the Eastern District of Virgina Case styled *Parizer et al v. AJP Educational Foundation, Inc. et al*, 1:24-cv-00724-RDA-IDD.  That case specifically involves allegations regarding the use of the "Toolkit."[10] The Complaint in that case specifically states in part "When someone tells you they are aiding and abetting terrorists—***believe them***."  *Id.* (emphasis in original).

Likewise, here, Mr. Gerwaski, like other students at UNLV, has been victimized by the antisemitic and tortious conduct on the UNLV campus, post October 7, 2023.  He has properly asserted his claims against the Defendants and the Motion to Dismiss should be denied.

**C.      The Conspiracy Claim is properly pled and is factually supported**

Lastly, Defendant argues that the civil conspiracy claim should be dismissed because Plaintiff has not "alleged any agreement between AMP and the other defendants, much less with the particularity required by FRCP 9(b)."  This argument, again, is incorrect and is a factual dispute. Moreover, Plaintiff's allegations of coordinated action with NSJP, SJP-UNLV, and other groups to advance Hamas's objectives survive at the pleading stage.  The alleged conspiracy is also

---

[9] https://www.kasowitz.com/media/client-news/kasowitz-and-barnard-announce-settlement-of-lawsuit/

[10] https://ia804601.us.archive.org/14/items/gov.uscourts.ilnd.464113/gov.uscourts.ilnd.464113.1.2.pdf

specifically alleged in the SAC.  For example, the launch of the on-campus activities, including the launch of the "Toolkit" were directly after the October 7, 2023 attacks:

- Within hours of the attack, the language of the Hamas-authored disinformation campaign appeared in NSJP propaganda across social media and on college campuses. Exactly as AMP intended, NSJP acted as Hamas' loyal foot soldiers for Hamas's propaganda battle on university campuses across the United States. The next day, NSJP released its Day of Resistance Toolkit ("NSJP Toolkit")[11] across more than 300 American college campuses and on the internet.

- The Toolkit, literally, was an instruction manual including the following pictures as guidelines for online media distribution whereby student organizations would simply use Canva to modify the prototype provided by NSJP, and subsequently blast it out on social media networks, such as Facebook, Instagram, Twitter, Snapchat, Tik Tok.

- Immediately thereafter, SJP-UNLV and NPL had coordinated their "day of rage" hosting a variety of off campus protests initially in downtown, Las Vegas in accordance with directives issued by Hamas.

- Subsequently SJP-UNLV coordinated with non-student groups to facilitate antisemitic protests on UNLV's campus with other non-student organizations such as NLP, the Fifth Sun Project, and Red Desert Collective, among others, in clear advancement of carrying out NSJP's and Hamas' instructions in Las Vegas.

- These organizations worked in unison with SJP, taking instructions from NSJP to wreak havoc on UNLV's campus with antisemitic protests commencing on October 19, 2024 and continuing to present day.

- The NSJP Toolkit is a direct response to Hamas' "call for mass mobilization" issued the day prior. In it, NSJP demands its members and allies "not only support, but struggle alongside our people back home … and above all normalize and support our fearless resistance."

- To do so, the NSJP Toolkit puts forth a strategy to "normalize the resistance," Hamas, by arguing that Liberation is not an abstract concept… [L]iberating colonized land is a real process that requires confrontation by any means necessary. In essence, decolonization is a call to action . . . It calls upon us to engage in meaningful actions that go beyond symbolism and rhetoric. Resistance comes in all forms—armed struggle, general strikes, and popular demonstrations. All of it is legitimate, and all of it is necessary. (emphases added).

- AMP controls NSJP and NSJP communicates with its local chapters including SJP-UNLV. UNLV was one of those campuses that SJP-UNLV utilized the NSJP Toolkit in its activities.

SAC 90-98.  Plaintiff's SAC contains specific allegations to support how the Defendant groups worked together to engage in the conduct at UNLV.

---

[11] DAY-OF-RESISTANCE-TOOLKIT.pdf (imgix.net)

If this Honorable Court finds that a cause of action does not state a claim upon which relief can be granted, Plaintiff requests leave to amend. Generally, FRCP 15 advises the court that "leave shall be freely given when justice so requires." This policy is "to be applied with extreme liberality." *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 712 (9th Cir.2001); *Foman v. Davis*, 371 U.S. 178 (1962). Dismissal with prejudice and without leave to amend is not appropriate unless it is clear on de novo review that the complaint could not be saved by amendment. *Chang v. Chen*, 80 F.3d 1293, 1296 (9th Cir. 1996). A district court's failure to consider the relevant factors and articulate why dismissal should be with prejudice instead of without prejudice may constitute an abuse of discretion. *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986).

Dismissal with prejudice would be reversible, especially in light of the fact that jurisdictional facts are disputed, Plaintiff has pled additional injury and detail in the SAC, and AMP's control over relevant evidence justifies targeted discovery.

## V.    CONCLUSION

AMP's Motion to Dismiss should be denied in its entirety. At a minimum, Plaintiff's Countermotion for Limited Jurisdictional Discovery should be granted.

DATED this 15th day of August 2025.

Respectfully Submitted:

CHESNOFF & SCHONFELD

By: <u>Robert Z. DeMarco</u>
    DAVID Z. CHESNOFF, ESQ.
    Nevada Bar No. 2292
    RICHARD A. SCHONFELD, ESQ.
    Nevada Bar No. 6815
    ROBERT Z. DEMARCO, ESQ.
    Nevada Bar No. 12359
    Counsel for Plaintiff, *COREY GERWASKI*

## **CERTIFICATE OF SERVICE**

Pursuant to Fed. R. Civ. P. 5(b), I hereby certify that a copy of the foregoing document was electronically filed with the Clerk of the Court to be served by the Court's electronic filing system on all counsel of record.

**DATED** this 15th day of August 2025.

/s/ Robert Z. DeMarco
Employee of Chesnoff & Schonfeld